## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| CONTINENTAL AIRLINES, INC., et. al | ) |
| | ) |
| Debtor | ) |
| | ) Case No. 90-932 &90-933 (MFW) |
| | ) |
| **Ramon E. O'Neill** | ) Civil Action No. 06-568 (SLR) |
| **J. Trigg Adams** | ) **(Lead case)** |
| **Brownie N. Inman** | ) |
| | ) |
| Appellants | ) |
| v. | ) |
| | ) |
| | ) |
| JAMES BALDRIDGE, WILLIAM MANN | ) |
| and LARRY DUNN. | ) |
| Representatives of the LPP CLAIMANTS, | ) |
| | ) |
| and | ) |
| | ) |
| CONTINENTAL AIRLINES, INC. | ) |
| | ) |
| Appellees, | ) |
| | ) |
| | ) |

## REPLY BRIEF OF APPELLANT RAMON E. ONEILL

Ramon E. O'Neill
7424 SW 129 Ct.
Miami, Fl. 33183
(305) 386-4866  Home
(786) 252-0175  Cell
avionloco@aol.com

Dated May 2, 2007



## I. Introduction

Why are we here again in front of this Court? The answer is simple, the debtor has lied and the debtor has been caught. Not only did the debtor lie but this time the debtor has willing accomplices, including class counsel and the class representatives. I do not like to use the terms: lies and liars. I am a courteous and respectful person and would not use those terms, normally, even when a person has transgressed in that direction. I apologize to the Court that I know no other way to describe the terrible misrepresentations that have been made to the Courts and the Bankruptcy Court, in particular, by Continental, Class Counsel and Class Representatives.

The lies had very serious consequences for the Class of LPP Plaintiffs. Three out of four, or to put it another way, 1500 of 2000 LPP Plaintiffs who should have received the Settlement Award approved by the Bankruptcy Court were either eliminated by a direct lie to remove them from the list of LPP Plaintiffs (1220 pilots hired after Mar 3 1989), willfully eliminated as the 256 pilots hired before Mar 1989 (later to become the B list pilots) , or after I was instrumental as an unpaid Pro Se appellant to have all LPP Claimants reinstated by Appeals Court, again, maliciously and willfully eliminated.

I am petitioning this Court to instruct the Bankruptcy Court to re-open this case to investigate the fraud. If the fraud is recognized as such by this Court or the Bankruptcy Court the settlement should be nullified, Bankruptcy protection removed and the case should be remanded to arbitration ; or if fraud is not confirmed to compel the debtors to fully comply with the January 31, 2002 Bankruptcy Court order. By full compliance, I mean and request that the 1220 pilots hired after Mar 3, 1989 and

the 196 hired before Mar 3, 1989, and any LPP Plaintiffs who should have been identified and notified receive the Settlement Award the Bankruptcy Court intended.

This Court as well as the Appellate Court upheld the settlement agreement and now the debtor as well as the Bankruptcy Court should comply with the same settlement order which would provide Continental protection from the consequences of arbitration..

There is no *res judicata*. All I am trying is to do is enforce an order which this Court has determined to be fair and equitable. There is no *res judicata* when the debtor lies and commits perjury within a chapter 11 proceeding. But there is 18 USC § 152 and § 157 which explicitly prohibits any party to conduct false and/or fraudulent statements, representation, declarations, conceal documents and falsify record information in a title 11 proceedings.

The settlement agreement is a no-opt-out order, in very simple words, I cannot opt out nor can Continental opt out. This settlement agreement was brought forward by Continental as demonstrated on the September 20, 1999 letter from Continental to Miles J. Tralins (Class counsel). The letter states, page 1 first paragraph:

*"This proposal is made in order to avoid the burden, inconvenience and expense of litigating those claims, including the litigation of a seniority integration arbitration which will be a necessary precedent to liquidating the claims in the Delaware Bankruptcy Court."* (EXHIBIT 1).

In simple words it is a settlement in lieu of a right to arbitrate, an individual right reaffirmed by this Court on November 29, 1995, the honorable Longobardi presiding. An obligation which Continental acknowledges in its letter to the National Mediation Board on November 11, 1998. (EXHIBIT 2).

The issues in dispute are the events that transpired after the settlement order of

2

January 31, 2002. The motions filed after the April 02, 2002, the bar date established in

the settlement order, not only prove that the settlement was a total scam, but it also

proves Continentals' intentions of non compliance with its obligation to arbitrate and/ or

compensate members of the Class for their right to arbitrate.

## STATEMENT OF FACTS

Continental in its answering brief states: ***"The appellants' opening briefs spins a
fainful tale of fraud and deception in an attempt to goad the Court into revisiting the
Baldridge Settlement and the issue of class membership. The appellants' unrelenting
accusations are completely unsupported by any fact or document in the record of these
appeals."*** (Page 1 "Introduction" second paragraph)

Again, I warn this Court to be careful, the three main documents used in my

opening Appeal brief (listed below) were three documents that Continental requested to

be forwarded from Bankruptcy Court to this Court upon filing of my notice of appeal.

Also the documents mentioned below were used by Continental on their motion to

dismiss this appeal. The remainders of the documents in my opening brief are exhibits

attached to these documents.

a)    **MOTION OF CLASS ACTION PLAINTIFFS FOR FINDING THAT NEWLY
IDENTIFIED FORMER EAL PILOTS ARE MEMBERS OF THE CLASS, FOR ENTRY OF
ORDER REQUIRING CAL TO FUND THE SETTLEMENT FOR THE CLASS MEMBERS, FOR
90 DAY EXTENSION OF TIME TO PROVIDE NOTICE AND FOR APPROVAL OF FORM OF
NOTICE**
Bankruptcy Court Docket 169 4/25/2002

b)    **DEFENDANTS OBJECTION TO MOTION FOR FINDING THAT NEWLY IDENTIFIED
FORMER EAL PILOTS ARE MEMBERS OF THE CLASS, FOR ENTRY OF ORDER
REQUIRING CAL TO FUND THE SETTLEMENT FOR THE CLASS MEMBERS, FOR 90 DAY
EXTENSION OF TIME TO PROVIDE NOTICE AND FOR APPROVAL OF FORM OF NOTICE.**
Bankruptcy Court Docket 257 dated 6/7/2002,

c)    **REPLY TO DEFENDANTS' OBJECTION TO MOTION OF CLASS ACTION
PLAINTIFFS FOR FINDING THAT NEWLY IDENTIFIED FORMER EAL PILOTS ARE
MEMBERS OF THE CLASS, FOR  ENTRY OF ORDER REQUIRING CAL TO FUND THE
SETTLEMENT FOR THE NEW CLASS MEMBERS, FOR 90 DAY EXTENSION OF TIMETO
PROVIDE NOTICE AND FOR APPROVAL OF FORM OF NOTICE.**
Bankruptcy Court Docket 290, dated 6/12/2002

3

The five affidavits which I refer to in my opening brief were the five affidavits used to in support of the approval of the settlement agreement, the settlement agreement which I am seeking to enforce. The above documents proving that five affidavits to be an intentional act of perjury is one of the issues this Court will have to address in this Appeal. It is obvious that Continental will not address the subject, they avoided addressing the issue on their answering brief. Continental and Class representatives cannot refute their own actions.   Continental and Class representatives knew the consequences of perjury, deception and omitting documents in a Chapter 11 proceeding.

For this Court to better understand how Continental's lies and deceptions have convoluted this case, I will bring forward the most critical  lies  and the  intent in a time line fashion. I will take the liberty to emphasize those facts which have never been brought forward to the Courts in the lengthy history of this case. All of these facts of which Continental was obligated to disclose to the Bankruptcy Court, and Continental chose not  so they could gain greater relief during the bankruptcy proceedings. This Court has to come to terms with the reality that Continental has avoided any discovery through out the entire case.  Every lie has its supporting document, which are either Continental internal memos, Department of Transportation orders, Arbitration awards and motions submitted by Continental and/or Class Representatives.

**February 24, 1986**    The collective bargaining agreement was signed at 2:45 a.m. on February 24, 1986.  Eastern Air Lines v. Airline Pilots Ass'n Int'l, 670 F.Supp. 947, 949 (S.D. Fla. 1987), aff'd 861 F.2d 1546 (11th Cir. 1988)

Shortly after the collective bargaining agreement between Eastern and ALPA was signed, Texas Air Corporation ("Texas Air") acquired Eastern.  Eastern Air Lines v. Airline Pilots Ass'n Int'l, 861 F.2d at 154

4

**March 9, 1989**    Eastern filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.


**September 22, 1989**  In an arbitration decision; a panel of the Eastern-ALPA System Board of Adjustment chaired by Professor Frank Elkouri interpreted that language to encompass sections 2(a), 3, and 13 of the standard "Allegheny-Mohawk LPP's."

In accordance with those LPPs, if Eastern and another carrier were to "unify, consolidate, merge, or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them" in a manner affecting the seniority rights of the Eastern pilots, "provisions shall be made for the integration of seniority lists in a fair and equitable manner."


**December 3, 1990**    Continental filed for bankruptcy.


**January 19, 1991**     Eastern ceases operations.

Three types of airplanes were transfer to Continental DC-10's, Boeing 757's and Airbus A300's

*Continental had never operated  Boeing 757's and Airbus A300's. For the sake of simplicity Eastern had pilots trained in these airplanes and Continental did not.*


*For this Court better understanding of training cost I will take the liberty to explain the mechanism that Continental had to go through in order to train one crew on the Airbus A300.*

*Continental basically had to remove at least five pilots from flight duties for a period of 3 months and pay these five pilots their salaries while they were in training. Continental had to also replace at least 2 pilot empty slots by hiring pilots from the street. One Airbus A300 cost Continental what we refer  in the industry seven  training cycles for a period of at least 3 months.*

*Each aircraft requires five full crews to operate on a monthly basis, this equates to 15 pilots. 5 times 7 training cycles equates to 35 pilots in training.*

*Continental had the capabilities of bringing in fifteen fully trained pilots on the from the Eastern ranks and in less than 30 days these three Eastern pilots would have been producing revenue. This equates to a lower  training cost..*

**August 13, 1991**    *The merger arbitration award between some of  the Continental Airlines Groups was rendered (Ross arbitration). It included Continental Airlines, People Express Airline, New York Air and Frontier Airlines pilots. The Eastern pilots were not participants in this merger arbitration.*

*This arbitration was hidden from the Bankruptcy Court and therefore Continental never asked for any relief from the high cost of training this award created. Continental violated 18 U.S.C. by hiding the award from the Courts.*

*The narration of the arbitration award brings four very interesting conclusions.*

*a)    Continental was willing to spare the high cost of training among these carrier pilots for the sole reason that they were non union pilots.*

*b)    Continental was willing to deal with the low morale within these pilots.*

*c)    Eastern pilots had been merged into the Continental and Continental had not and would not inform the Courts.*    (EXHIBIT 3)

**September 24, 1991**   After Continental had merged all the airlines operationally including Eastern, Continental started to sell overlapping international routes. Every transaction in which an Eastern route was sold Continental took the position that none of the  Eastern Employees Collective Bargaining agreement contained Labor Protective Provisions. Continental was deceiving the Department of Transportation as well as the buyer of the routes in order to obtain a higher monetary value for these assets.

An example of this conduct is included as **EXHIBIT 4**, Department of Transportation docket 47390. The following paragraph is extracted from this document page 3 paragraph 4.

6

*The joint applicants also assrt that they do not anticipate any labor issues arising from this transaction. Eastern employees will not be affected by the transfer because substantially all of them have been given notice of termination effective as of February 2, 1991. According to the joint applicants, neither this transaction nor this type of transaction has been the subject of recent collective bargaining between Eastern and a union representing Eastern employees, or Delta and a union representing Delta employees.*

*If this is not a Lie, then I will definitely have problems recognizing the Truth.*

**April 16, 1993**   Judge Balick entered an Order confirming Continental's Joint Second Plan of Reorganization, as Modified ("Plan of Reorganization"). The Plan of Reorganization took effect on April 27, 1993. When the bankruptcy court confirmed Continental's Plan of Reorganization, it noted that the $450 million investment was "crucial to the feasibility of the [Reorganization] Plan."

Continental argues that a "forced" 'date of hire' seniority integration would entail up to $100 million in retraining costs" and the "displacement of thousands of Continental pilots." The court notes that this argument was made prior to the Settlement Agreement. The present consequences of seniority list integration would certainly be less drastic, as is obvious from my explanation above, and certainly obvious to Continental

In addition, the arbitrator is not required to integrate the seniority lists strictly by "date of hire". An arbitrator would be charged with integrating the seniority lists in a fair and equitable manner. If a strict "date of hire" integration scheme would be inequitable, then an arbitrator would not order it.

*The events of January 19, 1991 and August 13, 1991 had not been disclosed to the Bankruptcy Court. If Continental would have disclosed them Continental's argument would have been proven invalid. Again not disclosing documents and perjury carry consequences.*

7

**May 7 to May 17, 1993**   *Continental internal memos clearly demonstrate that Continental would go to any extent to keep the Eastern pilots away from merging with Continental because of the union affiliation of the Eastern pilots. In this country such act is known as union busting. In simple words Continental used the Bankruptcy Court in order to conduct its union busting.*

**March 24, 1994**   The Airline Pilots Association (ALPA) and Continental settled nearly all litigation, grievances, arbitration, and bankruptcy claims that had previously been brought by ALPA The Settlement Agreement was approved by the bankruptcy court on July 19, 1994, and ALPA thereafter ceased being the bargaining agent of any Eastern pilot . If ALPA was not the collective bargaining representative of the LPP Claimants, then it could not settle the claims of the LPP Claimants. If ALPA was the collective bargaining representative of the LPP Claimants, then while ALPA had the power to settle the claims of the LPP Claimants, the language of the Settlement Agreement makes clear that ALPA did not settle those claims, but notes specifically that they remain as they were before, and that the individuals must pursue further, on their own.

**August 15, 1994**   Continental notified this Court, and by carbon copy the LPP Claimants, that it intended to file a motion to dismiss the appeal of the LPP Claimants on the grounds that ALPA's settlement of the underlying claims was binding upon them. (Civ. A. 94-496, D.I. 9 at A-82).

**September 12, 1994**   Continental filed another motion to dismiss the appeals of ALPA and the LPP Claimants as moot. In the brief accompanying that motion

8

Continental argued that ALPA represented the LPP Claimants in the Kasher Arbitration, which was the forum in which the LPP dispute was to be decided. (D.I. 49). ALPA has settled the LPP dispute with Continental. That Settlement Agreement was approved by the bankruptcy court on July 19, 1994. Therefore, argues Continental, ALPA and the LPP Claimants no longer have standing to prosecute the LPPs. Obviously Continental was wrong, as it ignored the clear language in the Continental/ALPA settlement.

**November 29, 1995**   This Court, the honorable Joseph J. Longobardi presiding vacates the permanent injunction contained in Section 12.19 of Continental Plan of Reorganization and re-establishes our right to arbitrate.

The honorable Longobardi and ALPA were unaware of the omissions of documents by Continental which clearly proved that Continental had lied in the Reorganization Plan. (See August 13, 1991 and September 24, 1991 above)

Also this Court in the content of its discussion within this opinion brings out the following :

> *2. Second Motion to Dismiss as Moot*
>
> *The issue raised in the Second Motion to Dismiss as Moot is whether the Settlement Agreement signed by ALPA moots the LPP dispute, thereby mooting the appeal of both ALPA[13] and the LPP Claimants. Continental argues that it has settled with the only party capable of asserting the right to seniority list integration, so the LPP dispute is now moot. While the parties dispute whether ALPA represents the LPP Claimants, representation is irrelevant.[14] The issue is whether individual pilots can assert a right to seniority list integration under the collective bargaining agreement, and if so, whether the Settlement Agreement disposes of those right.*
>
> *The reply brief of Continental demonstrates that the Settlement Agreement had no effect at all on the rights of the LPP Claimants:*

> *The settlement was plainly intended to leave individual pilots in the same position they were prior to the settlement – no better, no worse.*

9

*(D.I. 55 at 2). The language of the Settlement Agreement, and the briefs of the other parties, support this statement. Thus, Continental cannot seriously claim that the settlement mooted the appeals. Rather, Continental asserts that the seniority integration rights were group rights that could only be asserted by ALPA, and the individual LPP Claimants never had standing to bring the LPP claims.[15]*

*The substantive issue is, as previously noted, whether the LPP Claimants have individual rights to seniority integration under the LPPs. Before reaching that issue, however, this court must decide that it, rather than an arbitrator, has the power to make that determination. This depends upon whether seniority is a "major dispute" or a "minor dispute."*

*As stated by the Supreme Court, "major disputes seek to create contractual rights, minor disputes to enforce them." Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 302 (1989). A minor dispute relates either to the meaning or proper application of a particular provision...." Id. at 303 (quoting Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 723 (1945)); see also United Transp. Union v. Conemaugh & Black Lick R.R. Co., 894 F.2d 623, 628 (3d Cir. 1990) ("minor dispute concerns the meaning and application of provisions of the negotiated agreement"). The burden of showing that a dispute is minor is "relatively light." General Comm. of Adjustment, United Transp. Union, Western Maryland Ry. Co. v. CSX R.R. Co., 893 F.2d 584, 591 (3d Cir. 1990). When in doubt, courts construe the dispute as minor. Id.; Air Line Pilots Ass'n v. Eastern Air Lines, 869 F.2d 1518, 1521-22 (D.C. Cir. 1989); Chicago & north Western Transp. Co. v. International Bhd. of Elec. Workers, Local Union No. 214, 829 F.2d 1424, 1428-29 (7th Cir. 1987).*

*The LPP dispute is a minor dispute. The controversy involves whether the Eastern and Continental have "merged" within the meaning of the LPPs which are part of the collective bargaining agreement. A district court's role in minor disputes is limited to protecting the jurisdiction of the arbitration board. Chicago & North Western Transp. Co. v. International Bhd. of Elec. Workers, Local union No. 214, 829 F.2d 1424, 1428 (7th Cir. 1987). The federal court cannot consider the merits of the underlying dispute or the remedy that might be appropriate. General Comm. of Adjustment, United Transp. Union v. CSX Railroad Co., 893 F.2d at 592-93; Air Line Pilots Ass'n v. Eastern Air Lines, 869 F.2d at 1518, 1521 (D.C. Cir. 1989).*

*The issue of whether the LPP Claimants have individual rights to seniority integration under the LPPs is not properly before this federal district court.[16] Therefore, this court will not dismiss the claims of the LPP claimants based on their alleged lack of standing to assert the contractual right to seniority integration.[17]*

---

*13. Continental does not seek to enforce the promise made by ALPA to withdraw its appeal. This court sitting as an appellate court, will not do so sua sponte.*

*14. If ALPA was not the collective bargaining representative of the LPP Claimants, then it could not settle the claims of the LPP Claimants. If ALPA was the collective bargaining representative of the LPP Claimants, then while ALPA had the power to settle the claims of the LPP Claimants, the language of the Settlement Agreement makes clear that ALPA did not settle those claims.*

*15. Continental does not claim that the LPP Claimants have no standing on appeal. Because the second February 1993 Order specifically bound the LPP Claimants, they have standing to appeal that order.*

*16. Jurisdiction may lie with an adjustment board in accordance with its normal jurisdiction over minor disputes, or jurisdiction may lie with a Section 13 LPP Arbitrator as provided by the LPPs. The issue of which of those two fora is appropriate is not properly raised in this appeal.*

*17. There is administrative precedent for the proposition that the LPP Claimants may individually assert their seniority rights. See, e.g., In re North Central-Southern Merger Case, 82 C.A.B. 1, 1979 WL 21508, *63, Orders 79-6-7, 79-6-8 (May 15, 1979) ("labor protective provisions represent a formula for protecting individual employees" from hardships involved with merger. "The spouses as individuals are clearly entitled to the benefit of the labor protective conditions").*

**August 29, 1997**      Third appellate Court decision the honorable Mansmann,

Lewis and Michel presiding. This opinion reaffirms the District Court opinion (directly

above) and expands more on the validity of the Eastern Pilots Collective Bargaining

Agreement (CBA) and the individual right of each pilot covered by the (CBA) to

arbitrate.

    The Appellate Court in the content of its discussion within this opinion brings out

the following:

*Continental does not dispute that it did not follow the requirements set forth in section 1113 to reject the collective bargaining agreement. Instead, Continental suggests that the imposition of the injunction was consistent with the bankruptcy court's authority to determine the administrative priority and status of the bankruptcy claims. Thus, it argues, section 1113 cannot divest the bankruptcy court of jurisdiction to exercise this authority and impose the injunction. We disagree.[14]*
*The injunction allowed Continental to avoid its obligation to arbitrate the merger dispute under the LPPs. In In re Ionosphere, the Court specifically held that the application of the section 362 automatic stay provision to effectuate this result in the absence of the debtor's compliance with the requirements of section 1113 was impermissible, as "its application would allow a debtor unilaterally to avoid its obligation to arbitrate." In re Ionosphere, 922 F.2d at 993. Here, the enforcement of the statutory injunction in the face of Continental's failure to follow the requirements of section 1113 is no different. As the enforcement of the injunction would have the effect of permitting Continental to escape its duty to arbitrate under the collective bargaining agreement, we decline to enforce the statutory injunction in the absence of Continental's compliance with the requirements to reject the collective bargaining agreement.[15]*

### 2. Duty to Arbitrate

Finally, we reject Continental's argument that it has no duty to arbitrate the LPP dispute. Throughout this litigation, Continental has premised its arguments on the assumption that it is bound by the LPPs and has a duty to arbitrate the LPP dispute. In so doing, Continental reaped enormous benefits: (1) it was able to obtain a ruling that the claim based on seniority integration could be treated as a right to payment in bankruptcy, satisfiable by a monetary award; and (2) in turn, it received backing from investors for its plan of reorganization, which was critical to plan confirmation by the bankruptcy court.[16] Now, Continental maintains that there has been no determination that it is bound by the LPPs and that the case should be remanded to the district court for a determination on the merits of its duty to arbitrate the dispute.

In light of overwhelming advantage that Continental derived from maintaining the position that it was bound by the collective bargaining agreement, and thus, had a duty to arbitrate the LPP dispute, we refuse to allow Continental to repudiate that representation and return to the district court to litigate the issue whether it is bound by the agreement. See EF Operating Corp. v. American Bldgs., 993 F.2d 1046, 1050 (3d Cir. 1993) ("one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so . . . a reviewing court may properly consider the representations made in the appellate brief to be binding as a form of judicial estoppel, and decline to address a new legal argument based on a later repudiation of those representations.") Accordingly, we conclude that Continental is bound by its prior representations that it has a duty to arbitrate the LPP dispute.

### III.

For the foregoing reasons, we affirm the district court's decision in all respects.

14. We have not been required previously to address the applicability of arbitration under collective bargaining agreements when the employer is in bankruptcy, although the issue was raised in a case we decided last year. See Antol v. Esposto. 100 F.3d 1111. 1121 n.4 (3d Cir. 1996) ("[W]e need not decide that interesting issue here."). This case, however, requires us to do so.

15. Despite our conclusion that failure to comply with section 1113 bars an injunction of the arbitration, we reject the Claimans' contention that the substitution of a monetary damage award, in lieu of seniority integration, is not permitted under section 1113 because it alters or modifies the terms of the collective bargaining agreement. The bankruptcy court's determination of the administrative priority and status of the claims was not based on an interpretation of the LPPs. Nor did it predetermine the appropriate remedy warranted under the LPPs, thus "nullifying" the agreement and infringing on the arbitrator's jurisdiction. Substitution of the equitable remedy in no way amounts to an alteration or termination of the terms of the collective bargaining agreement.

16. It is apparent that Continental assumed this position in efforts to obtain judicial confirmation of its plan of reorganization. In its Motion for Partial Summary Judgment, Continental stated:

1. [Debtors] make this Motion For Partial Summary Judgment On Their Partial Objection to Claims Based On Certain Alleged Labor  Protective Provisions Involving The Air Lines Pilots Association, International ("ALPA") And Eastern Air Lines, Inc. ("Eastern") in order to ensure that they will be able to reorganize successfully and more specifically, to satisfy a condition of the Investment Agreement dated November 9, 1992 ("Investment Agreement"), by and among [the investors] an the

*Debtors. In addition to monetary damages, these claims seek to require Continental to hire several thousand Eastern Air Lines pilots, which if granted would necessitate the displacement of an equal number of incumbent Continental pilots. Debtors seek in this Motion a legal determination   that   the "LPP Claims" . . . are, at best, dischargeable, prepetition general unsecured claims within the meaning of the Bankruptcy Code Section 101(5).*

## ARGUMENT

Every District Court and Appellate Court decision has protected the unrejected

CBA, therefore at the same time protecting the pilots covered by the CBA, which are all

pilots on Eastern seniority list.

Even the Bankruptcy Court protected every pilot covered by the CBA referring to

the January 31, 2002 (Baldridge settlement agreement) by allowing to file a proof of

claim by April 3, 2002. The Appellate Court also reaffirms such rights in its May 5, 2004

*To the extent that O'Neill argued that other pilots were missing from the class list, the settlement, as approved by the Bankruptcy Court on January 31, 2002, included a clause which allowed other class members who met the definitions to file a claim by April 3, 2002. Thus, this objection to the class certification was remedied by the Bankruptcy Court.*

When this District Court issued its memorandum order on March 31, 2003 (Civil

Action 02-375 and 02-479) and  the Appellate Court issued its opinion on March 5, 2004

(*In re Continental Airlines, Inc.* No.03-2374 and 03-2375), both Courts were ignorant of

the Bankruptcy Court failed to protect a large portion of the LPP Claimants.

The Bankruptcy Court did not  question the validity of the motions filed by

Class Counsel and Continental on and after April 25, 2002.  Specifically those motions

proved that the January 31, 2002 settlement agreement to be a total scam. The

Bankruptcy Court was, therefore, misled by Continental and Class Counsel,  and

unfortunately failed to protect all pilots covered by the CBA, ie: all  LPP Plaintiffs.

The Bankruptcy Court has never had the jurisdiction to delete any pilot from the

benefits of an arbitration or of a Class Action in lieu of that arbitration. The Bankruptcy Court overstepped it's boundaries when it rendered the order on June 14, 2002.

Continental has always wanted and obtained control over the issue of our arbitral rights, because if arbitration have been conducted, discovery would have taken place and all their lies would have been exposed. The lies exposed by that tribunal process which when brought forward to the Bankruptcy Court would have created major headaches.

The time line above exposes some of what I consider to be the crucial lies that have taken place during the bankruptcy process. Again these are not documents I fabricated, but are evidentiary documents submitted by different entities.

Continental knew the consequences of their lies and they took the risk, a risk that enable Continental to gain millions of dollars. Now part of the truth is out and the Courts have to determine how a corrupted debtor will be dealt with.

Once again, I am not re-arguing the above-cited decisions, but citing them here to illustrate how hiding material facts and making mis-statements have been unseen or ignored by the courts, and how that has distorted the application of the law.

## CONCLUSION

This Appellant for the foregoing reasons petitions this Court to assemble a panel of honorable judges for the hearing and for this panel of judges to mandate the maximum penalties for perjury.

I'm aware that the above lies and the lies already exposed on my opening appellate brief give just cause to even nullify Continentals' 1993 reorganization plan, which is an issue this Court will have to voluntary address.

14

Continental cannot continue to be protected in light of all the malicious

intentional acts it has committed. Continental can spend millions of dollars on attorneys

but a fact remains, Continental has lied constantly since the beginning of this Chapter 11

proceedings, actions condemned by Bankruptcy Code and 18 U.S.C.

Respectfully submitted,

Ramon E. O'Neill, *Pro Se*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| CONTINENTAL AIRLINES, INC., et. al | ) |
| | ) |
| Debtor | ) |
| | ) Case No. 90-932 &90-933 (MFW) |
| | ) |
| **Ramon E. O'Neill** | ) Civil Action No. 06-568 (SLR) |
| **J. Trigg Adams** | ) **(Lead case)** |
| **Brownie N. Inman** | ) |
| | ) |
| Appellants | ) |
| v. | ) |
| | ) |
| | ) |
| JAMES BALDRIDGE, WILLIAM MANN | ) |
| and LARRY DUNN. | ) |
| Representatives of the LPP CLAIMANTS, | ) |
| | ) |
| and | ) |
| | ) |
| CONTINENTAL AIRLINES, INC. | ) |
| | ) |
| Appellees, | ) |
| | ) |
| | ) |

# CERTIFICATE OF SERVICE

I, Ramon E. O'Neill, certify that I am not less than 18 years of age, and that service of **REPLY BRIEF OF APPELLANT RAMON E. ONEILL** was made on May 02, 2007 upon the attached service list by FedEx, unless otherwise specified.

Under penalty of perjury, I declare that the foregoing is true and correct.

Ramon E. O'Neill

Ramon E. O'Neill, *Pro Se*

Counsel for Continental Airlines:
Robert Brady, Esq.
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17 Floor
Wilmington, DE 19801


Counsel for LPP Claimants:
Bruce Jameson, Esq.
1310 King Street
Wilmington, DE 19801

Hand Delivered and Electronically to
J. Trigg Adams and Brownie N. Inman

# EXHIBIT 1

**Continental** 

Continental Airlines, Inc.      Tel 713 324 5000
41st Floor HQSLG              Fax 713 324 5161
1600 Smith Street
Houston TX 77002

September 20, 1999

Miles J. Tralins, Esq.                                    **CONFIDENTIAL**
Tralins & Associates                            **For Settlement Purposes Only**
One Biscayne Tower, Suite 3310
2 South Biscayne Tower
Miami, FL 33131

      Re:    *EMPC v. Continental Airlines, Inc.*

Dear Mr. Tralins:

      This letter sets forth the terms of a settlement proposal to resolve the labor protective provision claims ("LPP claims") filed by former Eastern Air Lines, Inc. pilots which remain pending and unliquidated in the Continental Airlines, Inc. bankruptcy proceeding. This proposal is made in order to avoid the burden, inconvenience and expense of litigating those claims, including the litigation of a seniority integration arbitration which will be a necessary precedent to liquidating the claims in the Delaware Bankruptcy Court.

      In terms of evaluating the settlement proposal set forth below, you should know what Continental's positions would be if, as a result of the seniority integration arbitration, there was any liability (a result which, as you know, Continental does not believe would occur) and the parties were required to litigate the liquidation of the LPP claims. First, it is Continental's position that the LPP claims are subject to a limitation of one year's back pay pursuant to Bankruptcy Code Section 502(b)(7). Second, any damages that would accrue if liability were found would commence, at the latest, as of January 1991 and hence would be based upon the pilot pay structure in place for Continental at that time. Third, the liability to any pilot would depend upon the status they would have had (*i.e.* Captain, First Officer, Second Officer) based upon the integrated seniority list and given Continental's pilot staffing requirements as between January and December 1991. Continental does understand that you disagree with the applicability of the Section 502(b)(7) limitation, and perhaps some of Continental's other positions as well.

      However, in order to avoid what could be years longer litigation and to finally resolve these long-pending claims, Continental would propose the following settlement terms:

    (1)    If, as a result of the declaratory action we understand you will bring on behalf of all eligible EAL pilots, a final declaratory ruling is issued that the LPP claims are subject to a limitation of one year's back pay pursuant to Bankruptcy Code



Mr. Miles J. Tralins, Esq.
September 20, 1999
Page 2

Section 502(b)(7), the bankruptcy estate will grant each former Eastern pilot with an unresolved LPP claim (list to be agreed to by the parties) an agreed claim in the face amount of $110,000;

(2)    The claims will be paid as are all general unsecured prepetition Class 13 claims under the Reorganization Plan confirmed on April 27, 1993;

(3)    Because this settlement provides a face value claim greater than the one-year 502(b)(7) limitation,[1] settling former Eastern pilots with unresolved LPP claims must agree to sign a general release releasing the bankruptcy estate and Continental and all affiliates or related parties from any claims arising out of the alleged Eastern merger.

Before proceeding to make this offer generally available, we would like to have your agreement that you will endorse the terms of the settlement to the pilots you represent.

If you have any questions, please do not hesitate to call me. I look forward to hearing your response after you have had the opportunity to discuss it with your clients.

Very truly yours,

Robin E. Curtis
Managing Attorney
Labor and Employment

cc:    Jon Geier
       Jim Patton

---

[1] Pursuant to the Pilot Employment Policy revised August 1, 1990, Ch. 12, effective 4/1/91, the pay scale for a first year captain was $59.41 per flight hour with a 72 flight hour per month guarantee resulting in an annual salary of $51,330.24. Of course, the pay scale for first and second officers was substantially lower.

# EXHIBIT 2

LAW OFFICES OF

# PAUL, HASTINGS, JANOFSKY & WALKER LLP

A UNITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

ROBERT K. HASTINGS 1910-1991
COUNSEL
LEE O. PAUL
LEONARD S. JANOFSKY
CHARLES H. WALKER

600 PEACHTREE ST., N.E. STE. 2400
ATLANTA, GEORGIA 30308-2222
TELEPHONE (404) 815-2400

695 TOWN CENTER DRIVE
COSTA MESA, CALIFORNIA 92626-1924
TELEPHONE (714) 668-6200

555 SOUTH FLOWER STREET
LOS ANGELES, CALIFORNIA 90071-2371
TELEPHONE (213) 683-6000

1299 PENNSYLVANIA AVENUE, N.W.

WASHINGTON, D.C. 20004-2400

TELEPHONE (202) 508-9500

FACSIMILE (202) 508-9700

INTERNET www.phjw.com

390 PARK AVENUE
NEW YORK, NEW YORK 10022-4697
TELEPHONE (212) 318-6000

345 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94104-2635
TELEPHONE (415) 439-1000

1055 WASHINGTON BOULEVARD
STAMFORD, CONNECTICUT 06901-2217
TELEPHONE (203) 961-7400

1299 OCEAN AVENUE
SANTA MONICA, CALIFORNIA 90401-1078
TELEPHONE (310) 319-3300

ARK MORI BUILDING, 30TH FLOOR
12-32, ARASAKA 1-CHOME
MINATO-KU, TOKYO 107, JAPAN
TELEPHONE (03) 3586-4711

November 11, 1998

WRITER'S DIRECT ACCESS
(202)508-9589
jageicr@phjw.com

OUR FILE NO.
19978.59928

## VIA FACSIMILE AND REGULAR MAIL

Ms. Priscilla Ziegler
Staff Coordinator, Arbitration
National Mediation Board
1301 K Street, N.W., Suite 250E
Washington, D.C. 20572-0002

　　　　Re:　　Eastern Pilot Merger Committee Request for Arbitration Panel

Dear Ms. Ziegler:

　　　　　　On behalf of Continental Airlines, Inc. ("Continental") this responds to the request by John C. Lenahan that the National Mediation Board supply a panel of arbitrators to conduct a seniority integration arbitration between 300 former Eastern Air Lines, Inc. ("Eastern") pilots and Continental. Mr. Lenahan purports to make his request on behalf of an entity called the Eastern Pilots Merger Committee.[1] Continental objects to and opposes Mr. Lenahan's request on the following grounds: (1) the NMB has already supplied a panel of arbitrators to Myles Tralins, counsel to approximately 300 other former Eastern pilots for the identical dispute entailing Labor Protective Provisions ("LPPs") in effect when Eastern still existed and supplying another panel almost certainly would result in inconsistent arbitration results, and (2) to the extent the EPMC alleges this is a "different" dispute than the one for which Mr. Tralins has sought a panel of arbitrators, Eastern is no longer a carrier covered by the Railway Labor Act and therefore the Board has no authority to perform services.

　　　　　　<u>The Longstanding Eastern LPP Arbitration Already is Underway</u>. The NMB previously supplied a panel of arbitrators in response to the request of certain former Eastern pilots, represented by attorney Myles Tralins, seeking to arbitrate pursuant to the LPP clause of the 1986 collective bargaining agreement between Eastern and the Air Line Pilots Association ("ALPA") (the "Eastern LPPs"). In this arbitration proceeding, the former Eastern pilots assert

---

[1]　　To the extent the EPMC requests an arbitration panel as the "representative" of certain pilots, Continental contests any representational status.

PAUL, HASTINGS, JANOFSKY & WALKER LLP

Ms. Priscilla Ziegler
November 11 1998
Page 2

that Eastern somehow "merged" with Continental and thereby triggered a seniority integration proceeding under the Eastern LPPs. The EPMC apparently seeks to arbitrate the same dispute.

By way of background, arbitration of the Eastern LPPs began in proceedings brought by ALPA before arbitrator Richard R. Kasher, who issued a preliminary procedural ruling on August 4, 1992. This arbitration proceeding was long in abeyance, due, first to the Eastern, and then the Continental, bankruptcies and subsequent court proceedings and an ALPA settlement too lengthy to enumerate here. Suffice it to say that on August 29, 1997, the United States Court of Appeals for the Third Circuit affirmed the rulings of the United States District Court for the District of Delaware vacating an injunction against continuation of an arbitration.[2] *In re Continental Airlines, Inc.*, 125 F.3d 120 (3d Cir. 1997), cert. denied, 118 S. Ct. 1049 (1998). Arbitrator Kasher, however declined further participation on the grounds (a) the District Court's decision specifically stated that the Kasher Arbitration was over and that individual pilots would have to begin anew to the extent they had standing and (b) that none of the parties that had selected Mr. Kasher remained in the proceeding. Mr. Tralins, on behalf of his clients, thereafter requested and was provided a panel of arbitrators from the NMB.[3]

The NMB should not supply another panel of arbitrators for the identical dispute. This is not a case where there can be multiple grievances arising out of repeated alleged violations of a single work rule. The question whether Eastern and Continental merged, and how seniority should be integrated, entail's group rights that can, by their very nature, only be resolved once, in a single proceeding. The very language of LPP § 13(a), incorporated by reference into the Eastern-ALPA agreement, provides for a single arbitration proceeding conducted by "an arbitrator selected from a panel of seven names furnished by the National Mediation Board." This panel has already been supplied. If any other former Eastern pilots wish to be heard on this

---

[2]    The Third Circuit also affirmed the District Court's holdings that (a) whether individual pilots had standing to pursue arbitration after ALPA withdrew was a minor dispute for an arbitrator and (b) the bankruptcy LPP claims filed by Eastern pilots were, at best, general unsecured, pre-petition claims not entitled to specific performance or an administrative priority. In addition, before any seniority arbitration proceeding could commence, there would have to be a finding that a merger had in fact occurred. The fact that the Board dismissed the single carrier case brought by the unions representing the former Eastern employees should be dispositive on that question. *In re Eastern Air Lines, Inc.*, 17 N.M.B. 432, 448-50 (1990).

[3]    The parties have not yet selected an arbitrator, in part due to discussions between Mr. Tralins and Continental on a possible settlement of this dispute. Because Mr. Tralins' clients were the only former Eastern pilots to timely request a panel of arbitrators from the NMB, he has recently filed a motion in the Delaware Bankruptcy Court seeking to have the LPP claims of all other unresolved LPP claims dismissed for failing to perfect their right to arbitration. The motion remains pending.

sent By: TRALINS & ASSOCIATES  ;          305 3744933  ;     Feb-25-99 10:53;          Page 13/14

PAUL. HASTINGS, JANOFSKY & WALKER LLP

Ms. Priscilla Ziegler
November 11 1998
Page 3


subject, their recourse is before the arbitrator selected from the panel already provided. Of
course, Continental contends that other than the pilots represented by Mr. Tralins, former Eastern
pilots failed to timely petition for arbitration.

      **The NMB Has No Jurisdiction To Appoint Arbitrators Except in The LPP
Dispute That Accrued While Eastern Was Operational.** The LPP arbitration already
underway seeks to arbitrate a right that allegedly accrued in the past, under the old Eastern-ALPA
collective bargaining agreement. If the EPMC is asserting some right that accrued more recently
under the Eastern-ALPA agreement, the controversy is not covered by the Railway Labor Act,[4]
and the NMB lacks the power to appoint arbitrators. The NMB has no authority to take any
action in such a matter, even the ministerial act of supplying names of arbitrators, because Eastern
is no longer a "carrier by air engaged in interstate or foreign commerce . . ." as defined in the
Railway Labor Act. 45 U.S.C. § 181. *See RLEA v. Wheeling Acquisition Corp.*, 736 F.Supp.
*1397, 1402-03 (E.D.Va. 1990)* (company that did not currently own any rail lines or provide any
rail services was not a "carrier" under RLA, and had no "employees" under RLA; therefore,
controversy not subject to RLA procedures), *aff'd, 914 F.2d 53, 56 (4th Cir. 1990)*. The NMB's
sole statutory authority is to assist the resolution of disputes between "carriers," employees of
carriers, and their representatives. E.g. 45 U.S.C. § 155. The NMB zealously guards against
involvement in controversies that are not within its statutory mandate. *See The SABRE Group,
Inc., 25 N.M.B. 466 (1998)* (declining to opine whether or not SABRE was subject to the RLA,
since the request did not fall in one of the well-recognized areas of NMB activity).

      In sum, the NMB has no authority to act in non-carrier disputes and should not
respond to the EPMC's request. To do so would undermine the LPP arbitration that is already
underway, and delay resolution of a controversy of many years duration.

---

4/    The pilots represented by Mr. Lenehan recently filed a law suit in the District Court for the
District of New Jersey seeking a declaration that they "are entitled to two separate, distinct and
concurring remedies, namely, (1) enforcement of the [Eastern-ALPA] Collective Bargaining
Agreement and the [Eastern] LPPs which require seniority integration plus damages for
Continental's failure to comply with the Collective bargaining Agreement and the LPPs
subsequent to the confirmation of [Continental's] plan of reorganization, and (2) liquidation of
their proofs of claim under the Continental bankruptcy plan of reorganization." This frivolous
lawsuit is in contempt both of the order confirming Continental's plan of reorganization and the
decision of the Third Circuit.

UL. HASTINGS. JANOFSKY & WALKER LLP

Ms. Priscilla Ziegler
November 11 1998
Page 4

If you have any questions with respect to this letter, please call the undersigned at the number provided above. Thank you for your consideration of this matter.

Very truly yours,

Jon A. Geier

of PAUL, HASTINGS, JANOFSKY & WALKER

Counsel for CONTINENTAL AIRLINES, INC.

cc:    John C. Lenahan
       Myles Tralins
       Stephen Crable
       Robin Curtis

EXHIBIT 3

In the Matter of the )
)
PILOT SENIORITY INTEGRATION ABRITRATION )
)
   among )
)
PEOPLE EXPRESS PILOT MERGER COMMTTEE )
)
   and )
)  OPINION
CONTINENTAL PILOT MERGER COMMITTEE )  AND
)  AWARD
   and )
)
FRONTIER PILOT MERGER COMMITTEE )
)
   and )
)
CONTINENTAL AIRLINES, INC.

Appearances:

      For the People Express Pilot Merger Committee
         Daniel M. Katz, Esq.
         Ellen Ranzman, Esq.
         (Katz & Ranzman)
      For the Continental Pilot Merger Committee
         Denis F. Gordon, Esq.
         Frank Petromalo, Jr., Esq.
         (Gordon & Barnett)
      For the Frontier Pilot Merger Committee
         John A. McGuinn, Esq.
         (Schmeltzer, Aptaker & Shepard, P.C.)
      For Continental Airlines, Inc.
         Michael J. Madigan, Esq.
         Michael J. Mueller, Esq.
         Jonathan S. Spaeth, Esq.
         H. Jonathan Redway, Esq.
         (Akin, Gump, Strauss, Hauer & Feld)

<u>Merger Committee Members</u>

  <u>People Express Pilot Merger Committee</u>
   Jim Mackenzie, Chairman
   Steve Abdu
   Jim Brucia
   Mark Cleppe
   Michael Hynes
   Spence Kershaw
   Jay Malloy
  <u>Continental Pilot Merger Committee</u>
   Neil Miller, Chairman
   Joseph J. Birmingham
   Carl Christensen
   Charles Higdon
   Tom Stephens
   Jack Stice
  <u>Frontier Pilot Merger Committee</u>
   Robert L. Williams, Chairman
   Douglas A. Bader
   Roger Brooks
   Dave P. Kaplan
   Robert L. McCoy
   Billy J. Watkins
   Michael L. Waldron
  <u>Continental Airlines, Inc.</u>
   Robert P. Lemon
   Sam Peckham
   James Cato, Esq.

Background

This matter is before the undersigned, Jerome H. Ross, following a Federal District Court Order

Compelling Arbitration of the Integration of Pilot Seniority Lists of Continental Airlines, People

Express Airlines and Frontier Airlines Pursuant to the Provisions of the Labor Protection Agreement.*

On September 15, 1986, the Texas Air Corporation (Texas Air or TAC) and People Express, Inc.

(PEI) entered into a merger agreement.**  On the same date, TAC and PEI entered into a Labor

Protection Agreement (LPA) in order "to provide assurances to the employees of the air carrier

subsidiaries of PEI with regard to their seniority interests in the event of any future merger of airline

operations involving any air carrier subsidiary of PEI." The LPA further provides for "fair and equitable

seniority integration procedures" in the event of any such future merger. It also provides for a "final and

binding decision by a Neutral Mediator"*** in the absence of agreement of the parties. The LPA also

requires that a separate procedure be conducted by the seniority integration committees for each craft

or class of employees on each carrier participating in the merger. It further provides for the surviving

merged carrier to participate as a party to the selection of the neutral and as a party to the proceedings.

---

* United States District Court for the District of New Jersey, Civil Action No. 87-1155, Hon.
Nicholas H. Politan, August 7, 1989.
** People Express Airlines, Inc. became the operating subsidiary of a newly formed holding
company, People Express, Inc. on August 28, 1985.
*** The Court and the parties recognize that the appropriate title is Neutral Arbitrator.
On December 30, 1986, Texas Air, the parent corporation of Continental Airlines (the Company,

4

Continental or CAL) formally acquired People Express Airlines, Inc. (People Express or PEX) from PEI. PEI became a wholly-owned subsidiary of Continental which remained a wholly-owned subsidiary of Texas Air.*

On March 12, 1987, Continental issued a memorandum proposing to unilaterally merge the seniority lists of the CAL pilots and the PEX pilots in the event of a consolidation of CAL and PEX operations. The list placed the top 295 PEX captains below the junior CAL captain. The remaining 162 former PEX captains were integrated into the list below the junior CAL first officer, and the remaining PEX pilots followed these former captains. The bottom of the list was composed of an estimated 1000 pilots who were to be hired in 1987 and thereafter.

The PEX pilots, represented through the People Express Pilot Merger Committee (PEX Committee), challenged the Company's list in Federal District Court. On June 15, 1987, the Court denied the PEX Committee's application for a preliminary injunction.

When the PEX Committee moved to enjoin the Company from implementing its lists, TAC was in the process of merging the operations of CAL and Frontier Airlines (Frontier or FAL). On June 15, 1987, Arbitrator George Nicolau issued an Opinion and Award rendering an integrated seniority list for the pilots of Continental and Frontier.

---

* On July 11, 1989, PEI was merged with PEX and CAL was then merged with PEX. The surviving entity was renamed Continental Airlines, Inc.
On July 10, 1987, the Company announced a revised seniority list integrating CA and FAL pilots

pursuant to the Nicolau award and integrating CAL and FAL pilots pursuant to the Nicolau award and integrating the PEX pilots as reflected under the current seniority list in the following order: 1675 CAL captains; 162 FAL captains and 295 PEX captains (integrated by date of hire, which places all FAL captains ahead of PEX captains); 299 CAL first officers (pursuant to the Nicolau award); 1262 additional CAL, FAL and PEX first officers (pursuant to the Nicolau award ratio for the first 1056 CAL and FAL pilots, and by date of hire for the remaining FAL and PEX pilots,*); 162 PEX second officers and Flight Manager Representatives (FMRs) and 508 CAL new hires. A more specific breakdown of the Company's seniority list is set forth under the section on Proposed Seniority Lists.

On October 14, 1987 the District Court ordered that the CAL pilots were a necessary party to an arbitration pursuant to the provisions of the LPA. System Bid 87-3, the first opportunity for PEX pilots to bid under the integrated flight operations, was announced on October 23, 1987.

On October 24, 1988, the Court certified the PEX Committee as the plaintiff class representative for all pilots employed by PEX as of March 12, 1987. The Court, on November 15, 1988, granted a motion for intervention filed by the Frontier Pilots Litigation Steering Committee (FPLSC) on behalf of the FAL pilots. The FAL pilots are represented in this Arbitration by the Frontier Pilot Merger Committee (FAL Committee). On April 24, 1989, the Court also certified the FPLSC as a representative of all CAL pilots, excluding PEX pilots. On the same date the Court granted the PEX

_____

* The PEX Committee claims that the first 162 of these former PEX pilots are downgraded captains.

Committees motion to compel arbitration.

Pursuant to the Court's Order Compelling Arbitration, dated August 7, 1989, the undersigned Arbitrator was selected from a list provided by the American Arbitration Association. The Order provides for the participation of the PEX Committee, the FAL Committee, the Continental Pilot Merger Committee (CAL Committee) and Continental.

On February 1, 1990, at a prehearing conference, Continental filed a Motion in Limine seeking enforcement of Arbitrator Nicolau's Award of June 15, 1987, which rendered an integrated seniority list for the former FAL pilots and the CAL pilots. The motion was granted by the undersigned on February 26, 1990, thereby requiring that the FAL pilots not argue for any change in their seniority relative to other non-PEX pilots at Continental, as determined in the award of June 15, 1987. By District Court Order dated May 14, 1990, the FAL pilots' motion to reverse this decision was denied.

Hearings before the undersigned Arbitrator were held in Washington, D.C. on the following dates in 1990: May 7-11, 15-16 and 21-24; June 4-8 and 11-15; July 9-13, 16-19 and 30; August 1-3; September 12-15, 17-21 and 30; October 1-6 and 15-19; November 5-6, 8, 10, 12, 14-15, and 27-30; and December 14-15. In 1991, hearings were held on January 7, 14 and 26; February 7, and March 2. Post hearing briefs were filed on April 2, 1991. Reply briefs were filed on April 15, 1991.* Oral argument was held on April 29, 1991. Technical support committee sessions were convened on June 14 and 27; July 11, 12 and 15 and August 7-8, 1991.

## Historical Overview

This section highlights the facts and circumstances under which four airlines relevant to this integration – Continental, PEX, Frontier and New York Airlines (New York Air or NYA) – came into existence and operated.**

---

\* Under the briefing procedures, the FAL Committee filed its opening brief on April 15, 1991, and it incorporated its reply arguments into its oral argument on April 29, 1991.

\*\* The relevance of NYA, which is not specified in the District Court Order, is addressed in the section on Discussion and Findings.

### People Express

A unique chapter in the history of the domestic airline industry was written following passage of the Airline Deregulation Act of 1978 when People Express introduced a new concept in air travel.

People Express was incorporated on April 7, 1980. Its application to the Civil Aeronautics Board for permission to form a new airline listed the following objectives: (1) provide a broad new choice of flights with high frequency service; (2) keep costs low by extremely productive use of assets; (3) offer unrestricted deep discount price savings through productivity gains; (4) focus on several high density markets in the eastern United States which had not benefited from deregulation; and (5) center operations in the New York/New Jersey metropolitan area with its highly concentrated population and use the under-utilized, uncongested and highly accessible Newark International Airport as its main base.

These objectives would initially result in People Express providing frequent service to underserved cities, especially those with industrial markets, primarily in the northeast. In order to attain these

8

objectives, management concentrated on reducing costs to a bare minimum in every aspect of the operation. All seats were sold for one deeply discounted price, which PEX termed "unbundled service" and which today is commonly known as "no frills." A difference in fares was charged for peak and off peak hours. Fares were collected in flight, as opposed to using ticket counters and agents. Customers were charged for all in flight food and drink services and baggage checking. There were no hot galleys in the planes.

PEX's first flight service began on April 30, 1981, with three planes flying between Newark, Buffalo, Columbus (Ohio) and Norfolk. By 1982, People Express had over 1,200 employees, owned 17 aircraft and serviced 18 cities.

In addition to insuring the highly productive use of employees and the fleet, management implemented a labor relations philosophy which did not include union representation for employees. Rather, management's objective was to motivate employees to be highly efficient by making every employee a "manager" and an "owner" of the company. As such, employees performed more than one type of duty under the concept of cross utilization. For example, pilots had the job title of Flight Manager. Although their primary job was to fly planes, they were assigned duties in other functional areas (such as scheduling, air traffic, reservations or insurance) on an average of four days monthly in addition to their regular flying duties of from 80 to 86 hours each month. By 1986, many pilots were not required to work outside their flying duties. Flight attendants, with the job title of Customer Service Manager, also were cross utilized to perform duties such as fare collection on the aircraft. Employees

9

responsible for overseeing the maintenance of aircraft carried the Maintenance Manager job title. The Company also hired interns in six different functional areas of the operation.

Beyond the managerial concept, every new employee was required to purchase 100 shares of PEX common stock at greatly discounted prices, thus instilling the concept of ownership in all employees. In 1985, People Express employees controlled over 26 percent of the company's voting stock shares.

Employees were provided 100 percent medical and dental coverage, a profit sharing plan and other stock option bonuses and plans. The company did not offer an employee pension plan. The company's stated, although unwritten, policy was to not furlough or involuntarily downgrade employees.

In an effort to provide pilots their aircraft preferences, the company established a system which offered selection opportunities for pilots who had been hired in classes of from two to 15 employees beginning in 1981 through August 1983. The system was geared to classes in which every class member became a captain on the same date, as opposed to individual dates of hire and strict individual seniority. The system required consensus in a pilot group to resolve conflicts where all pilots could not receive their aircraft preferences. In 1983, the company implemented a new computerized bidding system, Selective Lines Individually Constructed (SLIC), which later was designed to customize flight lines based on individual pilot requests. By 1985, a lottery system, in which seniority played no part, was implemented for bidding on flight lines.

The location of PEX's corporate offices at Newark International Airport also was consistent with the effort to operate potentially productive assets at a minimum cost. Although the airport is located in

the New York City metropolitan area, it largely had been ignored. People Express inexpensively

purchased a building on the airport premises to house its corporate offices. The offices were sparingly

furnished and staffed. There were no secretaries, and every employee performed clerical and secretarial

duties. A basis computer system was used to maintain passenger seat reservations.

The concept of a Newark hub for passenger exchange to the spokes in the People Express system

proved very efficient. As the number of PEX flights increased, the company significantly contributed to

the development of a more efficient air traffic system and an improved air flow control system in the

congested New York City area.

The initial success and growth of PEX resulted in net incomes of $1 million in 1982 and $10.4

million in 1983. During 1983, PEX acquired 37 B-727-200 aircraft from other airlines. It began service

to London with a B-747-200 at fare prices which received wide public acceptance. The company's fleet,

all previously owned, had increased to: 37 B-727-200s, five B-737-200s and one B-747-200. By the

spring of 1984, PEX had 150 daily departures from Newark more than any other carrier in the New

York City area. In 1985, PEX and the Port Authority of New York and New Jersey (Port Authority)

entered into an agreement to contruct Terminal C which PEX agreed to lease for 25 years. International

service to Brussels and Montreal was added to the system. On November 22, 1985, PEI acquired

Frontier, gaining a major hub in Denver, but also engaging in fierce competition there against

Continental and United Airlines. In December 1985, PEI entered into an agreement to purchase Britt

Airways, at the time the nation's third largest regional commuter line which served 29 mid-western cities. Within months it had completed the purchase of Provincetown-Boston Airlines (PBA). In 1986, the company joined the American Airlines Sabre reservation system, announced a frequent flyer program and offered first class airport lounges.

By January 1986, People Express was flying one million passengers a month, the fifth largest domestic airline by this measure. Its operating revenues had increased by two-thirds from 1984 to 1985. Plans were being implemented to construct Terminal C, which would become the largest airline passenger facility in the northeast.

However, the company was experiencing problems associated with its rapid growth. Overbooking, inadequate terminal facilities in Newark and erratic departure and arrival times depressed profits in the last quarter of 1984 and the first quarter of 1985. There is also evidence that during this period employee morale was dropping from its previous high levels.

The Company experienced very substantial operating and net losses in the last quarter of 1985 and the first two quarters of 1986. With the increased decline in the company's financial condition, in June 1986 PEI retained an investment banker to seek a buyer for PEX and concurrently develop a new business plan to incorporate fundamental changes in its policies and practices – a move which had become necessary to the survival of the company. By the summer of 1986, People Express had reversed its no frills policy and had developed a plan to become a more traditional multi-class service carrier in the face of severe financial problems. After rejecting a TAC offer to buy PEX and Frontier, PEI agreed

12

to sell Frontier to Untied in June 1986, but the transaction was never completed.

On September 15, 1986, PEI and TAC entered into a merger agreement under which TAC ultimately acquired PEX for $113.7 million, -- the figure having been lowered twice from the initial $122.1 million purchase price. PEX stockholders approved the action on December 29, 1986. TAC also purchased Frontier in the same transaction.

Continental

In 1937, a small carrier from El Paso to Pueblo, Colorado began operating under new ownership as Continental Airlines. By 1961, Continental had added several cities in Texas and New Mexico, as well as Wichita, Tulsa, Chicago, and Los Angeles. The airline grew steadily between 1966 and 1977, and it added several Pacific routes. From 1977 to 1982, Continental's financial situation increasingly worsened as the Company had difficulty in adapting to the effects of airline deregulation. Several merger attempts following deregulation were unsuccessful. In 1979 Continental began service in the northeast with flights to Newark from Denver and Houston. The Company's losses in 1979 through 1981 were significant.

In 1947, another carrier, Trans-Texas Airlines, began service to eight cities in Texas and later expanded to cities in Arkansas, Louisiana, Mississippi and Tennessee. In the late 1960s and early 1970s, Trans-Texas began service to Monterrey (Mexico), Denver, Los Angeles, Salt Lake City and Mexico City. In 1969 the Trans Texas name was changed to Texas International Airlines (TI). In 1972, Jet Capital Corporation, headed by Frank Lorenzo, gained voting control of TI which had posted large

losses since 1968. Under Jet Capital, TI evolved into a low cost, low fare carrier and grew significantly

during the 1970s and early 1980s. During 1978 and 1979, TI launched an unsuccessful effort to acquire

National Airlines, but realized a large profit through the sale of the National stock it had acquired.

In 1980, TI created a holding company, Texas Air Corporation. Texas Air, in turn formed New

York Air, which it operated as a separate, non-union subsidiary offering a simple low fare structure and

high frequency service.

In March 1982, Texas Air assumed control of Continental, which was deep in financial difficulty,

and partially guaranteed Continental's debt. Texas Air itself, however, was incurring operating losses at

the time of the merger with Continental.

On October 31, 1982, Continental and TI merged as Continental to become the sixth largest carrier

in domestic revenue and passenger miles. Texas Air, the holding company which had been created in

1980, had two subsidiaries, Continental Airline Corporation and NYA. Continental continued to operate

at a loss in 1982.

By summer 1983, Continental had suffered heavy losses which TAC agreed to partially guarantee.

Relations between Continental and its unions were poor, and the International Association of Machinists

struck the Company. On September 2, 1983, Continental suspended operations and filed for bankruptcy.

It resumed operations under Chapter 11 on September 27, 1983, with a two-thirds reduction in fleet,

staff and number of cities it serviced. Moreover, it unilaterally implemented "emergency work rules"

which cut wages and increased productivity, notwithstanding an existing collective bargaining

agreement with its pilot union. In protest against the pay cuts, loss of seniority rights and other work rules, Continental pilots initiated a strike which remained in effect for almost two years. In October 1985, Continental and the Air Line Pilots Association (ALPA) negotiated a strike settlement which provided the pilots a choice from the following three options: (1) waive all claims against the Company and return to work as vacancies occurred; (2) receive severance pay in lieu of returning to work; and (3) not waive claims against the Company and return to work after all option (1) pilots have returned or be removed from the hiring lists on December 31, 1988.

While operating in bankruptcy, Continental began to deeply reduce its fares. The move was very successful in attracting passengers. During 1984, with financial backing from Texas Air, Continental began to rebuild its system by adding cities and increasing flights. In August 1985, Texas Air launched a new carrier, Continental West Airlines, as a full-service, low fare operation. Continental, still operating under bankruptcy rules, attempted to acquire 30 jetliners, but initially was able to sublease only four, with additional leasing arrangements contingent on court review of its financial and operating performance during the first half of 1985.

After February 1986, when Texas Air had bid successfully for Eastern Airlines, several other airline mergers were announced as companies were restructuring in an effort to attain "supercarrier" status in order to successfully compete in the market place. In acquiring Eastern, Texas Air was required to sell the shuttle service operated by NYA.

On September 2, 1986, Continental emerged from bankruptcy with two main hubs at Houston and

15

Denver, 40 percent larger than in 1983 when it had entered bankruptcy, and with plans to add to its fleet, as well as with a long term debt service obligation of almost $2 billion.

With the acquisitions of People Express and Frontier on September 15, 1986, Continental strengthened its presence in the east coast markets, gained major hubs in Newark and Denver, and achieved the critical mass required to attain supercarrier status. On February 1, 1987, PEX and NYA operations were merged into Continental.

## Frontier

Monarch Airlines began serving Denver, Salt Lake City and Albuquerque in 1946. A bankruptcy was averted in 1947 when the airline was sold. In 1949, Monarch acquired Arizona Airlines and Challenger Airlines. The three carriers combined to form Frontier Airlines. By 1956, Frontier served 68 cities and had 700 employees. Controlling interest in Frontier was sold in 1958 for $750,000 and again in 1964 for $2.5 million when RKO General, Inc. (a subsidiary of General Tire Co. of Akron, Ohio, later to become GenCorp) bought 56 percent of Frontier for $6.5 million. RKO General remained the majority stockholder until the airline was sold to PEI in 1985.

During the 1960s, Frontier gained a reputation as an on time airline providing a high standard of service to many small and remote locations. In 1967, Frontier merged with Central Airlines. By the end of the 1970s, 53 of Frontier's 89 cities were government-subsidized. In 1979, Frontier registered record profits and began preparing for operation under deregulation by terminating service to several cities and adding others. In 1981, Frontier again set new earnings records and began serving larger cities such as

Los Angeles, Seattle, Atlanta and Detroit. In 1982, Frontier became a subsidiary of Frontier Holdings, Inc. In 1983, as a result of a fare war in Denver between United, Continental and Frontier, Frontier Holdings posted a $13.8 million loss – its first in 12 years. The Denver battle continued into 1984 during which Frontier employees agreed to heavy wage concessions and the airline posted a $31 million loss. In 1984, Frontier Horizon, a non-union carrier subsidiary of Frontier Holdings, began service out of Denver.

The situation worsened in 1985. Attempts at an employee buyout plan failed as Texas Air tendered a share offer in excess of the employee offer. However, PEI outbid Texas Air and purchased Frontier in October 1985, using $200 million in cash from Frontier to fund the $309 million purchase. In a concurrent transaction, PEI and Frontier and its unions entered into an agreement which provided in part that: no further wage reductions or furloughs would be implemented; Frontier would not be merged with Continental, nor would it be sold to TAC/CAL; PEI would not sell Frontier assets in excess of $25 million; and PEI would provide sufficient working capitol to operate Frontier as a viable entity.

Frontier's losses increased under a new marketing strategy of deeply discounted fares and no frills service led by a new president selected by PEX Chairman Donald Burr. By May 1986, the marketing strategy was reversed as premium coach service was begun.

Following a $58.9 million loss in the first half of 1986, PEI, after having rejected a prior TAC offer to buy PEX and Frontier, announced tentative agreement to sell Frontier to United for $146

17

million. The purchase required United and its pilots to reach agreement on the wages and other terms under which the Frontier pilots would be employed at United. Their discussions continued until late August 1986. Although agreement was not reached, PEI received approximately $47 million from United for the sale of various Frontier assets.

On August 24, 1986 Frontier ceased operations, and it filed for bankruptcy on August 28, 1986.

On September 15, 1986, Texas Air agreed to purchase Frontier for $176 million in conjunction with the People Express acquisition.

New York Air

In December 1980, New York Air began operations as a subsidiary of Texas Air which owned 67 percent of NYA's common stock. NYA had leased six DC-9s from Texas Air to begin service between New York and Washington, D.C., Baltimore, Buffalo, Cincinnati, Cleveland, Detroit and Louisville, and between Boston and Washington, D.C. and Baltimore, and between Baltimore and Orlando. Texas Air initially provided NYA with $10 million of equity capital and agreed to guarantee a $15 million line of credit.    The NYA and PEX operating plans were similar in that both offered low fare, high frequency service based on high productivity, efficiency and simplicity of operations.

New York Air incurred an $11.6 million loss during its first year in operation. In January 1982, Texas Air purchased an additional $8 million of NYA convertible preferred stock. NYA's net operating loss for 1982 was $23 million. During 1983, NYA's fleet composition changed under leasing and sub-leasing arrangements with Texas Air, resulting in eight MD-80s moving from NYA to Continental.

Moreover, NYA used two of Continental's Washington National Airport slots during 1983. Although NYA showed a $4.5 million net operating profit in 1983, it experienced a $6.8 million net operating loss in 1984. In 1985, Texas Air acquired the remaining shares of NYA's common stock. NYA's 1985 net loss was $2.4 million.

In order to acquire Eastern in 1986, Texas Air was required to sell the Eastern shuttle service to Pan Am. The agreement between Texas Air and Pan Am was signed on September 12, 1986. The NYA shuttle operation was moved to Newark after Texas Air sold Pan Am 19 NYA arrival and departure slots at Washington National, 56 NYA arrival and departure slots at La Guardia and access to two NYA gates at Logan for $62.8 million. NYA showed a net profit of $36 million in 1986.

NYA was merged into Continental in February 1987. During its brief history, NYA started and ceased service from Boston, New York or Washington, D.C. to 82 cities.

## TAC-PEI Merger Agreement

The TAC-PEI merger agreement, dated September 15, 1986, was one of the most complicated acquisitions in airline history. It set forth numerous terms and conditions which required PEI to use its best efforts to preserve People Express operations and to refrain from attempting to sell the operation to another party. The agreement further required PEI to represent that PEX was a failing company for purposes related to merger and anti-trust considerations. The agreement established several conditions precedent to effecting the merger, such as: (1) approval by PEI stockholders; (2) DOT approval of the merger; (3) agreement of the Frontier unions; (4) acquisition by TAC of Frontier assets through

19

bankruptcy court approval; (5) PEI remaining out of bankruptcy and continuing to pay its debts as they became due; (6) PEI not ceasing or suspending any significant portion of its operations or business; (7) PEI using its best efforts to obtain waivers of default from its banks, and (8) TAC receiving waivers of claims of Frontier pilots arising out of the October 1985 agreement with PEI. It also required PEI to refrain from soliciting any other offers of purchase. As part of the agreement, PEI granted TAC an option to purchase a new issue of People Express convertible preferred stock, representing approximately 30 percent of the PEX voting power, exercisable while the merger agreement was in effect upon the occurrence of certain events.

The record further reflects that the merger agreement was renegotiated by the parties twice after September 15, 1986. In October 1986, TAC initiated discussions to renegotiate the terms of the agreement following PEX's heavy losses in September. As a result of the discussions, the amount paid by TAC was reduced. The PEX board of directors approved the renegotiated terms on November 2, 1986. Later in November, TAC again renegotiated lower terms which were approved by the PEX board on November 28, 1986.

### Events Following the Merger Agreement

Certain events involving seniority integrations at Continental, which bear on the present proceedings, occurred after the September 15, 1986 merger agreement.

On October 2, 1986, the Job Protection Agreement (JPA), under which the FAL-CAL seniority integration was conducted, was signed. In November 1986, Continental hired the former Frontier pilots

20

and merged CAL-FAL flight operations after Texas Air, through NYA, took delivery of Frontier's 44 aircraft and airport properties.

Between October 1986 and January 1987, the PEX pilots formed a research committee to prepare for their seniority integration arbitration with CAL pilots. The committee held its first meeting in December 1986. It retained counsel in early 1987.

A CAL-NYA seniority integration award was issued by Arbitrator Richard I. Bloch on December 18, 1986. It was implemented on January 27, 1987 for System Bid 87-1 which was open to CAL and NYA pilots, but not to PEX and FAL pilots.

The CAL-FAL seniority integration arbitration was held in early 1987, and following the submission of post-hearing briefs, the award issue on June 15, 1987.

On February 1, 1987, the Company began marketing CAL, PEX and NYA as a single integrated airline. The management of People Express operations, marketing and administration functions was assumed by Continental.

Between January and March 1987, Continental and the PEX Committee unsuccessfully attempted to reach agreement on a seniority integration procedure. On March 10, 1987, the Company informed the PEX Committee that it would unilaterally created a seniority list containing the CAL and PEX pilots to be used in the event the operations were merged. The list was announced on March 12, 1987.

On July 10, 1987, the Company issued another seniority list which included the FAL pilots. System Bids 87-2 A and B – an alternative arrangement with one option providing for PEX pilot

participation in the event CAL and PEX operations were merged – were never implemented.

On October 23, 1987, System Bid 87-3 was issued. For the first time, a system bid was open to all CAL pilots (including former FAL and NYA pilots) and former PEX pilots. The bid was awarded on December 11, 1987 and effective on July 1, 1988, when all CAL and PEX pilots first were fully staffed together.

## PEX's Financial Condition

In April 1986, People Express had begun to implement portions of a new marketing strategy in an effort to stem heavy first quarter 1986 losses. In June 1986, PEX announced that it was downsizing its operations due to an excess of capacity, and all or part of the airline was for sale. Although its boarding rate exceeded 2.1 million passengers in August 1986 (30.7 percent more than August 1985 and a new monthly record), the company's heavy losses continued in the second quarter. PEX's net loss for the first six months of 1986 was nearly $80 million. The Company incurred modest net losses in July and August 1986.

A preliminary business plan for PEX, dated August 7, 1986, states that although "PEX's cost structure is a very powerful competitive advantage, . . . given the revenue driven nature of the airline business, [PEX] must embark on a strategy to enhance its revenues." In addition to the new marketing strategy aimed at raising revenues, the company negotiated an 18-month lease to Pan Am of eight B-727-200s, which were excess to its current needs, for $8.4 million. It was also considering several possibilities for three of its B-747s, including their sale or lease to another carrier. The business plan

22

projected an increase in operating income of $40.7 million following its full implementation in the second year, after losses during the first and third quarters of the plan's implementation. The plan required a 25 percent reduction in daily departures, a 14 percent reduction in block hours, and a break even load factor (BELF) of 70 percent. In addition, the company's fleet would be reduced from 79 to 69 aircraft (two less B-747s and eight less B-727s) which would undergo extensive modification in order to provide multiclass service. Fifty eight of the 69 aircraft would be in service at any given point in time.

A "preliminary draft" dated "September__, 1986" by Morgan Stanley & Co., Inc., the investment banker retained by the PEX Board of Directors to review the conditions of the TAC-PEI merger prior to September 15, 1986, states in part: ". . . without the prompt infusion of a significant amount of cash from asset sales or sales of new equity, there is grave doubt that the Company will be able to meet its ongoing financial obligations in the near future." It further states: "Other than as described herein, no financially responsible company as of this date has made a credible proposal for the acquisition of PEI, and no other such proposal appears immediately forthcoming."

The TAC-PEI merger agreement and plan, dated September 15, 1986, required that PEX "shall affirmatively state and use its best efforts to demonstrate orally and in writing that it is a failing company both for purposes of any submission to [the U.S. Department of Transportation] and for purposes of any filing with or notification to any federal antitrust authority . . ..."

During the third quarter of 1986, which ended on September 30, two weeks after the merger announcement, PEX recorded an operating loss of nearly $24 million and a net loss of $40 million. The

23

company's losses for the first nine months of 1986 were $120 million. On September 30, 1986, People Express had a working capital deficit of $147.8 million, as compared to $10.7 million on December 31, 1985. Its debt service requirements as of September 30, 1986 were $34.5 million through December 31, 1986, of which $15.6 million had been paid through November 14, 1986. An Internal Revenue Service assessment of $11.5 million against the company also was outstanding.

On October 15, 1986, the U.S. Department of Transportation (DOT) issued a Show Cause Order concerning the acquisition of PEX by TAC. Although the DOT declined to render findings as to whether PEX was a failing company because, it noted, such a determination was relevant only if it had found the acquisition to be anticompetitive, the order observed: " . . . the applicants themselves have made public facts suggesting that [PEX] will not survive without the acquisition. People Express' financial difficulties have become widely-known as a result." The order further stated: ". . . the imposition of LPPs is likely to cause Texas Air's withdrawal from the transaction and thus the bankruptcy of People Express."

The DOT's Final Order in the above transaction, dated October 24, 1986, noted:

*. . . The record amply demonstrates that prompt approval of the acquisition is necessary for [PEX's] survival. People Express in fact would have run out of cash already but for the financial assistance provided by Texas Air under the merger agreement, and that agreement does not require Texas Air to provide any additional assistance after this month. Without the last payment by Texas Air at the end of this month, People Express would have little or no cash left, and it appears unable to obtain cash from any other source. App. October 9, 1986 letter at 3. Its cash shortfall from operations appears to exceed $500,000 each day, a rate of losses which will rapidly exhaust the last cash advance due from Texas Air.*

24

The order also stated: " . . . Given People Express' critical financial condition, it is unlikely that the carrier could continue to operate at its present scale if it remained independent."

The minutes of a special PEX board of directors meeting on September 14, 1986, state in part:

*At this point in the meeting, Mr. Burr asked Mr. Norris to review with the Board the Company's current cash position and projected cash flows through the end of the year. Mr. de Leeuw then reviewed with the Board the status of the Company's accounts payable. Mr. de Leeuw stated that there could be no assurance that vendors or other creditors of the Company would continue indefinitely to allow the Company to extend payment periods. Messrs. Norris and de Leeuw reported to the Board that they had developed day-to-day and week-to-week cash flow forecasts based upon anticipated revenues, scheduled lease and debt payments and anticipated operating expenditures. Messrs. Norris and de Leeuw reported that, without the prompt substantial infusion of a significant amount of cash, management's projections indicated that the Company would be in a negative cash position by mid-October. Mr. Norris and Mr. de Leeuw reviewed the status of the Company's ongoing efforts to raise cash by disposing of aircraft. Messrs. Norris and de Leeuw reported to the Board that it did not appear that a partial liquidation of the Company's aircraft and other assets represented an alternative method of both resolving the Company's cash flow deficit and placing its operations on a profitable basis. The fact that the Company's aircraft were already heavily financed and had little remaining equity value And that the market for used aircraft, particularly Boeing 747's, was very weak made it very remote that the Company could raise enough to continue operations as an independent entity even under the protection of Chapter 11 of the Bankruptcy Code. The Board also considered the revenue impact that might result from a public admission of the Company's status as a failing company. Mr. Fiedorek then reported to the Board that the cash flow forecasts presented by Messrs. Norris and de Leeuw were corroborated by month-to-month cash flow projections which had been developed by Morgan Stanley. Mr. Fiedorek also reported that representatives of the Palmieri Company ("TPC") had concluded, on a preliminary basis, that management's cash flow analysis was essentially correct.*

\*          \*          \*

*Mr. Norris then reviewed the Company's projected cash flows in the context of a bankruptcy proceeding. Mr. Norris reported that management had concluded that, in a bankruptcy proceeding, the Company might be able to have a modest positive cash position at year end, but that such analysis did not consider any negative impact on revenues resulting from a bankruptcy filing. It was noted that the Company's cash position was so critical that any adverse revenue impact of a bankruptcy proceeding would have a material adverse effect on the Company's cash position and its viability. It was the conclusion of management that a bankruptcy liquidation would result in only a 50%*

25

*realization for unsecured creditors and no residual equity for the holders of the Company's Common Stock and Class B Common Stock. In addition, it was management's view that the Company did not have a realistic possibility of reorganizing in bankruptcy for various reasons, including the uncertainty as to the ability of People Express Airlines to retain the rights to Terminal C in the event of a bankruptcy.*

The record also contains a document dated September 17, 1986 and titled, Transcript of Discussion with People Express Board of Directors. The discussion reflects that a financial consulting firm, The Palmieri Company, was commissioned by PEX to undertake an intensive review of the company's financial position. The group, which was composed of experienced consultants, spent two and a half days examining: (1) the company's "status quo cash flow"; (2) the underlying assumptions in the company's forecasts; (3) adjustment in the forecasts for the effects of a bankruptcy proceeding; (4) other potential cash sources and risk issues, and potential responses to routing and fleet deployment and pricing and labor issues; and (5) whether the company could hope to exist as a viable business. The group found that "the cash flow could not be more critical" and the "near term cash crises . . . leaves very little room to maneuver outside of a [bankruptcy] proceeding or outside of a sale such as the one that has been negotiated." The group further found that "it would be difficult to find anyone who . . . would be willing to testify to a judge that there was over the period of six months to a year an opportunity to make a business out of this airline." The group concluded: Therefore, we think that it is more than likely based on the observations of our study, that a Chapter 11 proceeding does not present an alternative to the company and would likely lead to a liquidation in a relatively short period of time."

The record is unclear concerning PEX's assets at the time of the merger. A letter of October 9,

26

1986 from counsel for TAC and PEX to a DOT official stated:

*People Express also has no unencumbered assets that have any significant equity that would provide an opportunity for raising additional capital. The majority of People Express' aircraft fleet (53 aircraft) are covered under publicly-held secured equipment trust certificates the trust indenture which contains a provision which prohibits People Express from creating any additional liens on those secured aircraft. The remaining 26 aircraft are covered under capitalized leases or operating leases which would provide no financing opportunities since People Express does not own the assets.*

The record also reflects that the company held about $60 million in spare parts, $35 million in slots

and gates, an undetermined amount of collateralized equity in its aircraft and international routes,

including Newark to London.

On September 15 and October 3, 1986, TAC respectively infused $10 million and $20 million into

PEX. By December 18, 1986 TAC had provided PEX $107 million through 11 separate cash infusions.

PEX's net loss for 1986 was $198.5 million. (200 million from Eastern)

## Compensation Comparisons

This section reviews the major items in the compensation packages at People Express and

Continental in September 1986.

PEX employees received 100 percent paid medical and dental insurance through a self insured

company plan. Disability insurance was fully paid for the first six months of incapacitation, with 50

percent of base salary up to $3,000 per month thereafter, also through a self insured company plan.

Stock ownership in the company was available at significantly discounted prices. Employees also

participated in the Ownership Income Plan based on the number of shares they held. After 1984, the

profit sharing plan for pilots changed to a return on revenue plan. Although the company did not offer a

27

retirement plan, employees could participate in a 401(k) stock purchase plan. A $50,000 death benefit policy for each pilot was provided by the company. Vacation was accrued at the rate of 14 days per year on completion of one year of employment. Employees received unlimited paid sick leave days and seven paid holidays each year. They also received credit for training days. The company's unwritten no-furlough policy was to provide employees with a "job for life." Employees received unlimited flight pass privileges.

Continental's medical and dental plans contained deductibles and provisions for co-insurance. The Company today offers employees the opportunity to enroll in a dental plan with no deductible. Although no paid disability insurance was offered in 1986, the Company today pays one-half of the cost for this item, and it offers a long term disability plan. In 1988, Continental established a retirement plan which is a 100 percent company funded, defined benefit plan. It also offers a 401(k) plan and matches 25 percent of an employee's contribution up to three percent of salary. In addition, the Company provides a flex-benefit program which entitles employees to contribute up to two percent of salary to purchase certain benefits and up to another two percent of salary in lieu of one week of vacation. The life insurance benefit is equivalent to a pilot's annual base salary. The profit sharing plan provides for payment to employees for the years in which the Company realizes a net profit. Continental, at the time of the merger, provided for pilots to accrue sick leave on a monthly basis. Today, the Company provides up to five months of paid sick leave. Vacation is accrued at the rate of seven days per year after one year of service. There are no paid holidays, and no credit is given for training days. After six

28

months of service, an employee has unlimited flight passes.

The PEX salary structure for pilots after four years of service, effective August 1, 1985, was as follows: Captain/Team Manager - $75,500; Captain - $68,300; First Officer/Team Manager - $60,500; First Officer/Team Leader $54,500; First Officer - $48,500; and Second Officer - $48,500. Captain's pay for new hires through four years of service successively was: $42,000, $48,000, $53,800 and $60,500 (with overrides for team manager duties ranging from $4,000 in the second year to $7,200 in the fifth year of service). First officers' pay ranged from $22,000 for a new hire to $41,800 for four years of service (with $12,000 overrides for team managers and $6,000 overrides for team leaders). Second officers' pay ranged from $12,000 for a new hire to $41,800 for four years of service (with the same $12,000 and $6,000 overrides paid to first officers in leadership positions). An incentive program based on the sharing of revenues from in-flight commissary sales, with the potential for a $6,000 average annual incentive payout, was implemented in 1986. A question remains regarding whether a $12,000 pay cut was effective in November 1986, or prior, for captains not working in a support function.

Continental salaries for captains ranged from $48,750 for the first four years of service to $50,000 for five to ten years of service, and amounts ranging from $52,500 $64,000 for from ten to 30 or more years of service. First officer pay for a new hire increased from $15,000 to $24,000 after six months and from $33,000 in the second year incrementally to a maximum of $40,000 in the sixth year of service. Second officers were paid the same rates as first officers during the first year and earned from $29,000

in the second year to a maximum of $35,000 in the sixth year. In addition to these salary scales, all pilots were paid a portion of the savings realized from fuel efficient flying practices which amounted to 27 percent of their pay. Over 90 percent of all pilots received a training incentive of $3,000, paid to all employees who do not change equipment on a bid. Pilots also received additional pay for flying in excess of the 83 hour per month guarantee.

## PEX Facilities

PEX's facilities may be divided into three components: (1) Terminal C at Newark International Airport; (2) other structures in and around Newark International Airport and (3) outstations and slots.

Newark International experienced phenomenal growth in the 1980s. It now handles about 40 percent of the total revenue passenger traffic in the three major airports serving the greater New York City area. Seventeen million people reside within 50 miles of Newark International. An expansion of the airport's capacity is estimated to double its passenger traffic to 50 million by the year 2000.

In 1984, People Express and the Port Authority agreed to reconstruct Terminal C which had been built in 1971. On January 11, 1985, the parties entered into a contract for the construction and lease of the facility. PEX received the rights to 41 gates; Eastern, nine gates; U.S. Air, seven; NYA, five, and Delta, four. The International facility in Terminal C was not restricted to PEX use. Although PEX contributed no money toward the construction of Terminal C, it worked on the design and construction schedule of the 860,000 square foot facility. The Port Authority agreed to fund the construction project up to a cost of $150 million, and up to $175 million on subsequent approval. The opening date of the

30

facility, which originally was scheduled for February 1986, was extended to the summer of 1987 due to construction delays. The Port Authority took control of the construction project from PEX. In September 1986, the construction schedule was more than 50 percent completed, with the foundations laid, major structural steel in place, exterior skin affixed, ramps largely finished and some interior mechanical work accomplished. PEX's rental payments on Terminal C were to commence on January 1, 1987. PEX's 25 year lease was converted to a month-to-month tenancy on September 30, 1986, when it failed to meet certain financial conditions under the agreement with the Port Authority. On August 15, 1987, with the Port Authority's consent, PEX assigned its rights under the lease to Texas Air. The Port Authority and Texas Air reached agreement on a new 25-year lease, an increase to $225 million of Port Authority funding and a reduction in the rental to be paid by Texas Air. When Continental assumed control of the construction project, it was 84 percent complete at a cost of $165 million. Continental undertook extensive redesign of the facility which opened on May 22, 1988. Construction work on Terminal C continued into 1990. From August 15, 1987, when $152 million had been spent on the facility, the Port Authority has funded increases to a total cost of $232 million. Continental ultimately will reimburse the Port Authority through rental payments. Continental additionally has contributed $56 million to the project. The total cost of Terminal C as of April 1990 was $291 million.

PEX released several other facilities in and around Newark International, including the North Terminal which housed 23 PEX gates, the North Terminal Annex, the hangar 55 complex and the cargo

31

building which houses other tenants. Offsite facilities included the Haynes Avenue building, the International Plaza building and a simulator facility 30 miles from Newark International in Totowa, New Jersey. Continental assumed the leases on all of these properties.

PEX held leases on more than two dozen outstations at various airports which included terminal space, landing rights, gates and slots. It also owned or leased a variety of ground equipment at these stations. PEX held 200 slots at high density controlled airports, most of which were commuter slots.

### Flight Manager Representatives

In 1984, PEX began investigating other sources for the recruitment of pilots. The approach selected in November 1985 involved the hiring of pilots who could qualify with a minimum number of flight hours, and who would be trained "from the ground up" using simulators for instruction as opposed to aircraft. Candidates for this Flight Manager Representative (FMR) program were selected from young aggressive recent aviation school graduates who would require a longer period to upgrade from second officer through first officer to captain positions. These candidates were ranked in the top third of their class with a minimum 3.0 grade point average, and a recommendation from the dean of their school. They held a commercial instrument multi-engine rating and had completed the flight engineer dispatcher written examinations.

The first employees to qualify for the program were ten in-house PEX employees who met the majority of these qualifications. In August 1985, they were placed in a Flight Manager Development (FMD) program developed by the company. The program was flexible, and it was changed as the

company itself was changing in 1985. Additional new hires for the same program, known as FMRs, were recruited with the aim of quickly attaining captain positions. They were generally about 35 years old. Recruiting efforts for succeeding FMR classes focused on younger people in an effort to avoid future problems arising out of mass retirements. These FMRs were brought on board in a type of probationary status in a training program from which they would graduate as second officers qualified on the B-727. Following the requisite simulator training, they would become first officers. After PEX acquired Britt, FMRs were trained on commuter aircraft. The time frames for FMR progression to the first officer position are in dispute between the parties. The starting salary for FMRs was $12,000, and they were eligible for the incentive program with a potential payout of $6,000.

PEX hired approximately 180 FMRs and immediately placed them on the pilot seniority list. Approximately 30 resigned before completing the program. Of those 30, 17 were hired by other airlines. Twenty nine FMRs who had over 1,500 flight hours attempted, and all successfully completed, an optional "up or out" program at Continental under which they became qualified as first officers prior to completing the Company's training schedule at its commuter operation for the remaining FMRs. Of the remaining FMRs at Continental in June 1990, 112 were qualified to fly as first officers and the balance were second officers.

### Fleets

On September 30, 1986, CAL operated 149 aircraft with 116 on order or option (58 on order and an additional 58 on option.* CAL's fleet consisted of: 50-B-727-200s, 24 B-737-300s, 16 DC-9-30s,

14 B-727-100s, 14 DC-9-80s, 11 DC-9-10s, eight DC-10-10s, six DC-10-30s and six A-300s. Between September 4 and 15, 1986, PEX had leased seven B-727s to Pan Am (and an additional B-727 on October 1, 1986) for use on its shuttle. Moreover, under the September 15, 1986 merger agreement, PEX had agreed to lease back from NYA six B-727-200s which ultimately passed to CAL through NYA. The record reflects that both PEX and CAL pilots flew these aircraft in December 1986.

By December 31, 1986, CAL was operating 244 aircraft with 104 on order or option. On December 30, 1986, PEX had taken delivery of an additional B-747 which was paid for by TAC and flown by both PEX and CAL pilots in 1987.

In a March 12, 1987 announcement to pilots, CAL management stated that PEX pilots would receive credit for 66 aircraft – 22 B-737s, 36 B-727s and eight B-747s (one of which was paid for by TAC and did not fly for PEX in 1986).

On September 15, 1986, FAL's fleet contained 25 B-737-200s and 16 DC-9-80s, for a total of 41 two-pilot narrow-body aircraft.

On September 15, 1986, NYA's fleet contained eight B-737-300s, 20 DC-9-30s and six DC-9-80s, totaling 34 two-pilot narrow body aircraft.

---

\* Arbitrator Nicolau had identified 104 CAL aircraft on order or option as of September 12, 1986. The difference between 112 and 104, 12 B-727s, was placed on option from PEX to TAC pursuant to the September 15, 1986 merger agreement in return for the cash payments of $49.5 million to PEX.

## The Company's Staffing Analysis

The Company's staffing determination for PEX pilots is based on its analysis, in late February or early March 1987, of PEX operations using Continental's pilot utilization. The monthly block hours assigned to PEX operated aircraft were: 11,408 for the B-727s, 5,332 for the B-737s and 1,829 for the B-747s. These figures were based on the maximum number of hours on a daily basis projected in 1987 for the PEX aircraft in operation at Continental. The monthly block hours per pilot used in the staffing analysis was: captains, 64.6; first officers, 64.25 and second officers, 66.52. These figures yielded a total of 289 captains (177 for the B-727s, 83 for the B-737s and 29 for B-747s). In order to accommodate a PEX management request to include a specific PEX pilot who had performed significant non-revenue flying duties, six additional captains were added to reach the 295 figures. The number of first officers was calculated at 290 (178 for the B-727s, 83 for the B-737s and 29 for the B-747s). The number of second officers was 200 (172 for the B-727s and 28 for the B-747s). The total number of pilots required under the Company's staffing analysis was 785.

## Overview of the Proposed Seniority Lists

### The Company

The Company's proposal, as reflected in Bid 87-3, establishes the following seniority list: numbers one through 1,675 were awarded to CAL (including NYA) captains; numbers 1,676 to 2,119 were awarded to FAL and PEX captains by date of hire; numbers 2,120 to 2,418 were awarded to CAL first officers pursuant to the Nicolau Award under which 299 pilots (285 CAL first officers and 15

35

former NYA pilots) were placed for captain expectancies based on CAL's order and option aircraft;

numbers 2,419 to 3,680 were awarded to CAL, FAL and PEX first officers, of which the first 756 pilots

(579 CAL and 177 FAL) were integrated by ratio under the Nicolau Award and the remaining FAL and

PEX pilots were integrated by date of hire; numbers 3,681 to 3,842 were awarded to the PEX FMRs as

second officer positions; numbers below 3,842 were awarded to CAL pilots hired in February 1987 and

thereafter.

Under the Company's proposal, as of September 1, 1990,* the pilot seniority list was as follows:

numbers one to 1450 were held by CAL pilots; numbers 1451 to 1575 were held by FAL pilots;

numbers 1576 to 1794 were held by PEX pilots; numbers 1795 to 2084 were held by CAL pilots;

numbers 2085 to 2725 were held in a ratio of CAL and FAL pilots; numbers 2726 to 3019 were held by

PEX pilots (except for four numbers held by FAL pilots); numbers 3020 to 3070 were held by FAL

pilots; numbers 3071 to 3210 were held by PEX pilots (FMRs).  The remaining numbers were held by

CAL pilots or reserved for CAL commuter pilots.

PEX Committee

The PEX Committee's proposal is based on the concept that each pilot group (not including FAL

which was not operating on September 15, 1986) is entitled to the jobs it brought to the merged carrier

---

    * This date is used as opposed to, for example, September 1, 1991, because the record does not
reflect the effect of the four parties' proposals on a date in 1991.

on September 15, 1986. The job entitlements, as viewed by the PEX Committee, are wide-body captain, narrow-body captain, wide-body first officer, narrow-body first officer, wide-body second officer and narrow-body second officer. The PEX Committee maintains that it brought 1061 entitlements to the merged carrier.

The PEX Committee's status-ratio proposal, if in effect on September 1, 1990, would have produced the following breakdown of the pilot seniority list: numbers one to 1635 would have been held by 457 PEX pilots in a ratio with CAL pilots; numbers 1636 to 2112 would have been held by 162 PEX pilots (FMRs) integrated with CAL and FAL pilots; numbers 2113 to 2223 would have been held by FAL pilots; numbers 2224 to 2513 would have been held by CAL pilots; numbers 2514 to 3154 would have been a ratio of FAL and CAL pilots; numbers 3155 to 3209 would have been held by FAL pilots; the remaining numbers would have been held by CAL pilots or reserved for CAL commuter pilots.

CAL Committee

The CAL Committee's proposed list is premised on the allocation of 631 positions to PEX pilots on the property on October 23, 1987, when Bid 87-3 was announced. Based on the list used under that bid, the proposal awards Numbers one to 1660 to CAL (including NYA and FAL) pilots; numbers 1661 to 2018 are a ratio of 230 PEX pilots and 128 CAL (including FAL) pilots; numbers 2019 to 2463 are a ratio of 18 PEX pilots and 427 CAL pilots; numbers 2464 to 2514 are awarded to CAL pilots; numbers

2515 to 3723 are merged in a ratio of 393 PEX to 816 CAL; numbers 3724 to 3769 are awarded to PEX pilots; the 153 FMRs are slotted below those CAL pilots placed on the CAL seniority list prior to February 10, 1988, and they are merged in a ratio with 136 Continental Express pilots.

The CAL Committee's proposal, if in effect on September 1, 1990, would have tracked the Company's list as implemented from numbers one to 1575; numbers 1576 to 1893 would have reflected a ratio of CAL and PEX pilots; numbers 1894 to 2710 would have interspersed 13 PEX pilots with CAL (including FAL) pilots; numbers 2711 to 3623 would have been a ratio of CAL and PEX pilots; numbers 3624 to 3661 would have been held by PEX pilots; numbers 3662 to 3801 would have been held by CAL pilots; numbers 3802 to 4069 would have been a ratio of PEX pilots (FMRs) and Continental Express pilots.

## FAL Committee

The FAL Committee's list, if effective on September 15, 1986, would have placed 609 PEX pilots below 557 FAL pilots. These pilots would have been followed by 119 FAL pilots, then 420 PEX pilots (including the FMRs).

This proposal, if in effect on September 1, 1990, would have resulted in: CAL plots holding the first 1450 numbers; FAL pilots holding numbers 1451 to 1575; CAL pilots holding 1576 to 1865: a ratio of FAL and CAL pilots from 1866 to 2506; PEX pilots from 2507 to 2877 (except for 2862 held by a FAL pilot); 2878 to 2931 held by FAL pilots; 2932 to 3070 held by PEX pilots; 3071 to 3115 held by CAL pilots; and FMRs interspersed with CAL pilots from 3116 to 3941.

Positions of the Parties

## PEX Committee

The PEX Committee's proposal is premised on the facts that in September 1986, the three carriers – CAL, NYA, and FAL, which compromise the list into which PEX pilots will be integrated – paid and staffed as captains 940 pilots (102 on international wide-body aircraft and 838 on other aircraft) while PEX paid and staffed 457 captains (52 on B-747s and 405 on narrow-bodies). Based on the combined total of 154 wide-body captaincies, the list should be merged so that the top 154 names include the 52 PEX pilots and the 102 most senior pilots on the CAL-NYA-FAL list, regardless of the carrier of ancestry of those 102 pilots. A date of hire list which included the PEX pilots would fail to deliver to PEX pilots the 52 wide-body captaincies and the 405 narrow-body captaincies they brought to the merger. Therefore, a status ratio is used to preserve the jobs and relative bidding power on each of the two lists, with the 52 PEX and 104 CAL wide-body captains comprising the most senior positions on the list. The next 1,243 most senior places combine the 405 PEX and 838 CAL other captain entitlement holders in an arithmetical ratio. This will preserve the precise access to wide-body flying each pilot in this group had before the merger and distribute ratably as between the CAL and PEX pilots the opportunities for bidding and other benefit selections based on seniority.

Continental decided not to buck the 1985-87 consolidation trend in the industry to achieve nationwide route systems and "critical mass." Texas Air gained a "turn-key" expansion into the dense New York City travel market which PEX already dominated through its Newark hub. It also gained the Newark-London and other PEX international routes, Terminal C, PEX's standardized fleet and the 1,061

pilots already trained on the aircraft in the fleet.

This was a merger of equals. While PEX had experienced some financial problems in the year preceding the merger announcement, it recorded net profits in three of the four years of its independent operations after its start-up year. Its operations were profitable on a net and operating basis in the second and third quarters of 1985, and it earned net and operating profits of $5 million and $11 million, respectively, in August 1986, the month before the merger announcement. Cash was stable from August 25 to September 15, at $13.3 million. The reality is that PEX never ceased operating and never filed for Chapter 11 protection.

Predicting the future course of any airline in the turmoil of this volatile industry is a very difficult undertaking. The record reflects that PEX would have pursued two realistic alternatives other than liquidation if the TAC merger would not have been consummated. One was a merger with America West. The other was a "turnaround" plan. On the other hand, in predicting Continental's future without PEX, there are questions as to how it would have fared without the Newark hub, the PEX fleet and the dedicated PEX employees.

There is no seniority integration arbitration decision which discounts what the pilots from a carrier should receive in terms of a fair and equitable award on account of their carrier's poor financial performance. Any such decision in this case would have no factual support in the record, no case precedent and no basis in logic or fairness.

The Company's claim that the imposed list must be fair because all four pilot groups oppose it

certainly is no test of fairness. In fact, the other three pilot groups were pleased with the list after the

PEX operation brought enhanced job opportunities and job security for them through, for example, the

B-747s to which CAL pilots quickly gained access on former PEX routes. The 288 PEX pilots inserted

at numbers 1678 to 1966 had no chance to fly the regular captain positions in Continental's other

domiciles at Houston, Los Angeles, Denver or Honolulu. And not one of the PEX pilots other than

these 288 is ahead of any CAL or NYA pilot hired before February 23, 1987.

On September 15, 1986, TAC promised the PEX pilots that the PEX and CAL seniority lists would

be merged in a "fair and equitable" way. The promised seniority integration arbitration took place only

after the PEX pilots commenced litigation, and the arbitration started three and one-half years after the

promise.

TAC's control of PEX effective September 15, 1986 enabled it to renegotiate the purchase price

for PEX. The September 15, 1986 Agreement and Plan of Merger gave TAC effective control of PEX.

The lock-up provision of the merger Agreement itself prohibited PEX from soliciting other offers and

required PEX to portray itself as a failing carrier. PEX's alternatives were, therefore, limited by the

merger Agreement. Upon announcement of the merger on September 15, 1986, TAC took immediate

control of PEX and utilized its assets to benefit TAC's other interests. In October 1986, TAC adopted a

schedule for consolidation of operations at the outstations and immediately began consolidating those

operations. TAC was also able to eliminate competition by discontinuing PEX service to cities where

PEX and Eastern competed. Continental also sent its representatives to meet with the Port Authority

regarding Terminal C in July and October 1986, and on ten to 15 occasions between October 1986 and February 1987.

There can be no doubt that the operational changes reflected an intent by TAC in the fall of 1986 to merge its airline subsidiaries as soon as possible. In October 1986 Continental announced that TAC would fold NYA, PEX and FAL into Continental. Steps were also taken to implement a merger of operations as soon as possible. TAC received certificates in the names of PEX and CAL to serve PEX routes from Newark to London and from the United States to Brussels, Luxembourg, The Netherlands, Shannon, Switzerland and West Germany. TAC also received the PEX exemption to serve Montreal from Newark. Effective November 15, 1986, TAC integrated the PEX Frequent Flyer program into the Eastern, CAL and NYA programs. In short, senior management at Continental was making preparations for the merger of operations with PEX almost immediately after September 15, 1986.

Every pilot seniority integration in the airline industry, except two, has been conducted under the fair and equitable standard. The two exceptions were NYA-CAL and FAL-CAL. This arbitration is the only arbitration at Texas Air conducted under the fair and equitable standard since the 1983 strike. During our/these bankruptcy proceedings.

In January and February 1987 the PEX pilots were being assured by PEX management representatives that TAC and CAL management were saying that the merger process was to be a "traditional" arbitration. In March 1987, a CAL management representative handed the PEX Committee the memorandum describing the imposed list.The PEX Committee was not consulted about the imposed

list. All but one of the people who determined how the imposed list would go together have numbers on the CAL pilot seniority list. The CAL Pilot Operations Group was given the opportunity to have input into the imposed list.

The FAL pilots were integrated under a JPA which, as Arbitrator Nicolau commented, did not provide a "level playing field" with "a considerable and obvious tilt in favor of the CO [CAL] pilots." Nicolau refused to include the PEX pilots despite attempts by the Company and the CAL pilots to do so in the PEX pilots' absence.

Continental should not now be permitted to take advantage of its strategy of delay in denying the PEX pilots an arbitration by urging that the imposed list should remain in effect because it will be a nuisance or an expense to change now.

As Arbitrator Bloch observed in the CAL-NYA decision: "There can be no question . . . that, both legally and by any other reasonable measure, [Continental] had started anew in 1983." Continental and Frontier had comparable hiring cycles, both in the percentage and number of pilots that they hired. People Express and New York Air also had very similar hiring patterns as start up carriers in the early 1980s with rapid advancement in the industry. CAL is similar, however, in that its hiring pattern peaked during the 1983-85 time frame which also was the period of the bankruptcy and strike at Continental.

The industry-wide pilot preference for wide-body flying and the PEX contribution to the merged carrier of its London route, its B-747 fleet and its other vital assets are factors which strongly support the choice of a status-and-category ratio method of seniority integration. In the 1983 TI-CAL pilot

integration arbitration, the 66 senior CAL pilots were placed at the top of the merged list because they were international wide-body captains and because TI did not fly any international wide-body aircraft at the time of the merger. Pilot preference for wide-body aircraft pervades the industry for reasons including improved working conditions and higher pay, status or prestige and a "mystique factor". This preference also occurs at Continental, as confirmed by the CAL seniority list of June 1, 1989, on which 30 of the top 35 captains are staffed on wide-body equipment.

The fact that PEX contributed all eight B-747s to the merger makes doubly inequitable the Continental imposed seniority list which denies B-747 flying to PEX pilots accustomed to the acknowledged prestige and other benefits associated with B-747 flying. Conversely, CAL pilots achieved windfall gains and unfairly profited at the expense of PEX pilots. Seven of these B-747s which PEX operated in September 1986 comprise one-third of the wide-body aircraft then flown by the four merging carriers, and produce 90 percent of the seats and 85 percent of the total capacity of the 14 DC-10s which Continental operated on September 15, 1986. The eight B-747s, together with existing PEX routes and its Newark hub, enabled Continental to expand into profitable markets which otherwise would have been unavailable to the Company.

In addition to the PEX fleet, Continental assessed the spare parts in the PEX inventory at more than \$60 million.

A major contribution that People Express brought to the merged carrier was its Newark hub facility together with the market presence and power that PEX had built up at Newark. Terminal C, as

planned and engineered by PEX, was a major asset in and of itself in promoting Continental's public image. Scandinavian Airlines System (SAS) joined with Continental because the SAS hub in Newark dovetailed so well with the extraordinary Terminal C facility. Continental also gained lease rights to significant hangar and storage space at Newark, sufficient ground equipment to service the extensive fleet at PEX's hubs and out-stations, valuable take-off and landing rights at various slot-restricted airports, and gate space at London's Gatwick Airport.

A carrier's abilities to generate traffic, keep costs low enough to permit effective competition, and maintain a dominant hub to protect or expand its market share were critical to survival and growth in the deregulated era for new entrants and established carriers alike. PEX was the only one of the four carriers to experience substantial, uninterrupted growth over the full five year period ending September 30, 1986, whether that growth is measured in terms of traffic, capacity or block hours flown by pilots. In five years, PEX reached a level of operations that permitted the DOT to place it in the category which the government defines as a "major carrier" – a level never approached by Frontier or New York Air. PEX produced an operating profit in four of its five years beginning with the fourth quarter of 1981 and ending with the third quarter of 1986. CAL and NYA produced operating profits in three of the five years, while FAL posted an operating profit in only one of the five years. Moreover, PEX showed a positive spread between its actual load factor and BELF in four of the five full years of its operations – the best performance among the four carriers. In sum, PEX was better able than the other three carriers to generate traffic and keep costs low enough to permit effective price competition during this five year

period. PEX achieved this operational success largely in the context of stable finances, as indicated by

its relatively low debt-to-equity ratio. While PEX may not have had the financial strength of some

carriers in the industry, it was not as highly leveraged as Continental. Additionally, PEX brought crew

costs to the merged carrier that were substantially lower than the industry average as a proportion

of transportation revenues, due to PEX's relatively greater efficiency and productivity. Similarly,

aircraft utilization was also higher at PEX than at CAL or NYA. Finally, the importance of a dominant

position at Newark, and by implication, in the New York market cannot be overstated in helping

Continental to serve eastern markets in order to achieve sufficient mass to survive both in the national

and international markets. International route authority was crucial for the near term future with respect

to Atlantic markets, as well as having the ability to enter into cooperative marketing agreements with

European carriers. It is true that PEX had problems in the year ending September 30, 1986, but that

period coincides with its ill-fated acquisition of Frontier. The PEX-CAL merger relieved the PEX

system of the burden of hemorrhaging attributable to the FAL operation and, at the same time, relieved

Continental of a low-price competitor at its Denver hub. Claims that PEX was poised for imminent

demise and that the valuable assets brought by PEX to this merger would have just disappeared are not

plausible in light of airline industry history. Generalizing about a carrier's long term prospects from the

financial situation faced by that carrier over a period of months ignores the basic strengths of the carrier

built over a period of years. PEX did not have problems that were different from the other three carriers

and, indeed, showed characteristics and assets in terms of performance over a long-term, five-year

period that were superior to those other three carriers.

When PEX and CAL merged, the PEX employees lost ground in the pay and benefits area as well as under Continental's personnel policies. PEX recognized that its most important asset was its employees, and it revolutionized traditional views of employee relations. The actual earnings of the PEX pilots, which were higher than those of the CAL pilots prior to their merger, dropped as a result of the merger and the imposed seniority lists. The pay rates and other compensation plans of the PEX pilots were superior to those of the CAL pilots prior to the merger and dropped as a result of the merger. The base rate of PEX fifth year captains was $68,300, which includes the team leader override received by all PEX captains. The base rate for CAL fifth year captains was $50,000. After the merger was announced, PEX pilots took a pay cut to $56,250 in order to bring them closer in pay to the CAL pilots, and to $50,000 in 1987 to conform to the CAL pay rate. PEX fifth year first officer base pay was $48,500, (with a team leader override, $54,500) as compared to $40,000 for their CAL counterparts. Fifth year second officers at PEX had a base pay rate of $48,500 ($54,500 with a team leader override), while the CAL fifth year second officers received $35,000. Entry level pay for new hire pilots at CAL was $15,000 for the first three months, $18,000 for months four through six and $24,000 for months seven through 12, and PEX paid $12,000 plus incentive pay for the first year. Although PEX pay rates rose consistently from 1983 to the merger, CAL pay rates dropped dramatically since the strike and bankruptcy in 1983, with barely any increase in the ensuing years. Moreover, CAL pay rates are substantially lower than the pay rates at other carriers, and Continental does not differentiate between

wide-body and narrow-body pay rates as is common in the industry. PEX also had a variety of income incentive programs, while CAL has a profit sharing plan that is more restrictive than the PEX plan. PEX had a no furlough policy and a no downgrade policy, whereas CAL has had numerous pilot furloughs. PEX provided medical, life and disability insurance benefits that far surpassed those at CAL. THE SLIC bidding system enabled PEX pilots to prioritize their desires for the upcoming month through the use of a computer syntax by which the lines of flying were build. A Custom Bidding feature permitted a pilot to work with a scheduler to build the best schedule based on the pilot's desires. On the other hand, CAL pilots bid for preconstructed lines, and improving one's schedule is based on a first come, first served basis through the "open window" period. Continental has unilaterally changed the work rules regarding seniority when it suited the Company to do so. The vacation, holiday and sick leave benefits at PEX were far superior to those benefits at PEX were far superior to those benefits at Continental. There was a unique relationship relationship between PEX management and employees which resulted in cooperative labor management relations in a high quality work environment with significant opportunities for self-actualization – none of which were present at Continental.

On September 15, 1986, the FMRs were fully qualified pilots who met or exceeded Continental's real hiring requirements for second officers, and thus should be treated just like other second officers for purposes of seniority. At PEX, they were fully qualified commercial pilots with high expectations and excellent career opportunities. Immediately upon their arrival at PEX they were placed on the seniority list and began an intensive training program to prepare them to upgrade to first officer within

approximately one year. Twelve FMRs became continental check airmen, several of whom gave line check instruction during the transition to CAL procedures. Others trained and gave final line checks to CAL 1987 and 1988 new hires being staffed as second officers. Continental did not distinguish the FMRs when it proposed to the Federal Aviation Administration reduced training for the PEX pilots for the changeover to CAL procedures. FMRs flew as second officers on the Continental side in January 1987 when they were needed to staff the PEX B-747s and B-727s that TAC had given to Continental and which were being bid for the flown by the CAL pilots. Nonetheless, CAL management appended the FMRs to the bottom of the seniority list and forced them to fly in a commuter operation before upgrading to first officer. The FMRs as a group were placed in a less senior position than an entire group of, at best, equally qualified CAL and FAL first and second officers hired prior to the merger. Because the CAL pilots hired after April 1987 were hired for the benefit of Eastern and not Continental, it would be unfair to place them ahead of the FMRs. Aside from the constructive notice these CAL new hires had in 1987, these pilots remain at Continental solely due t attrition and voluntary leaves. No arbitrator has ever looked behind an airline's hiring to assess the qualifications involved in merging pilot seniority lists.

A comparison of staffing at PEX and CAL on September 15, 1986 shows that the two airlines were staffed at virtually identical levels for their relative size. During the planning process, PEX used ratios to calculate flight hour utilization rates for line pilot staffing levels, with management flight crew members added separately. While People Express staffing levels reflected policies and characteristics

specific to PEX, the resulting measurements were almost identical to CAL's. At CAL, the pilot system bids and the Pilot Employment Policy (PEP) Manual reflect an average ratio of flight crewmembers per aircraft of 5.27 to 5.29 counting all pilots. CAL's block hour utilization rate is indicated in several documents to be 64 flight hours per line flight crewmember.

In creating the imposed list, which credits PEX with 288 captaincies and FAL with 1677, the Company failed to consider this parity of staffing between PEX and CAL. This resulted insignificant loss to the PEX pilots and a significant gain to the CAL pilots, as can be seen from computing the respective crew ratios of 3.60 and 9.16 (based on 80 PEX and 183 CAL aircraft), and average flight hours per captain at 81.32 for PEX and 27.42 for CAL. A CAL crew ratio of 9.16 would require 605 PEX pilots to fly even the 66 planes Continental allows us. Applying CAL pilots' 27.42 flight hour average to the number of hours flown at PEX in September 1986 (23,421) would require 854 PEX captains. Moreover, CAL's forecast of flight hours to be flown by a portion of the original PEX fleet in 1987 and 1988 reveals that the shortage of PEX captains for this purpose grew from 103 in June 1987 to 191 in September 1988. At PEX, the daily block hours to be flown by each narrow-body aircraft type was utilized to determine monthly block hours, and B-747 staffing used a total number of man days to be worked. A monthly flight crewmembers utilization rate was applied to the monthly block hour value to determine the number of line flight crewmembers, and the number of management flight crewmembers was then added to determine the total staffing required. The CAL methodology uses the forecast flight hours over a given time period and applies a flight crewmember utilization rate to

determine the required number of line flight crewmembers. CAL staffs at a level sufficient to cover the peak flying periods, and the management flight crewmembers are then considered separately. In the specific calculation of the imposed PEX staffing level, none of the 75 PEX Captains utilized in management function by Continental in March 1987 appears to be included. Additionally, the Company did not use its flight crewmember utilization rate in determining the number of PEX captains necessary to operate in the CAL system. Finally, PEX was given credit for only 66 of the 80 aircraft, the Company says, to account for aircraft transferred to NYA and leased short term to Pan Am. Yet PEX captains flew some of these aircraft after their supposed transfer to NYA, and it appears that the leased aircraft were returned to Continental after a further extension of the leases. In the same way, the Company distorted the block hours projected for PEX pilots by using a 1987 timeframe which is not justified. Based on these considerations, and in the interest of fairness, the Company should have used the ratio method and the actual number of flight crewmembers paid and staffed at PEX and CAL (1061 PEX pilots and 2175 CAL pilots), with no need for any recalculation of the required or projected staffing levels.

Based on the foregoing considerations and analysis, the PEX Committee contends that its status and category proposal is fair and equitable because it preserves the relative positions of the pilots from each group and avoids any windfalls to one pilot group at the expense of the other. The six categories in its proposal are: wide-body captain, narrow-body captain, wide-body first officer, narrow-body first officer, wide-body second officer and narrow-body second officer. Places on the merged list are given

out to pilots from the two unmerged lists on an entitlement basis. That is, each pilot is assumed to bid

the best job he can hold, in accordance with the established job rankings, and the array of names on the

consolidated list derives from the principle that each pilot's unmerged relative percentile in his

unmerged job will be preserved, as closely as is mathematically achievable, when the two unmerged

lists are combined. Under the proposal, each pilot group can take advantage of its own attrition. The

number of jobs used to create the ratios for the merged list are based on the jobs that existed before the

merger announcement, as opposed to a prediction or projection of the future. The proposal is fair

because it preserves each group's pre-merger access to preferred wide-body flying. A date of hire based

integration is unfair and inequitable to the PEX pilots who would be barred from access to the very

aircraft they brought to the combined carrier, thus permitting the CAL pilots to reap windfall gains at the

expense of the PEX pilots. Given the disparate origins and histories of PEX and CAL – one, a

deregulation airline; the other, dating back more than 50 years – the more significant fact is

that a new airline began with Texas Air's acquisition of PEX, and its merger of PEX, CAL, NYA and

FAL. Beginning on February 1, 1987, at the latest, pilots on both lists began accruing tenure and service

with a new entity, whose pilot seniority list will be created through these proceedings. By preserving

each pilot's relative standing in his status and category, the PEX proposal will distribute bidding power

and jobs in precisely the same way the two separate lists did. We reject the other parties' proposals to

integrate seniority lists on the basis of unreliable predictions about the economic futures of PEX and

CAL absent the merger. It is not only unwise but unfair and inequitable to construct an integrated pilot

51

seniority list based on the uncertainty of speculations about the future of PEX and CAL as unmerged carriers. Arbitral precedent supports the adoption of the status and category ratio list and counsels against the use of unreliable predictions about the unmerged economic prospects of merging carriers.

The constructive notice date for the merged seniority list should be September 15, 1986. All pilots hired after that date should be placed on the integrated lists, in date-of-hire order, below all pre-merger pilots. Because CAL did not hire any pilots between the TAC-PEX acquisition date and February 23, 1987, September 15, 1986 is functionally equivalent for constructive notice purposes to any later date up to February 23, 1987. As of that date, any pilot applicant knew or should have known that his/her seniority rights would be subject to the superior rights of other pilots already employed by the merging airlines. Arbitrators have uniformly accepted the constructive notice doctrine and have ordinarily determined the merger announcement date as the constructive notice date. In this case, pilot applicants would have been placed on constructive notice through a series of events including: the TAC announcement, on September 15, 1986, of the PEX acquisition and merger with CAL upon consummation of the TAC-PEI merger agreement; the TAC-PEX joint application, filed on September 19, 1986 with the DOT, seeking approval of the acquisition; the DOT's tentative and final approvals respectively on October 14 and 24, 1986; the consolidation of facilities of CAL, NYA and PEX during the fourth quarter of 1986; the diverting of PEX aircraft via NYA to CAL; CAL pilots bidding on B-747s previously flown by PEX pilots; the merging of the PEX frequent flyer program with the CAL program in November 1986; and the PEX shareholder approval of the acquisition on December 29,

1986. After issuance of the March 12, 1987 list, management would have expected the Company's interviewers to advise all job applicants who asked that every pilot hired after February 1, 1987 would be placed below all PEX pilots and FMRs. The contingencies contained in the merger agreement were the normal contingencies and conditions that would take place in any financial transaction of this size and complexity and which, at most, added time, but not uncertainty, to the final outcome which was resolved on December 29, 1986 by the PEX shareholder approval. An objective pilot applicant at Continental on September 15, 1986, or as late as February 22, 1987, should have reasonably believed that the likely outcome of the TAC-PEI merger agreement would result in the integration of the operations and pilots of PEX and CAL. Therefore, it would have been unreasonable for an applicant to wait until October 1987 before realizing that his/her seniority rights might well be subject to the superior, pre-existing seniority rights of another pilot group. In this regard, it would be particularly inequitable to elevate the CAL pilots hired after April 1987 as potential strike replacements for Eastern, as they were surplus to Continental's operational needs.

The Company's list is unfair and inequitable. It was not compiled as a result of mutual negotiations and mediation or arbitration. Instead, it was unilaterally created by CAL management – specifically, by four CAL pilots whose names appear on the list – and imposed upon the PEX pilots despite their opposition. The use of such a list created by self-interested decision makers is unfair and denies the PEX pilots their right to due process. Thus, there is an unavoidable inference that CAL's decision-makers were not acting in the interests of PEX pilots. Accordingly, the list should be

summarily rejected.

The Company's list should also be rejected because it was created in breach of the LPA and in violation of the industry standard of a fair and equitable integration procedure. There is absolutely no precedent for the unilateral manner in which Continental constructed the list. The PEX pilots had no meaningful input into its formulation. Continental's reliance on the allegation that PEX would have gone bankrupt and ceased operating but for the merger as a purported justification for its derogation of the PEX pilots' seniority rights is unsupported by the facts for the case precedent. A carrier's financial condition deserves little or no weight when merging pilot seniority lists. Continental desperately needed PEX to survive in the deregulated environment, and the merger of PEX and CAL should be viewed as the joining of equals. Continental cannot show that PEX would have gone into bankruptcy and ceased operating but for the merger, even if it were appropriate for CAL to take into account its supposedly superior financial condition to PEX, which it is not. Continental has had a planned strategy for delay in this case, and therefore the fact that its unlawful list has been in effect for four years should be given no weight. Indeed, the Company should be stopped from arguing that its imposed list should be upheld on the ground that it has been in use for four years.

The Company's list should also be rejected because it arbitrarily places CAL pilots ahead of PEX pilots with the same or higher status, seniority and experience, substantially decreases the PEX pilots' relative position and permits CAL pilots to reap windfall gains at the expense of PEX pilots. In compiling the imposed list, the CAL decision-makers focused almost exclusively on the allegedly

54

disparate economic conditions of the two airlines to the exclusion of other relevant factors such as length

of service, relative position on the unmerged lists, and status achieved at the pre-merger carriers. Under

the imposed lists every PEX pilot loses relative position. Despite the wide-body jobs that PEX pilots

brought to the merger, for example, the lists denies any of them from achieving any of their entitlements

to the more desirable positions. The Company downgraded approximately 150 PEX captains and placed

them junior to all CAL and NYA pilots hired before the merger announcement. In so doing, the

Company split the PEX April 25, 1983 training class of pilots, with the anomalous result that one class

member (number 300 on the PEX seniority list) is now number 1977, and another (number 301 on the

PEX list) is now number 2857 on the integrated lists.

The Company's list also artificially enlarged the CAL captain class and artificially reduced the

PEX captain class. The former was increased from 857 pilots actually trained and flying as captain on

September 15, 986 to the top 1677 positions on the imposed list.* The latter was reduced from 457 to

288. According to the PEX Committee's analysis, 1299 captain slots, including management, were

awarded based on present and future captaincies on Bid 87-1, effective December 1987. Therefore,

since the number one PEX seniority holder does not appear on the merged list until number 1678, at

least 378 pilots who did not even hold a future captain bid were placed ahead of him. CAL pilots were

---

* CAL bid 85-5 projected 857 captains at Continental on November 1, 1986. As of September 1986,
Continental paid and staffed only 772 captains. According to the Block Award, NYA had 168 captains on that
date. Since the PEX merger, however, Continental has needed to promote CAL pilots to fill the downgraded PEX
captains' positions.

allotted 1677 captain positions based in part on the planned delivery of aircraft in 1987, which did not arrive, and the additional transfer of aircraft (five B-747s and six B-727s) from PEX. The reduction of the PEX captain class was accomplished without talking to a single PEX line pilot and was fraught with inaccuracies and inconsistencies – not the least of which were the reliance on, and a misunderstanding of, only one month's statistics, and a misunderstanding of PEX's manning and staffing calculations.

Under the Company's list which resulted in the PEX pilots' loss of relative position, they enjoy few benefits from working for the merged airline – especially with regard to bidding different types of equipment and holding different domiciles.

The Company's list is unsupported by any precedent, including the cases it has cited. In the CAL-FAL pilot case, Arbitrator Nicolau observed that the JPA and its Sideletter imposed restrictions not found in other proceedings, resulting in a considerable and obvious tilt in favor of the CAL pilots. For example, he was required to take special notice of the non-operating status of Frontier and the limited employment prospects for FAL employees resulting there from; and as a result, give this fact greater weight than the expectation that Continental's competitive position would be enhanced. Even more damaging to the FAL pilots was the requirement to ensure no dilution or adverse impact on the promotional expectations of CAL (including NYA) captains and first officers based on all aircraft in service or on firm order or option to Continental. The CAL-PEX flight attendant case is not a useful precedent because, like the FAL pilots, their arbitrator's mandate required him to consider factors beyond the fair and equitable standard. Moreover, the PEX flight attendants were grouped in a single

job description (Customer Service Manager) and were subject to different economic and non-economic benefits from those of the captains, first officers and second officers whose progression in status and careers are more significantly determined by seniority. A third distinction was the PEX practice of cross-utilization whereby 15 to 20 percent of the Customer Service Managers worked in jobs which did not involve flying. Finally, the CAL-PEX flight attendant hearing lasted only six days, whereas the record of the instant case is far more complete with respect to the financial condition of the two airlines involved in the merger, among many other things, and the many economic benefits brought to the merged carrier by PEX and its employees.

The CAL Committee's proposal is even more unfair and inequitable than the Company's proposal, and therefore should be rejected. The primary factor which the CAL Committee used in constructing its proposal was the contention that PEX as an airline had failed, and that therefore the PEX pilots had no career expectations and were entitled to nothing by way of seniority integration. Although PEX experienced some financial difficulty during the year preceding the announcement of the TAC merger, the fact is that PEX was a going business at the time of the merger, which, unlike CAL and FAL, never sought Chapter 11 protection. Continental's financial history (and current status) hardly places it in a position to assert that its financial condition was superior to that of PEX. Nor are FAL and NYA pilots entitled to seniority preference over PEX pilots. FAL had already filed for bankruptcy protection at the time of its operational merger with CAL. NYA as well was having serious financial problems at the time its operations were merged into Continental's in early 1987. The CAL Committee's

57

proposal uses a variety of methodologies, manning levels and different system bids for determining the number of CAL pilots and the number of PEX pilots. System Bid 87-3 (October 1987) was used for determining CAL pilot utilization, but the month of December 1986 (the industry's seasonal low point month) was used for PEX. System Bid 88-1R (a reduction bid) was used to determine the number of PEX pilots eligible for captain positions. The CAL commuter staffing levels were used in determining the FMR placement. Neither date of hire nor length of service nor position achieved was given any significant consideration under the CAL Committee's proposal. It would have been better for a pilot hired by PEX in 1983 to have quit PEX as a captain after the acquisition and then gone to work at Continental in 1987, because he is ranked beneath CAL pilots hired by Continental in March 1987. The CAL Committee's list is totally unfair to the FMRs in view of their hire dates, qualifications or experience, as well as under the constructive notice doctrine.

The FAL Committee's proposal improperly tries to reverse the impact of the CAL-FAL award which was not a product of the PEX pilots' proposal in this case, nor of any PEX actions. This Arbitration was intended by the Court to be a two-list integration involving CAL and PEX. The FAL pilots' participation is solely as a component of the CAL list. The FAL Committee's proposal imposes inexcusable and irresolvable equities on the PEX pilots who would lose 1,000 seniority slots and be covered under a useless 'fence" which creates additional inequities and will spawn future arbitrations. The FAL Committee's proposal simply ignores all FMRs under its "date of commitment" method which recognizes FMRs on the date they completed their training, as opposed to the date they entered training.

CAL Committee

The CAL Committee determines that 641 PEX pilots (248 captains, 230 first officers and 163 second officers) were entitled to placement on an integrated list. Its figures are based on the actual block hours flown by PEX in December 1986, as opposed to the Company's approach which used 1987 projected monthly block hours. The CAL Committee also uses the actual CAL pilot utilization rates, as opposed to the Company's use of the PEX monthly utilization rates. It adds a five percent factor for management pilots, which approximates the number at Continental. This reflects the fact that the PEX pilots would be employed under Continental work rules and subject to this management structure.

The CAL Committee premises its list on the date of October 23, 1987 – the date of Bid 87-3 which was the first combined seniority event involving CAL, former FAL and former PEX pilots.

The former PEX pilots are integrated by status to the extent that 230 of the 248 captains are ratioed with 128 CAL captains in the group of captains immediately below the last former FAL captain. Those 128 CAL pilots had held captaincies as a result of Bid 87-3. The remaining 18 PEX captains are then ratioed with 427 CAL pilots who had held captain seats as a result of Bid 87-3, but lost them in an overall seven percent decrease on reduction Bid 88-1R. The 393 PEX first officers and second officers are ratioed with 816 CAL first officers and second officers – ending with the last pilot Continental hired prior to Bid 87-3. The remaining 51 former PEX pilots employed on October 23, 1987 follow in a block. The FMRs are placed on the merged list, effective February 10, 1988 – 58 weeks after TAC acquired PEX and the earliest time at which the FMRs could achieve full commercial pilot qualification

under Continental's training program. They are ratioed with 136 CAL commuter pilots.

Arbitral authority establishes that to be "fair and equitable", the integrated seniority list must recognize and protect the career expectations which each competing group might reasonably have anticipated had the merger not occurred. The application of this common sense principle is not simply a matter of mechanically counting airplanes and pilots. Rather, some assessment must be made of the probability that those airplanes would continue to provide work and promotions for those pilots if no merger had occurred. While such an assessment cannot be based on an exact science, the evidence in this case is overwhelming and largely uncontroverted that the PEX pilots had virtually no realistic expectation of being able to continue their careers as airline pilots with People Express after December 1986. In other cases, each partner has brought different strengths and different weaknesses, and the resulting combination was likely to be stronger than either of the pre-merger components. Moreover, none of the contending pilots were saved from unemployment by the merger in question and all had reasonable expectations of continuing their careers.

The proposed seniority list offered by the CAL Committee will afford each of the affected pilot groups the opportunity to realize the career expectations each might reasonably have expected had the merger not occurred.

A fair and equitable list must equitably apportion the opportunities for advancement and the consequences of retrenchment. The CAL Pilot Committee proposal places 230 PEX pilots on the combined list in the top 2,000 positions – within the lower 20 percent of the hard captaincies at

Continental. These PEX captains, however, ought not be permitted to outbid any CAL captain whose captaincy predated the award of Bid 87-3 – when the pilot forces were combined. To allow otherwise would constitute a classic windfall to PEX pilots who would never have had an opportunity to claim any of Continental's eight bases or equipment. Because slightly different considerations apply to those CAL pilots who first attained captaincies on Bid 87-3, they are ratioed with the 230 PEX captains so that career progressions are shared. The corollary premise – sharing of downside risk – underlies the separate ratio of the 18 PEX captains and the CAL captains who were unable to hold their Bid 87-3 captaincies through Bid 88-1R, so that any future reduction in that "fringe captain" area will be borne ratably by CAL and PEX pilots. A similar approach to assure no windfalls is used in the integration of the first and second officers, with all PEX pilots lower than all CAL pilots who had become first officers prior to the award of Bid 87-3, followed by a ratio of PEX and other CAL pilots in first and second officer positions. As of September 1, 1990, every PEX pilot in this last ratio would have had sufficient seniority to hold a first officer position. The final group of PEX airmen includes those individuals who would certainly have lost their jobs absent the merger. Therefore, these "constructively furloughed" pilots are placed at the bottom of the Continental list in October 1987, at the time of Bid 87-3. This last group includes the FMRs who, even under the People Express plan for them, would have been sent to commuter subsidiaries to accumulate piloting experience prior to becoming first officers. In 1987 and 1988, the FMRs were not qualified, by CAL's standards, to occupy any pilot position on the airline; yet they were given seniority position which allowed them to accrue competitive pilot seniority, thus

producing a clear windfall, while they were gaining experience at CAL commuter lines. For this reason, they are assigned a seniority date of February 10, 1988, which was the earliest date on which any FMR could theoretically have completed the CAL commuter training if, indeed, CAL had begun the program in 1987.

Concerning exposure to retrenchment in an industry where careers are not as stable and secure as they once were, the CAL Committee's proposal places the PEX pilots in far safer positions – with a cushion of more than 1,100 pilots junior to the last hired PEX pilot – than they occupied at PEX prior to the acquisition. The FMRs will senior to nearly 750 CAL pilots.

The principle of "constructive notice" does not prohibit implementation of an otherwise fair and equitable integrated list in this case. The notice underlying this principle is that pilots hired by an airline after that airline has publicly made clear its intention to acquire – and merge with – another airline, ma fairly be charged with notice that their seniority interests may be subject to the seniority claims of the pilots already employed by the to-be-acquired airline. That doctrine, however, does not arise until such time as an objective observer, having access to the publicly available information a pilot applicant might have, ought reasonably to have concluded that an operational merger of the affected pilot work forces would occur. Throughout most of 1987, the operational merger of PEX and CAL was in doubt. The PEX fleet was "fenced" from the combined CAL/NYA/FAL fleet, and staffed and flown exclusively by PEX pilots until October 1987. At that time, the operational merger became a reasonable certainty. Secondly, the doctrine simply imputes notice of the pendency of a merger, as opposed to establishing the

seniority equities of the to-be-acquired pilots as superior to those of the "on-notice" pilots at the acquiring airline. In this case, the PEX pilots had neither secure jobs nor reasonable expectations for career advancement, and nothing in the constructive notice doctrine relieves the Arbitrator from giving those facts determinative weight. Finally, the claim of constructive notice has no applicability to issues raised by the presence of the FMRs who were not pilots at People Express.

The proposal of the PEX Committee fails to satisfy any of the recognized criteria of fairness and equity. The proposal, attrited for currency to September 1, 1990, includes every PEX pilot and all but 33 of the FMRs (hired after June 29, 1986) in the top 2,000 hard captain positions. It bumps out of captain seniority hundreds of CAL pilots who held that status long before People Express was acquired by TAC.

The Company imposed list does not fully satisfy the fair and equitable standard. It credited the PEX pilots with more captains than People Express legitimately required in December 1986. The Company's calculation was based on a projection of the flying planned for the former PEX fleet in the summer peak period of 1987. By that time, however, PEX planes and pilots were flying routes they had never flown before, where they replaced flying formerly done by CAL planes and pilots. Additionally, the Company accommodated a PEX request to protect a PEX pilot in captain seniority, resulting in further inflation of the PEX captain entitlements. The Company also failed to consider the CAL captain reductions required by Bid 88-1R, which did not reach any PEX captain protected by the Company's list. As a result, the CAL pilots absorbed all of the adversity, and the CAL Pilot Committee's proposal

attempts to remedy this defect through its ratio method. Finally, the Company's list gives an unwarranted windfall to the FMRs, who were placed in a block senior to hundreds of fully qualified pilots hired by Continental in 1987 and 1988.

The FAL Committee, operating under the constraints imposed by the Court's Order, has made a persuasive case for its proposal, particularly in the way it has structured the relationship between the former FAL and PEX pilots.

FAL Committee

The District Court saw the need for construction of a list that was not only fair to the PEX pilots in relation to the CAL pilots, but a list that was also fair and equitable to the FAL pilots in relation to the PEX pilots. The FAL Committee is a full party to this proceeding, with the sole caveat that it would be bound by the Nicolau award.

The relevant histories of PEX and FAL and the transactions between themselves and CAL demonstrate the superior equities of the FAL pilots. Since its inception in 1946, FAL had enjoyed a long and profitable history, while PEX was a risky start up operation in 1981 and began a course toward financial oblivion after some brief successes. The FAL pilots hired prior to 1983 believed they were employed by a stable, mature and historically profitable enterprise, while every PEX pilot knew the uncertainty of the airline under deregulation with an unorthodox management style. The trade off for becoming "instant" captains was the risk inherent in an operation with no history of profitability. The FAL pilots absorbed a series of wage reductions and working condition modifications prior to the PEI

64

buyout. The FAL pilots and other FAL employee groups negotiated an agreement wit PEI in October 1985. The agreement provided that: (1) FAL pilots would continue to receive the pay rates, benefits and terms and conditions of employment contained in the ALPA agreement at Frontier; (2) FAL pilots would be covered by a "no furlough" agreement absent unusual specified conditions; (3) PEI would not sell FAL assets over $25 million and would maintain a minimum aircraft fleet at FAL; (4) PEI would operate FAL as a separate entity until at least February 1, 1990; (5) PEI would not, in effect, sell stock of FAL to TAC-CAL; (6) PEI would provide FAL with operating funds and enhance FAL as a viable carrier; and (7) In the event of a merger of PEX and FAL operations, the seniority lists would be integrated in a fair and equitable manner by arbitration if necessary. These provisions extended better rates of pay, benefits and terms and conditions of employment to the FAL pilots than the PEX pilots enjoyed.

PEI violated ever term of the October 1985 agreement.

When PEX took over FAL, FAL lost all control over its own destiny, and PEX, largely employee and pilot owned, ran FAL in to the ground and ultimately shut it down in a misguided bargaining tactic during the negotiations for its sale to United. While FAL had an operating loss of $40.7 million in the first three quarters of 1986, PEX had operating losses in the same period of $120.1 million. Thus, the FAL losses were more than offset by just the $46 million PEX took from the sale of FAL assets to UAL, and there is no basis for the claim that the FAL operation was bleeding PEX's cash position. Indeed, in June and July 1986, FAL was actually transferring money back to PEX.

Texas Air's proposal on September 15, 1986 required that the purchase of People Express could only go forward after the sale of Frontier, the signing of the JPA and a waiver of claims by the FAL employee unions. The terms of those documents included: (1) termination of the FAL-ALPA agreement and agreement to CAL wages and working conditions, including no longevity pay for FAL pilots; (2) termination of the pilot retirement funds; (3) termination of the October 1985 agreement with PEI, including the no furlough agreement; (4) waiver of all soft claims against TAC/CAL/PEI valued at $145.6 million for the pilots; and (5) a seniority integration arbitration procedure requiring the arbitrator to recognize the non-operating status of FAL and the entitlement of the CAL pilots to certain aircraft on order to CAL as of September 15, 1986.

As a matter of equity, there is no way that the FAL pilots as a group can be placed junior to the PEX pilots whose very jobs and "fair and equitable" seniority integration depended entirely on the FAL pilots execution of the JPA. PEX negotiated away the seniority rights of the FAL pilots when it violated (without PEX pilot protest) every provision of the October 1985 agreement and by October 1986 had no cash or other assets to pay the FAL pilots for those violations.

A comparison of the assets brought to the merger by FAL and PEX demonstrate the superior equities of the FAL pilots to the PEX pilots. FAL brought to the merger a much newer and homogeneous fleet than did PEX, and the Company erroneously gave PEX credit for five B-747s. FAL contributed its modern terminal and facilities at Denver, while PEX never operated out of Terminal C or paid for any of its construction. Frontier's turnkey operation enhanced its value to CAL, in contrast to

the serious serve problems encountered in the integration of PEX. Continental's exercise of the option to buy Frontier stock added significant value to the deal when TAC changed the nature of the transaction from a purchase of assets to a true merger. As a result, TAC/CAL became the debtor-in-possession of the Frontier estate of $112.6 million. TAC/CAL gained a total $8 million from the over-funding of the pilots pension plan and related actions – more than CAL paid out to the PEX pilots in debt forgiveness. The values of People Express and Frontier viewed by themselves and interested third parties have been consistently higher for FAL than PEX, even after FAL was placed in bankruptcy.

The pilot equities of the FAL pilots are vastly superior to those of the PEX pilots when measured by the primary factor of date of hire/length of service. There is no fundamental inequity in this case that should obviate the use of this factor in constructing a seniority list. People Express was, like Frontier, a carrier with an uncertain future. If FAL brought no real jobs to the merger because it was shut down, then certainly neither did PEX, which would have liquidated within weeks, if not days, after the failed attempt to sell Frontier to United. Also, the evidence is overwhelming that PEX would not have been purchased by CAL had not PEI also owned FAL and had no the FAL pilots agreed in the JPA to have FAL assets transferred to CAL.

The promotional expectations of the FAL captains were to remain captains and retire at age 60 as captains, and those of the FAL first officers were to promote to captain due to the normal age 60 attrition within the captain ranks. This natural expectation was not the case among the younger PEX group in their overstaffed system. The FAL proposal enables the FAL pilots to live out their careers with some

minimal dignity rather than stripping from them what little remains in the aftermath of the CAL-FAL award. The PEX first officers should be satisfied with the promotional expectation they currently have – a promotion to captain which they would have been unlikely to achieve at PEX for another 20 years if the airline had survived.

The vastly superior pay and benefits of the FAL pilots coupled with their length of service were factors in Continental's decision to give the PEX pilots full longevity for purposes of pay and benefits and to deny the FAL pilots this longevity. Arbitrator Nicolau found that any consideration of longevity pay based on general notions of equity and fairness was foreclosed by the language of the JPA. In the present Arbitration, where the only standard is the notion of fairness and equity, there is no such preclusion. The District Court's Order does not preclude the FAL pilots from seeking a longevity pay level comparable to their counterparts at CAL and PEX. This request harms neither of these groups, and would have no back pay consequences to the Company if implemented on a prospective basis.

There is also a great disparity between PEX and FAL with regard to working conditions, including retirement and contractual benefits. FAL's benefits were consistent with the benefit packages extended by other major airlines operating under a union contract. Beyond that, the FAL pilots were contractually protected under the October 1985 agreement. The FAL retirement plan was spectacular, with most senior of FAL pilots receiving over $500,000 in vested retirement benefits, and a pilot at the top third has received between $165,000 and $204,000 upon retirement. This is in stark contrast to the PEX pilots who had no retirement plan.

The "sweat equities" contributed by the FAL pilots far exceed those of the PEX pilots when considering: the series of wage reductions and work rule modifications totaling $47.8 million for the pilots; the damage resulting from PEI's violations of the October 1985 agreement; and agreement to the JPA. With respect to the PEX pilots, there is no showing of any willingness to make wage and work rule concessions until a wage cut was instituted in late 1986 when it was too late. Indeed, instead of giving up sweat equity, the PEX pilots were personally awarded $8.2 million in debt forgiveness and $3.2 million in related taxes as well as full longevity for pay and benefit purposes.

Although domicile is not controlling issue, it is relevant to the extent that the FAL pilots were based in Denver and the PEX pilots were based in Newark. The FAL Committee has proposed a fence (with restrictions) for the benefit of PEX pilots who shall be entitled to be awarded a maximum of 295 captain vacancies in the Newark base regardless of their system seniority in relation to all other CAL pilots, including FAL pilots.

A staffing comparison reflects that Frontier was lean and understaffed while People Express was greatly overstaffed and required 232 captains based on actual staffing requirement at PEX in December 1986. For a virtually defunct airline, the actual December 1986 staffing is an appropriate yardstick.

The FAL Committee used the following criteria in structuring its proposed integrated lists: (1) The integration proposal must be fair and equitable to each pilot group. (2) It must primarily recognize length of service as a pilot. (3) It should seek to: preserve jobs; avoid windfalls to any group at the expense of the others; maintain or improve pre-merger pay, standard of living and pre-merger pilot

status; and minimize detrimental changes to career expectations. (4) It should accomplish the above by reference to the economic condition of the airlines involved (and the reasons therefore), the equities that each airline and pilot group brought to the merger, and the nature of the transaction that resulted in the merged airline. (5) All attrition occurring within each pilot group after the effective date of the transaction resulting in the merger should be regarded as a benefit to be shared equally by all pilot sand not by any single pilot group. (6) The resulting integrated list should continue to be fair and equitable during the entire careers of all the pilots on it.

Even under a finding that FAL and PEX were "in the same boat" in terms of financial strength, a date of hire or length of service proposal would be favored because both carriers would be regarded as similarly situated.

The quid pro quo sought for the fence protection is that the named FAL pilots from the March 12, 1987 list between numbers 163 and 202 who remain on the list as of the date of this Award be pay protected as captains until the pilot either receives a captaincy or is entitled t a captaincy and declines such vacancy. At present, there are 25 such pilots who not only were flying as captains on FAL before the shutdown, but who were entitled, using the PEX staffing ratio (295 captains divided by 60 aircraft equals 4.92 ratio), to captain positions at FAL (41 aircraft multiplied by 4.92 equals 202). In other words, if 295 (now 219) captain jobs are to be protected, at least 25 more FAL pilots should be pay protected as captains.

The Company's list is unfair and inequitable t the FAL pilots. It fails to give appropriate deference

to date of hire/length of service. It gives B-747 positions to PEX pilots after previously allocating them to CAL pilots. It improperly integrates PEX flight engineers with FAL pilots. It erroneously placed all FMRs in a block after the last FAL pilot when they were not industry-qualified pilots and lacked the experience and qualifications that Continental required of its own 1987 new hire pilots.

## The Company

As in all prior airline arbitrations, the Arbitrator's duty here is to fashion an integrated seniority list that preserves the pre-merger career expectations of the respective pilot groups. The primary considerations in making this assessment is the economic viability of the carriers at the time of the acquisition and in the few years immediately preceding. This clearly is the standard because an airline pilot's career expectations are tied (for better or worse) to the economic health and future viability of his or her airline. The PEX pilots have the burden of proving that they had good promotional expectations. In the summer of 1986, the career expectations of the CAL pilots were strong and growing, and Continental did not need to acquire PEX or any other carrier to survive and reach its present size. PEX and FAL pilots are now largely first officers and captains in the nation's fifth largest airline. Newark is only a part of Continental's system, which includes major hubs and facilities at Houston, Denver and Cleveland and major international operations in Mexico, Japan, the South Pacific, Latin America and Europe. By year-end 1985, Continental had developed a worldwide network of operations, without any help from PEX, including 52 domestic and 28 foreign cities. In particular, CAL also commenced service from London to Houston. During 1986, Continental added 30 new destinations. On September

5, 1986, the DOT granted Continental a Denver to London route. By year-end 1986, CAL was about double the size of PEX. It could have simply sat back and waited to pick up PEX's aircraft and facilities after liquidation, which was assured. Neither TAC nor CAL had the power to, nor did they, exert control over PEX's operations before the acquisition was consummated. In fact, the merger announcement actually helped PEX's situation, as did Texas Air's $107 million in cash infusions between September 15 and December 18, 1986. In September 1986 and thereafter, PEX had no alternatives to liquidation other than TAC.

On February 1, 1987, PEX began operations under the Continental name, and the problems of PEX were thrust upon Continental, including an operational nightmare in Newark that severely damaged Continental's reputation and caused it hundreds of millions of dollars in lost revenue, as well as onerous operational contracts and facilities leases that were inherited. By early March 1987, the PEX Committee had rejected the NYA-type integration structure. After discussions and meetings with the pilot group representatives, the Company made a good faith determination that it was in the best interest of the airline for management to itself construct an integrated list rather than go through yet another divisive arbitration, which would indefinitely delay the promulgation of a combined list and the benefits to all pilot groups that such a list would provide.

The first step in the Company's list was the determination that Continental could utilize 295 PEX pilots as captains and 779 pilots in total, according to CAL's utilization of the PEX fleet. The Company also adopted PEX Captain Fred Abbott's input as to the number of captaincies the PEX pilots should

receive.* The staffing determination was made using the method by which CAL's own staffing requirements were determined. The number of block hours used produced the same number of captain positions to which the PEX pilots would otherwise have been entitled had PEX been able to survive independently.

The pilot utilization rate applied in the staffing determination was also fair and equitable because it was consistent with CAL's utilization rate for its own pilot work force. The 295 PEX captains were to be placed junior to the last CAL captain on Bid 87-1; the PEX non-captains hired before the acquisition; and the FMRs were to be placed after all the integrated non-captains but before any 1987 hires. None of the 950 PEX pilots remaining on March 12, 1987 was furloughed, despite CAL's need for only 779 PEX pilots. The CAL-FAL award placed 162 former FAL captains after the last CAL captain awarded a captaincy on Bid 87-1. The award then reserved a block for CAL first officers based on new equipment coming to Continental, followed by a ratio of remaining CAL and FAL first officers, and concluded with recent FAL hires at the bottom but before the 1987 CAL new hires. The Company believed that Arbitrator Nicolau's approach ratified the fairness of its proposed CAL-PEX list. On June 30, 1987 Continental held a meeting of the pilot groups in Houston and removed itself from the process, hoping agreement, the Company was faced with the decision of how to integrate its March list with the CAL-FAL award

---

\* Captain Abbott was the number 12 pilot on the PEX seniority list and Chief Operating Official for PEX at the time. He was also the founder of the PEX Committee.

The Company tried to look at all of the respective equities existing between the PEX and FAL

73

pilot groups.Frontier and PEX were not that far apart in value, as established by the fair market prices of $158.1 million for Frontier and $122.1 million for PEX (including Britt and PBA). Both were national airlines, as opposed to majors. Both carriers had failed. Neither pilot group had employment prospects. They both moved from a one-hub carrier to a multi-hub carrier with more equipment. FAL pilots waived claims allegedly worth up to $141 million, whereas Continental forgave PEX pilot stock debt of $8.2 million and paid $3.2 million in taxes on the debt. FAL pilots lost their retirement, and PEX had no such fund. The FAL pilots had traditional job duties, and the PEX pilots were no longer cross-utilized. The PEX pilots gained traditional seniority which the FAL pilots already had. The PEX bid trips by lottery, whereas the FAL pilots used seniority. The top FAL captains were hired in 1955-56 and the top PEX captains in 1980-81. The bottom FAL captains were hired in 1968, and the bottom PEX captains in 1983. FAL was a long-term carrier with status earned over time, and PEX was a "start-up" carrier with "instant" captains. The FAL pilots had overall superior longevity as compared to the PEX pilots. In short, the PEX pilots obtained more than the FAL pilots from the acquisition by virtually every measure.

The Company decided that a fair solution was to integrate the FAL and PEX captains and non-captains by date of hire and place the FMRs below all other pre-acquisition pilots but ahead of the 1987 CAL new hires. This list, in force on the property for more than three years, is very fair. It places the PEX captains in the "hard" captain seniority range without encroaching on the superior career expectations of the CAL captains. The fairness of the list is affirmed b the subsequent integrations of

the PEX flight attendants and ground agents, both of which groups received considerably less favorable treatment than the PEX pilots. Of equal importance, the Company's list also properly balances the equities of the pilots from the two failed carriers, PEX and FAL, relative to each other. It also properly places the FMRs giving due account to their unfinished training and most junior status at PEX, while placing them ahead of pilots who were hired by the Company at a later date.

Since the Company's list is fair, it should not be changed to one of the pilot proposals even if any one of them were also fair (which none of them is). Arbitral precedent defines the Arbitrator's charter not to devise a perfect list, if such a thing exists, but one that is fair and equitable on the whole. The District Court's standard of "fair and equitable," an undefined term common to all prior arbitrations, requires the outcome to be "fair and equitable" in its totality; it is not limited to the effect on the pilots. Under the Order, the Company is an equal party to this Arbitration. Under the fair and equitable standard, there is no rationale for saddling the Company with the operational and financial costs that would be associated with moving from one list to another, even assuming that one of the pilot committee proposals were also fair.

The three pilot committee's proposals are flawed in a variety of ways. The PEX Committee ignores: (1) the economic condition of the carriers and the relative promotional expectations of their pilot groups; (2) longevity, especially with regard to the FAL pilots; and (3) the benefits that they received from the acquisition. Furthermore, there is no factual basis for the PEX Committee's distinguishing between wide-bodies and narrow-bodies (while at the same time excluding A-300s from

the wide-body category), particularly at Continental where no base pay differential exists for flying wide-bodies and where pilots do not "chase equipment". In addition, the use of post-merger attrition in the manner utilized by the PEX Committee's proposal has been rejected by arbitral precedent and is on its face, unfair to CAL and FAL pilots. Nor is there any validity in the PEX Committee's use of 1,061 PEX pilots employed in September 1986, when the Court has determined that the Committee only lawfully represents the 950 pilots who were employed at Continental on March 12, 1987.

The Company's list is fair and equitable because it fairly balances the expectations of pilots from a failed carrier with those from a growing carrier, and it fairly balances the equities of pilots from two failed carriers.

The Company's list also fairly places the FMRs behind the other PEX pilots but ahead of new hires, and it does not integrate the FMRs with the FAL pilots by date of hire. At the time the FMRs joined Continental, they were not qualified to fly as first officers under CAL's flight time requirement of 2,500 hours in 1987. Therefore, Continental sent them to its commuter operations in order to gain additional flight experience, just as PEX intended to do in 1986. In addition, the FMRs joined PEX during the period when it was experiencing its financial downfall. Thus, by virtue of their hire dates, the FMRs did not bring the same equities as the more senior PEX pilots. Contrary to the CAL and FAL Committees' proposals, the FMRs' seniority should be determined by when they were hired by their ancestral carrier, as was the case with all the other pre-integration pilots. They were part of the same package of pilots and equipment that Continental began holding out to the public as its own on February

1, 1987.

The financial condition of the carriers shows that the CAL pilots had positive promotional expectations at the time of the acquisition, while the PEX pilots had no objective promotional expectations. Continental was setting traffic and financial records from 1984 until the PEX acquisition. CAL's 1983 bankruptcy was merely done to reorganize its financial position, and it was a highly successful endeavor. Continental did not need PEX to survive or to attain its present size. It was on a strong growth trend from 1984 to 1986 in a market with no shortage of aircraft in 1986, especially B-727s, B-737s and B-747s – the types of planes used by PEX. Continental was already developing its Newark hub at that time and, even without PEX, probably would have done so. There was no shortage of pilots in 1986. The Company's current bankruptcy, filed for on December 3, 1990 to gain relief from the interest expense inherited largely from PEX in 1987, is irrelevant to these proceedings. PEX was a failed airline by September 1986, and it had been "dying" for at least a year prior. Its failure was due to several causes. The "no frills" concept was no longer viable. Over-expansion had pushed PEX into the wrong cities and into competition with major carriers that had superior technology. Its rapid expansion in late 1984 and 1985 increased operating and interest expense costs and operational problems. The most pervasive reason why PEX could not compete with the major carriers was its lack of a sophisticated computer reservation system, which the majors used to underprice PEX. In addition to internal expansion, PEX mistakenly tried to grow by acquisitions. PEX lacked a traditional management and support infrastructure. Finally, it antagonized travel agents through low commissions, telephone

delays and unanswered calls.

The proof of PEX's failure takes several forms. At the time of the acquisition, PEX had neither the equity nor the cash to operate. Its cash balances fell steadily and dramatically from late 1984 on. By June 23, 1986, when PEX announced it was for sale, the company was "technically insolvent" because it was out of cash and had an inability pay bills. PEX's cash flow is not a meaningful indicator, and even if it were, the trend at PEX as very negative in all four quarters of 1986. Although PEX grew from 1981 to 1985, it did not put in a good financial performance, as properly measured by net income. Over its six-year existence, it lost $214.8 million. The Company never obtained net cash from operations, but rather from financings. By July 1986, the financial markets were completely shut to PEX. By September 1986, there was n remaining significant equity in its collateral on which additional financing could or would be based. Another indication of PEX's poor financial shape was its general retrenchment, including downsizing of its fleet. The B-747s were high cost, money-losing planes for PEX, and the market for them was soft in mid 1986. The August 1986 Business Plan also contemplated downsizing the B-727 fleet by eight planes. The result of the fleet downsizing was a corollary cancellation of service at five cities, with five more on the immediate "watch" list and an overall 14 percent fewer block hours. On October 16, 1986, PEX sold all of its interest in another six B-727s to NYA, and the planes left PEX's property on November 15, 1986. In sum, on September 15, 1986, PEX could only count 71 planes in its fleet, and on November 15, it had only 65 planes left, and one B-747 on order that it could not afford to take delivery of, but which the Company credited to the PEX

pilots in its proposal. Because of PEX's low fare strategy, to be profitable it needed exceedingly high load factors, which it could not come close to meeting in September 1986. Long before the announcement of the TAC-PEI deal, PEX had experienced a steady decline in traffic and consumer loyalty. It also was too dependent upon leisure travelers, and it did not have a business traveler following which it belatedly attempted to pursue. PEX was ready for liquidation in September 1986, because its operating philosophy and industry changes had foreclosed the possibility of reorganization. At the time of its failure, PEX had already pushed its operating cost to an industry low level.

The September 15 agreement did not give TAC control over PEX before December 30, 1986, and as a result the PEX pilots must take responsibility for the events at PEX from September 15 until December 30, 1986. There was never any assurance that the deal would be consummated, and even if consummated, whether TAC would leave PEX as a stand-alone subsidiary or merge it with Eastern or Continental. During the period from September 15 to December 30, TAC and CAL avoided even the appearance of control over PEX.

With regard to the six B-727s that were transferred to NYA (and later CAL), the planes were clearly TAC's, and any flying done on them by PEX pilots is irrelevant. The September 15, 1986 Acquisition Agreement permitted TAC to have its designee purchase 12 B-727s, an aspect of the deal that was not conditioned on consummation of the rest of the deal. The first six planes were sold to NYA, and because PEX needed them to fly its fall schedule and survive, NYA allowed them to stay at PEX until November 15, after which they became part of Continental. TAC never took delivery of the

other six B-727s, because PEX had so few uncollateralized assets by October 1986 that it could not give TAC the sufficient security, and further because their loss would adversely affect PEX's system.

The September 15 announcement of TAC's acquisition helped PEX's traffic and boosted consumer, shareholder and employee confidence. The announcements that really hurt PEX in 1986 were its announced decision on June 23 to search for a buyer and the announcement on August 28 that it had put Frontier into bankruptcy.

PEX had no alternatives other than Texas Air. Massive efforts to find another buyer had failed. No one else was ever interested enough to make an offer. None of the unionized carriers wanted to acquire PEX, since it was in their economic best interest to see it disappear. America West never made an offer to acquire PEX, and it was not interested in doing so. A "turnaround plan" would ot have saved PEX, and no such plan had actually been formulated.

Continental's determination that the PEX pilots were entitled to 295 captain positions was fair and equitable. Contrary to the claim by the PEX Committee, Continental does not staff at the levels required in the peak flying months. Rather, it determines the number of crews required to meet its flight schedule on each of the months expected to be covered by a system bid, examines the high and low points, and picks a staffing level in between. The PEX staffing determination was strictly a business decision, made in the ordinary course of business by the management official responsible for making such decisions. Because Continental was the acquiring carrier, its business judgment, rather than that of PEX, governed the determination of the variables in the staffing equation (block hours and pilot utilization rate).

Continental made the PEX staffing determination in late February or early March 1987, using the method by which its own staffing requirements are determined. The Company had no obligation, legal or otherwise, to use the peak month flying hours in 1987 for PEX aircraft. Additionally, operating forecasts and the resulting staffing projections are constantly revised, and the Company's PEX staffing determination in March 1987 was fair and equitable under the circumstances existing at the time. The block hours used were fair and equitable, and they produced the same number of captain positions that PEX would have needed under its Business Plan had it been able to survive. Moreover, the Official Airline Guide for the period October 1986 through January 1987 shows that PEX had projected a significant reduction in block hours either consistent with or below those contained in the Business Plan. In this regard, the unequivocal testimony of the CAL manager in charge of staffing was that CAL had no control over PEX's staffing during the fall of 1986. The pilot utilization rate applied in the PEX staffing determination was fair and equitable. The figures were obtained from the PEX head of manpower planning in order to confirm consistency with the Company's figures for the entire pilot population including management pilots. Because the utilization rates were essentially the same at both airlines, the PEX rate was used. Block hour utilization always contains management pilots. Even assuming that the PEX utilization rate did not account for management, Continental was under no obligation to adopt PEX's management structure; and CAL's own figure for pilot managers was only five percent, thus yielding only 13 more captain positions than were credited for the PEX pilots.

The respective pilot committees' staffing analyses only reinforce the conclusion that the staffing

determination with regard to PEX was fair and equitable. The CAL Committee's staffing analysis is flawed because it is not, on balance, a true staffing analysis based on a forecast of requirements during a future month or bid period. The FAL Committee's staffing analysis, like the CAL Committee's theory, is based on the actual PEX requirements during December 1986. Moreover, it is based on the number of captains PEX required under PEX's schedule, as opposed to the essence of the PEX staffing determination – the number of captains CAL required under CAL's schedule. The FAL proposal is further flawed with respect to the B-747s, because it proceeded from the false premise that by including the flying time generated by five 747s in System Bid 87-1, CAL was excluding those aircraft from the PEX operation. The effective date of System Bid 87-1 was December 15, 1987. Thus, the fact that the bid included B-747 flying time in the Pacific did not mean that CAL was intending, at the time the PEX staffing determination was made, not to utilize those aircraft in the CAL-PEX operation during 1987. The PEX Committee's staffing analysis is based on a "crews per aircraft ratio" method that is an imprecise and unreliable staffing method. It is in fact a fiction because the crews per aircraft ratio is the result of the block hours analysis, not its functional equivalent. By definition, the ratio changes any time the variables in the staffing equation – block hour sand pilot utilization – change.

System Bid 87-1 was not issued in anticipation of the Company list at issue. It was posted on January 27, 1987, approximately six weeks before the Company decided to construct it's own integrated list. The bid was necessary to accommodate the projected growth of CAL throughout the remainder of 1987. On September 12, 1986, the CAL pilots were anticipating the arrival of 104 aircraft on order and

82

option. The timing of Bid 87-1 was a business decision designed to accomplish the training required by the influx of new aircraft, not to upgrade CAL pilots to captain positions at the expense of PEX pilots.

The Company properly determined the PEX captain cut-off on the integrated list from the only available PEX list. That the Company's list "split" a class of PEX captains does not demonstrate unfairness. The 295th PEX pilot had moved up to number 288 by March 12, 1987, due to nominal attrition among the PEX pilots. The 288 number is only one number less than was produced under the Company's staffing analysis of PEX's requirements. The six additional PEX captaincies were given at the request of PEX management and not on the basis of staffing. Therefore, PEX is not entitled to any additional captaincies based on the Company's analysis and construction of the seniority list.

Promotional expectations of the pilot groups should be considered as a September 15, 1986. However, there is no basis for using that date for all other purposes. Texas Air had no control over PEX before the acquisition was consummated on December 30, 1986. Thus, the equities of any aircraft or other assets attributable to PEX should be measured as of that date, if they become a factor in constructing the integrated list. Indeed, the Company gave PEX credit for all 66 aircraft in the PEX fleet as of December 30, 1986, even though TAC had paid for the 66th plan – the B-747 that PEX could not afford. As for the number of pilots used in constructing the list, that is to be measured as of March 12, 1987, which is the date used by the Company in constructing its list. Moreover, the District Court ruled that only those pilots still working for PEX on March 12, 1987 are part of the class.

The PEX pilots are not entitled to special consideration because of the Newark hub, Terminal C or

other non-fleet assets. Those assets, even if they are considered within the context of career expectations, do not justify giving the PEX pilots any special consideration that will counterbalance their extremely negative job prospects before the acquisition. This is so because any consideration of the benefits to Continental from the assets must also weigh the harm. The evidence is overwhelming that PEX saddled with enormous costs in terms of loss of customer goodwill and soaring consumer complaint rates resulting from the difficulties incurred in trying to absorb the chaotic PEX operation. There were also other unexpected surprises, such as onerous contracts that Continental had to assume. There were increased debt expenses, capital improvements to PEX's fleet and facilities, and lease payments on unproductive space. In contrast, the merger of Frontier's operations went extremely well, because of the experience of the FAL employees and a traditional management structure in operating a full service airline. Many of the operational and financial burdens thrust upon Continental were attributable to PEX's practice of contracting out traditional or core services, and under cross-utilization, assigning inexperienced employees to handle the contracting out function.

Continental was successfully building a Newark hub even before the acquisition of PEX, and any airline was permitted to use the international arrivals gate at Terminal C. There also were no high density airport slot constraints at Newark, and CAL and NYA had existing market presence in the New York City area. Newark is not CAL's largest hub, and is only part of a large, worldwide operation.

The PEX pilots should not receive special credit for Terminal C. TAC did not acquire Terminal C through PEX. Indeed, PEX would have lost its lease to Terminal C. The lease held by PEX for most of

1986 and 1987 was commercially worthless. PEX did not bring a 25-year lease to the merger

negotiations with CAL. The merger was not motivated by Terminal C, and TAC obtained the lease on

its own. There was an absolute prohibition against PEX subleasing Terminal C without the Port

Authority's written consent. Even after PEX had been combined with CAL for marketing purposes on

February 1, 1987, the Port Authority refused to guarantee that CAL would be allowed to take over

PEX's lease. In fact, the Port Authority could have assigned the lease to any other airline on 30 days

notice to PEX. The assignment was effective August 15, 1987, the first time that Continental had a

contractual interest in Terminal C and control of the lease. PEX should not get credit for designing the

terminal. Only two-thirds of the building, domestic concourses C-1 and C-2, was actually covered by

the lease, and the structural shell of the departures level main building was erected by the Port Authority

in 1971. Nor was the international arrivals gate part of the lease. PEX never completed its design for

the terminal. The work that it did complete was not designed for the efficient functioning of a

traditional carrier. Numerous functional aspects of the terminal had to be corrected before CAL could

occupy it. Indeed, since PEX itself was aspiring to become more traditional, it too would have had to

alter Terminal C had it been able to survive. The largest design deficiency in Terminal C was the

baggage system and the concomitant design problems it dictated for the rest of the terminal. As a non-

traditional carrier, PEX did not have the same need as most normal carriers for baggage drop-off at

curbside and at the departures level ticketing counters. Consequently, PEX's system could not handle

the volume of baggage attendant to a major airline like Continental. The addition of the necessary 50

additional ticket counters along the front of the "window wall" also had the unfortunate side effect of practically eliminating the value of the passenger display flight system, because it is now very difficult to read the information on those signs; but moving them would be cost-prohibitive and would eliminate their intended value of providing flight information near the ticket counters. The baggage claims carousels were only marginally adequate for CAL. The baggage system was not fast enough to handle traffic during CAL's peak departure times, and it could not handle oversized bags and skis, which have to be either driven or carried by hand to the planes. CAL paid $577,619 just to install an oversized baggage system and $5 million in total changes to the main baggage system. In installing a direct feed from the apron level to the baggage claims carousels, Gate 70 (a prime, close-in gate) has been lost until 1993 or 1994, at which time it will cost CAL $12 to $15 million to fix the problem. PEX's design of Terminal C also posed problems for CAL with respect to the number of wide-body gates and jetways. Another significant design deficiency, which cost CAL about $4 million to remedy, was the failure of PEX to provide office space for a traditional airline operation. These design deficiencies must be taken into account because Terminal C was not adequate for any traditional carrier. CAL paid for the construction of the terminal, and PEX had no investment in it. PEX's design was no more than 50 to 60 percent constructed by October 1986. Terminal C and the North Terminal Annex project were finally closed out in October 1990 at a cost of about $280 million, of which the Port Authority had financed $225 million and CAL had financed $55 million. In addition, CAL's lease required that it invest $25 million in Terminal C for required items which would have been required by any traditional airline.

CAL also will repay the Port Authority for the \$225 million financing over the 25 year term of the new lease. In August 1986, PEX had built only 30 percent of the current terminal, and by August 1987, when CAL assumed the lease, only about 56 percent of the current terminal had been constructed. In short, Terminal C as it stands today owes its existence to Continental; especially the interior seen by the traveling public and the functional elements of the building that serve the public.

The PEX pilots should not receive special credit for other assets acquired along with PEX. These facilities were not "turnkey" in nature, as demonstrated by the large amount of work that was required for CAL to absorb them. Moreover, other items were not useful to CAL, and others still were not even assets of PEX. When compared to the rest of CAL's facilities throughout its vast system, the facilities contributed by PEX are not the key to Continental's future growth. The other Newark facilities, as well as Terminal C, were inadequate. These included: the flight kitchen and food operations; the hangar 55 aircraft maintenance facility which has cost CAL \$10 million and will require further expenditures; the cargo facility, a number of infrastructure deficiencies at Newark Airport, such as inadequate road frontage and parking; the unproductive North Terminal which CAL assumed under PEX's lease with the Port Authority; and two administrative buildings across from Newark Airport – the Haynes Avenue Building and International Plaza – which CAL assumed under PEX leases and which have imposed significant costs on CAL from unproductive space. Continental also inherited PEX's lease obligations on facilities at other airports, despite the fact that CAL did not have a use for all of them. Space at seven such airports has been unproductive for CAL at a combined cost of over \$1.8

million through the end of the respective lease terms. Most of the PEX outstations were closed and PEX operations relocated to the better facilities of TAC subsidiaries. PEX's ground handling facilities throughout the country were in poor physical repair, a problem that cost CAL over $15 million to rectify at the outstations, not including Newark. One hundred and sixty four of the high density airport slots for which PEX claims credit were commuter slots and could not be used by regular air carriers. PEX held only 35 slots, 14 at Washington National and 21 at Chicago. The combined CAL-NYA had about five times as many slots as PEX. The PEX Committee cannot remedy this imbalance by claiming credit for the Britt and PBA commuter slots which were not PEX slots, and in any event were less valuable than jet slots. Because TAC acquired its interest in PEX's slots at Washington National and Chicago on September 15, 1986 as collateral for the first $10 million cash infusion, TAC held an interest in the slots and could have seized them when PEX defaulted on the loan.

Domestic routes are not an issue in this arbitration, because a domestic certificate has no market value under deregulation where a carrier can fly into whatever domestic cities it wants to pursue. Of the three PEX international destinations, only the London route had even nominal value when it was received from PEX. The Brussels and Montreal routes had no value. The London route was losing money for PEX and was not worth very much without a great deal of marketing efforts. Although PEX had proposed flying to certain other cities as charters, those never took place. PEX had no Pacific flying. Regularly scheduled service from Los Angeles to Honolulu did not commence until December 12, 1986. Even then, the Honolulu flying was added only because PEX could not attract enough

passengers on its own B-747 routes.

SAS did not link up with TAC in October 1988 as a collateral benefit from the PEX acquisition. PEX and SAS were the two extremes in providing passenger service, with SAS at the high end. SAS first approached Eastern in 1983 to discuss a link-up at John F. Kennedy International Airport (JFK). At the same time the TAC-SAS deal was signed, SAS planned to operate three daily flights from JFK and only one from Newark. Moreover, to the extend that SAS was interested in the Newark hub, that was something that CAL could have provided without PEX.

The Company acted in good faith in imposing the seniority list. It received input from both pilot groups and acted in the best interest of all the pilots. When the PEX pilots were offered a "New York Air-type" expedited dispute resolution structure for the seniority integration, they rejected it. The PEX Committee counter-proposed considerable significant deletions and purported to mandate an operational integration of PEX and Continental, rather than leave that decision to management. It deleted the notion of balancing the "benefits" and "losses" fairly between the two pilot groups. All references to the traditional arbitral factors, as set forth in the NYA procedures, had been deleted. The PEX Committee did not want the Company to assist the pilot groups with the payment of outside counsel's fees. One of the conditions inserted by the PEX Committee was that pilots "from both PEX and CAL will be protected in their status and category". At this point, the Company started to believe that it would not be possible to do a NYA-type expedited arbitration with the PEX pilots. The Company conveyed its position that the PEX counter-proposal was not satisfactory. The exchange of proposals was not the

only communication with PEX pilots regarding seniority integration. Both before and after the consummation of the merger, the Company talked to the PEX Committee and management pilots to get their input regarding integration. Such discussions took place as early as November 1986. On January 6, 1987, PEX's General Counsel met with the PEX Committee and its counsel to discuss seniority integration procedures and conditions. On February 12, 1987, CAL's Vice President of Flight Operations met with a PEX senior pilot who then communicated their discussions to the PEX Committee chairmen. The PEX Committee maintained its position, as stated above, it its counterproposal. The PEX Committee also stated that it did not want to wait until the FAL arbitration was completed. These positions were unacceptable to the Company, especially the demand to start the arbitration immediately, because it could not have handled two arbitrations at once. On March 10, 1987, the Company met with the CAL and PEX pilot committees to consider their input as to whether management should construct its own list or whether the issue should be submitted to an arbitrator. One consideration was that the Company was planning to hire 1,000 new pilots in 1987 to operate many new planes coming from Boeing and McDonnell Douglas. The Company simply could not operate all these new aircraft without a new system bid, and expediting the list gave the PEX pilots an opportunity they otherwise might have missed to bid on this new equipment. Given the past tensions and operational problems, along with the process sought by the PEX Committee, it was determined that an arbitration would be more harmful at that time. On March 12, 1987, PEX and CAL entered into the agreement that outlined the concept for the Company's list. The agreement was signed for PEX by Captain Frederick

Abbott. Despite the affirmation by Arbitrator Nicolau in taking the same approach as the Company had taken in its conditional March 1987 list, the Company still endeavored to solicit the input of the two pilot groups regarding the contingent CAL-PEX list by scheduling a meeting for June 30, 1987. The two pilot committees were unable to reach agreement at that time. Given the history and deliberation behind the evolution of the Company's list, it is impossible to say that it was imposed as an arbitrary and punitive act.

In this case, there can be no meaningful comparison of the relative compensation, benefits and quality of work life of the CAL and PEX pilots. In light of the overwhelming evidence that PEX was ready to go out of business, any benefits received at Continental are superior to the alternative for the former PEX pilots (and the former FAL pilots). However, any fair and equitable list has to weigh benefits granted or concessions required as a direct result of the acquisition itself, since such items are implicitly part of the purchase price. Thus, as stated, considerations should include the PEX and FAL pilots' continued employment; the debt forgiveness /income tax payment program for the PEX pilots versus the FAL pilots' waiver of claims against the Company' the PEX pilots' gaining of a retirement fund for the first time versus the FAL pilots' loss of their Frontier retirement plan; the PEX pilots' keeping longevity from PEX for benefits purposes versus the FAL pilots' loss of longevity for the same; and the benefit both the FAL and PEX pilots received from joining a larger system with more routes, more types of equipment and more domiciles. All of these facts are important considerations in balancing the equities as between the PEX and FAL pilots.

The proceedings in the District Court are irrelevant to this hearing. The Company wanted to avoid a protracted and divisive arbitration, and it asserted its position in good faith. When the PEX pilots required that the Court impose sanctions of the Company for defending against their claims, the Company fully justified its position and the sanctions were denied.

The evidence has shown the following basic, relevant facts. From 1984 to 1986, CAL was setting traffic and financial records, and its pilots had strong and growing promotional expectations and job prospects. It was well posed for future growth in Newark and elsewhere, and it did not need PEX to expand. From 1984 to 1986, PEX became financially weaker and ultimately was subject to bankruptcy and imminent liquidation. The promotional expectations of its pilots were eroding, and by September 15, 1986, its pilots faced the certainty of no job prospects. PEX was financially and operationally more like its sister airline, FAL, than either was like CAL in the years immediately preceding the merger. While the FAL pilots had more longevity than the PEX pilots, the FAL pilots gave up more in the Acquisition Agreement than the PEX pilots by every measure. The Company list considers the above factors and balances them, such that the career expectations of the pilots from the growing carrier (CAL) are preserved. The pilots from the failed carriers (PEX and FAL) are not relegated to the bottom of the seniority list but instead are given credit for their contributions to the combined entity in a way that does not overly encroach on the pre-acquisition job prospects of the pilots from the growing carrier. The Company list is based on the staffing method CAL utilizes in the ordinary course of business and was applied to each of the pilot groups in an evenhanded manner. Each

of the pilot committee proposals seeks to advance the career expectations of its constituents at the expense of the other pilot groups, and each fails to give full credit to pilots from the competing pilot groups for their contributions to the combined entity.

The arbitral mandate in integrating airline seniority lists is to preserve, insofar as possible, the pre-integration career expectations of the respective pilot groups. The single most important factor to be considered in this analysis is the pre-integration economic health of the respective carriers, since this is what dictates their future career expectations.

The Company's list is by far the best proposal to accomplish the District Court's mandate. The "fair and equitable" standard does not require a "perfect" seniority list. Rather, the list must be "fair". Even assuming, however, one of the pilot committee proposals were also fair, arbitral precedent requires that so long as the Company's compromise list is also fair overall, the argument for any change would have to be highly persuasive. Nor, in this turbulent economic time in the airline industry, would a massive alternation of the presently constituted list (at the cost of millions of dollars) be in the best interest of future, secure jobs for all pilots – including PEX, FAL and CAL.

## Discussion and Findings

The most striking aspect of this dispute has been the intensity of effort and commitment of the pilot committees and counsel in presenting their positions. The divergent histories of the three airlines provided sufficient justification for each pilot group to view its interests as paramount. Frontier had a long and proud record as a quality carrier which rapidly tumbled under PEI's control. Continental

93

weathered intense labor struggles and difficult financial obstacles, and it emerged as a major carrier through astute financial management and employee efforts. People Express introduced revolutionary concepts in air travel and employee involvement during its nova-like existence.

These sharp differences converged in 1987, when the Company proposed an expedited dispute resolution procedure for the CAL-PEX pilot seniority integration after having spent significant time and resources in the NYA and FAL arbitrations. The PEX pilots, however, proposed a more conventional process. The parties were unable to agree on the ground rules, and the PEX Committee filed suit on April, 1978 to enforce its rights under the LPA.

The District Court's Order compels the integration of the CAL, PEX and FAL pilot seniority lists. This mandate necessarily requires a comparative analysis of the equities brought to the merged carrier by the three pilot groups.

The FAL Committee's position, as stated above, sets forth the equities brought to the merger by the FAL pilots. The record reflects that after 1985 these pilots had made heavy personal sacrifices in their attempts to keep Frontier flying. When their efforts failed, the pilots chose to preserve their jobs through their agreement to the JPA and its Sideletter No. 2 which established the guidelines for the CAL-FAL pilots seniority integration arbitration.

The JPA's Sideletter No. 2 required Arbitrator Nicolau to "take special notice of (a) the non-operating status of Frontier Airlines immediately prior to the date of this Agreement and the limited employment prospects for Frontier employees resulting therefrom, and (b) the fact that Frontier pilots,

94

aircraft and assets are expected to enhance Continental's competitive position". The Sideletter further bound the arbitrator " . . . to ensure that there is no dilution or adverse impact on the promotional expectations (for Captain or First Officer status without regard to equipment type) of either (i) those Continental Airlines (including New York Air) pilots in active service on the date this Agreement is executed (based on all aircraft in service, or on firm order or option to Continental, New York Air or TAC as of September 12, 1986 . . ."

In effect, the JPA and its Sideletter No. 2 defined the respective promotional expectations of the FAL and CAL pilots in a manner which greatly restricted the FAL pilots in pressing for a full measure of recognition commensurate with their contributions to the merged carrier, under established arbitral standards of fairness and equity. Arbitrator Nicolau determined that he was required to give greater weight to the non-operating status of Frontier and the resulting limited employment prospects of the FAL pilots than the expected enhancement f Continental's competitive position through the acquisition of Frontier's assets. Moreover, he found that the Sideletter protected the promotional expectations of the first officers as defined by Continental aircraft on order or option on September 12, 1986.

The LPA and the Order, however, contain no requirement to take special notice of the particular status of any of the carriers. Nor do they require the Arbitrator to ensure that the promotional expectations of a particular pilot group receive special protection. Rather, the LPA and the Order provide only fro a "fair and equitable integration" under which, the Order states, "[t]he parties are free to urge the neutral to consider any factor".

These critical differences between the arbitral charters of the JPA and the LPA require my analysis to focus primarily on the relative equities of the CAL and PEX pilots. To do otherwise would place the PEX pilots in the same unequal position as the FAL pilots in the CAL-FAL arbitration. For these reasons, I find that while the FAL pilots' equities must be weighed in creating a merged list which integrates the PEX pilots, the current placement of the FAL pilots on the seniority lists is one of many factors to be considered in balancing the pilot groups' equities. I have also noted that in September 1986, TAC had paid nearly 25 percent more for Frontier's assets than for all of PEI's holding which included PEX, Britt and PBA.

In constructing a fair and equitable list, I have considered the placement of the NYA pilots on the CAL list though an arbitration award dated December 18, 1986 following hearings held from September 2 to 12, 1986. While the NYA pilots are not a discrete group in this proceeding, the timing of their airlines start up, their seniority list integration, the merger of the operations of NYA and CAL, and the CAL-PEX marketing agreement on February 1, 1987 provide other benchmarks from which the myriad number of facts and equities in this case can be weighed. The NYA captains were ratioed with a group of CAL captains and first officers following the first 651 positions on the CAL seniority list. In constructing the list in the present case, I have noted that the NYA pilots had cast their fortunes with TAC, and in this way they shared a common bond with the CAL pilots prior to the merger. I have also considered the contributions of NYA and PEX to the merger carrier as well as their relative financial health in September 1986, without regard to whether TAC and PEI – which appear to have been

committed to ensuring the success of their subsidiaries – provided a source of funding.

I find that the most compelling reason for changing the existing list arises out of the Company's basic determination to compare the equities of the PEX and FAL pilots to the exclusion of other important factors – not the least of which, as stated, was the FAL pilots' placement on the list as a result of the JPA's conditions.

Other factors which support a change in the company's list center on the contributions of People Express to the merged carrier. On the other hand, the requirement for an extreme change in the existing list is offset to some extent by the absence in the PEX Committee's proposal of any consideration of preserving the career expectations of the pilot groups as they existed prior to the merger.

Economic viability of the respective carriers is a relevant consideration in assessing the promotional expectations of the competing pilot groups. The economics of the airline industry following deregulation in 1978 forced carriers to achieve sufficient size to continue to exist as independent entities which could compete successfully in a market regulated industry with acute price competition. Deregulation made it possible for two-thirds of the new entrants to fail – a condition which would not have occurred in the government regulated market of prior years. These realities dictate that a carrier's financial condition as well as the pilot jobs and other equities brought to the merged carrier be considered in constructing a fair and equitable integrated list.

In the present case, several overriding considerations required a rejection of the PEX Committee's proposal based on a status and category ratio approach. The change of People Express surviving its

grave financial difficulties in September 1986 was at best a very long shot, and at worst a foregone conclusion of failure. As a result of excess capacity, the jobs associated with PEX's B-747 flying had been greatly reduced. In this regard, I find unpersuasive PEX's assertion that the B-747s would have been gainfully utilized in charter flying. Additionally, wide-body flying at both People Express and Continental was not and is not now paid at a premium rate. The mystique factor in B-747 flying, which is a valid consideration, does not by itself serve to justify a status and category method of integration. This is especially true in this case where such an approach would place the senior PEX pilots, hired after 1980, among the senior CAL pilots hired in the 1950s and 1960s.

During a significant portion of the hearings, the PEX Committee took on the herculean burden of demonstrating that People Express could have weathered its financial storms. While it is true that the airline was operating on September 15, 1986, the voluminous evidence in the record concerning its financial condition indicates otherwise. The testimony of top level PEX officials who attended PEX board meetings at the time of the merger and thereafter adds dimension and support to the documentary evidence. PEX's financial circumstances in 1986 were far more severe than a temporary economic setback or wide swing in performance which can occur at any time in the volatile environment of the airline industry. For this reason, a comparative analysis of the four airlines' financial performance during the five years preceding the merger is of little relevance to a review of the promotional prospects of the pilot groups in September 1986. Indeed, a review of PEX's performance in 1985 reveals that signs of deterioration in its economic health were present when its capacity had outstripped its demand and

major carriers had begun to effectively compete against its low cost strategy with their sophisticated, computerized yield management systems and full service alternatives. In early 1986, PEX lacked financial resources, marketing capability and credibility with travel agents. By the summer of 1986, People Express had fallen into an uncontrollable tailspin. If the TAC-PEI merger had not been consummated, the virtually certain alternative was bankruptcy and liquidation.

The three other airlines relevant to this integration also had problems, ranging from the non-operating status of Frontier to the debt-laden burden of Continental to the continuing need to New York Air to be supported by TAC. Except for Frontier, however, People Express was by far the weakest of the sister airlines in September 1986.

There is no convincing evidence that TAC or CAL controlled PEX's operations following the merger and prior to its approval by the PEX shareholders on December 29, 1986. Until that date, the consummation of the merger was far from a certainty. Nor did the merger hinder PEX's ability to operate during this period. To the contrary, the credible evidence indicates that TAC's cash infusions totaling $107 million and the affiliation with Continental were positive factors in maintaining PEX's viability until February 1, 1987, when both CAL and PEX flight services were marketed under the Continental name.

I find that the Company has fairly calculated the total number of pilot positions brought to the merged carrier by PEX and required by Continental, as described above. Sixty-six aircraft was a reasonable reflection of the PEX fleet operating out of Newark in February or March of 1987, or in mid-

September 1986 after PEX had agreed to release 13 aircraft from its fleet of 79. The block hours used in the Company's staffing determination were based on a realistic projection of the flying schedule for the PEX fleet made in February-March 1987, as opposed to using a September 1986 date which did not reflect the downsizing of the PEX fleet and the reduction of block hours under a proposed business plan prepared prior to the merger. The Company's approach is also preferable to those of the CAL and FAL Committees which use PEX's December 1986 flying, thus basing their determinations on a traditionally low volume month as opposed to the conventional staffing method based on projections of future flying.

After reviewing the compensation packages, other benefits and working conditions at Continental and People Express in September 1986, I find that for the purpose of determining relative equities based on these factors, no significant differences existed. Both airlines paid salaries well below those at the major carriers. Even assuming that the PEX captains received a $12,000 pay increase in August 1985 and absorbed a $12,000 pay cut in order to align themselves with the CAL captains in November 1986 (as opposed to a pay cut based on internal considerations), when considered in the comparison of total pay, benefits and working conditions of both carriers in 1986, this difference does not tip the scales to support a finding that the PEX pilots had significantly greater equities in this area. PEX offered a unique mix of benefits, some of which were tied to the company's financial performance, while CAL provided a more traditional benefits package. Although the record reflects certain employee dissatisfactions at CAL in 1986 in the aftermath of its labor and financial problems, there also is persuasive evidence that PEX employees had been experiencing declining morale as the airline's

fortunes turned downward. On balance, the People Express work environment – with its unorthodox management structure and cross-utilization – presented stimulating challenges and exerted strong pressures on employees, in contrast to Continental's traditional management structure, conventional employment conditions and seniority based procedures.

The contributions of People Express to the merged carrier were substantial. All of the parties acknowledge the highly motivated and dedicated PEX pilot workforce, many of whom were hired when the major airlines were not hiring, thus allowing PEX to recruit and select the best available pilots. People Express, with its non-union status and low cost market niche, presented a highly compatible fit for Continental and removed a competitor on its east coast routes. The PEX domestic and international route structures also complemented the CAL system, although PEX's international operations – other than the London route – appear to have had little value in 1986. The PEX slots as well require some note, but their value is reduced significantly because the great majority of them were commuter slots. The PEX aircraft, while older and requiring modification for meal service and conventional seating, were a substantial addition to the merged carrier's fleet and numbered almost as many planes as FAL and NYA combined had contributed. The PEX standardized B-747s added a new dimension to the merged fleet and substantially increased Continental's international wide-body capacity.* I also have

---

* I recognize that the crediting of these aircraft to the PEX pilots works yet another hardship on the FAL pilots in that the CAL pilots had received credit for them in the CAL-FAL arbitration under the application of the required terms and conditions in that case. However, as stated, the PEX pilots should not be burdened with those requirements.

accorded some credit to the PEX pilots for the Newark hub and the other facilities in and around Newark International Airport. In the absence of other airline interest, it was PEX's initial long range vision that significantly contributed to the airport's growth and mobilized action on the Terminal C project. Today the Newark hub and its spokes are one of the main components in the Continental system which, due in some measure to PEX's routes and assets, has attained the critical mass required to compete in the airline industry. The fact that Continental had started building its Newark hub prior to the PEX acquisition and could have achieved its current mass without PEX reinforces the conclusion that PEX's contributions enabled Continental to fulfill its growth objectives.

In my view, however, the PEX contribution to the merged carrier can hardly be termed a highly efficient turnkey operation. The entire People Express operation – based on no frills, cross-utilization and unconventional management and organization structures – required extensive modification of, for example, baggage systems and ticket counters, prior to assimilation by a conventional carrier. Certainly, Terminal C was nowhere near completion in 1986, and the facility had to undergo massive design and construction changes to adapt it to the needs of a conventional carrier. The record contains vivid testimony describing examples of the horrendous problems and resulting lost business incurred at Newark Airport following the merger of PEX and CAL operations in early 1987 through the opening of Terminal C in late 1988 – a markedly different transition than occurred with the integration of the FAL

and NYA operations. The other facilities in and around Newark Airport also were not highly productive and have required significant expenditures for Continental to maintain them or to meet onerous contract terms negotiated by People Express. The outstations generally appear to have been in a state of disrepair and provided little more than a presence at the locations. And it must be noted that the acquisition of People Express added a $434 million long term debt load to Continental's already huge obligations.

By most measures, the PEX pilots gained more than they gave up in the merger. They moved from an unconventional operation filled with great challenges and even greater uncertainties to a more traditional carrier with a decidedly more promising future. The PEX pilots significantly enhanced their crew base opportunities from one, Newark, to: Houston, Denver, Cleveland, Los Angeles, Honolulu, Seattle and Guam. The diversity of schedules for the PEX pilots also increased as a result of the merger. Perhaps most important to the PEX first officers and second officers, their promotional expectations vastly improved as a result of moving to a carrier with a captain contingent which would provide continual attrition over many years, unlike the bunched distribution of the relatively young work force at their start up carrier.

Before analyzing the specific competing equities of the three pilot groups within the above framework of general findings and principles, the status of the FMRs must be addresses. At the time of their hiring at People Express the FMRs, with few exceptions, did not have the requisite experience for selection by the major airlines, including Continental. However, they were qualified to occupy the first officer seat at PEX. If the opportunity had been available, many of the FMRs would have flown as first

103

officers on a B-727 after one year of service. Whether or not PEX had planned to send the FMRs to its commuter airlines for seasoning and experience, I find that Continental's determination to utilize this approach was reasonable and in most cases consistent with its background and experience requirements for pilots.

The first group of the 651 senior CAL captains on the Company's list on September 15, 1986 – the date of the merger announcement – brought equities to the merged carrier that far outweighed those of the senior PEX pilots. The dates of hire of the CAL group range from 1951 to 1972 (after which there was no hiring until 1977), whereas the PEX group was hired in the 1980 to 1982 period. Continental contributed equipment and assets providing pilot job opportunities well beyond those brought by People Express. To integrate the senior CAL and PEX captains would constitute a windfall for the PEX group.

A break in the hiring dates of the CAL pilots occurs at number 652, held by a pilot hired in 1977. Under the CAL-NYA seniority list award, a group of 168 senior NYA captains was integrated with a group of 856 junior CAL captains. Following that block are the Frontier captains.

My prior finding with regard to the Company's placement of the NYA and FAL captains on the seniority list establish the broad parameters for measuring the reasonable career expectations of the PEX captains. The upper limit is the number one NYA pilot. The lower end is the number one FAL pilot. The great majority of the block between those two pilots is comprised of CAL pilots who are the primary comparator in this dispute.

I have weighed the following considerations in determining the appropriate integration point for

104

the PEX captains into this block. Although the placement of the NYA pilots serves to reinforce my finding that the Company's treatment of the PEX pilots was incorrect, it is clear that the NYA pilots' career expectations were significantly greater than those of the PEX pilots. And the CAL pilots harbored even greater career expectations than their TAC counterparts at NYA. At the other extreme, the FAL pilots' career expectations, as measured by the JPA, had been virtually decimated, notwithstanding their long service with Frontier. In balancing these career expectations and the contributions of the four airlines to the merged carrier, I find that the assets brought by People Express require the PEX captains to be slotted somewhat below the number one NYA captain and well above the number one FAL captain. Such a placement results in the PEX captains sharing the positions below the bottom one-third of the integrated NYA-CAL captain block above the FAL captains. Viewing all hard captain positions on the integrated list, the PEX captain ratio begins well into the bottom half of the hard captain group, thereby reflecting the superior career expectations of the CAL pilots. The exact placement of the PEX captains was determined by length of service, including the strike time of CAL pilots but excluding their furlough time. The number one PEX pilot was placed in a position reflecting his length of service within the block of captains ranging from the number one NYA captain through the junior CAL captain on Bid 87-1.

Due to the difference in the career expectations of the senior PEX and FAL captains, with the latter bearing the burdens attendant to the JPA and its Sideletter\*, I find that the block of 162 senior FAL captains must follow the ratioed group described above. In effect, the senior FAL captains comprise the

I further find that the equities of the senior FAL captains outweigh those of the former PEX captains. The dates of hire for these FAL pilots run from 1954 to 1968, as compared to 1983 for the PEX pilots. Assuming that the jobs of the former PEX captains could have been salvaged absent the merger, they would not have occupied a captain seat under any realistic projection of flying as a downsized carrier. Of course, the FAL captains were facing even more bleak prospects. However, they brought the opportunity for Continental to revive a true turnkey operation based in a conventional facility in Denver. Additionally, their decision to preserve their jobs through the JPA enabled the PEX pilots to take advantage of the benefits of the TAC-PEI merger in the absence of any other viable alternative available in late 1986. A balancing of these relative job prospects, dates of hire and contributions to the merged carrier, in my view, results in superior equities for the Frontier pilots.

The FAL Committee's proposals regarding pay protection and longevity credit for these Frontier captains and other former Frontier pilots must be denied. The District Court's Order requires that "the integrated list shall not alter or vary Continental's employment policy". I am not persuaded by the FAL

---

\* Conversely, I find no persuasive basis to assess the PEX pilots for their management's flagrant breaches of the October 1985 contract with the Frontier pilots.lower portion of the hard captain positions available under Bid 87-3.

Committee's argument that Continental's employment policy is broader than the policy set forth in its Pilot Employment Policy, which covers pay policy. Additionally, the Order provides that "FAL may not assert a position inconsistent with . . . [the CAL-FAL] Arbitration Award but shall, for the purposes of this arbitration, be deemed bound by that award". In that award Arbitrator Nicolau clearly denied the frontier pilots' request for longevity credit and effectively denied their request for pay protection.

I have apportioned the middle, or first officer, segment of the list by applying the same principles as were used in constructing the top, or captain, portion of the list. Adopting the Company's staffing determination for the PEX first officers, my intent was to ratio the PEX pilots in a manner reflecting their promotional expectations and the contributions of People Express to the merged carrier. The conceptual upper limit to begin their placement was at the top of the block of 299 CAL order and option pilots, which included NYA pilots. The lower limit for starting the PEX ratio was the number one pilot in the block of 1262 CAL, FAL and PEX first officers established under the Company's list.* Mr. Nicolau was required to integrate the FAL pilots in a manner which accounted for the promotional expectations of the 299 CAL pilots. Therefore, he began the ratio of Frontier pilots immediately below this block of order and option pilots.

---

* The block of 1262 pilots contains a ratioed group of 177 FAL pilots (143 of whom were captains at Frontier) and 579 junior CAL pilots pursuant to the Nicolau Award. They are followed by the group of FAL and PEX pilots integrated by date of hire.

I have chosen to begin the ratio at the 120th CAL pilot in the order and option block. This point was arbitrarily selected within the above stated upper and lower limits to integrate the former PEX captains – based on their equities and diminished promotional expectations – into the CAL pilots above them and the Frontier pilots below them. I have noted that almost one-third of the PEX downgraded captains (17 of whom, it appears had not even checked out as captain by September 15, 1986) had captain qualified dates in 1986.

I find that the placement of the remaining 100 or so PEX first officers and second officers should not change. These pilots had no career prospects, let alone promotional expectations, even if People Express had survived as a downsized airline. Their placement on the seniority list among the junior Continental and Frontier pilots reflects this fact and the relative equities they brought to the merged carrier.

The Company's placement of the FMRs immediately following the first officers and ahead of the Continental pilots hired after January 1987 shall not be disturbed. The FMRs were part of the People Express pilot group which the airline brought to Continental. Although they did not have the minimum flight hour requirements under which Continental normally recruited new hires, they were qualified pilots. As such, their equities were superior to those of the Continental new hires who had no employment relationship with the Company at the time of the TAC-PEI merger. Any requirement at People Express for the FMRs to have flown at a commuter line does not alter the balance of the equities between them and the CAL 1977 new hires, even considering that in 1986 these CAL pilots had more

substantial flying experience than the FMRs.

The resolution of this dispute required 73 hearing days and produced 16,725 transcript pages,

approximately 1,000 exhibits and post-hearing briefs exceeding 1,000 pages. Hopefully, the opportunity

for each part to have fully presented its case will result in a unified Continental pilot group.

## AWARD

### The Integrated List

The Continental Pilot Seniority List shall be integrated as follows based on a constructive September 15, 1986 list:

1. The Continental list shall remain as is from R.O. Glau to R.R. Heckenliable. Immediately after Heckenliable, former PEX pilots J.F. Barrall through J.C. Walton shall be ratioed with Continental pilots G.D. Schafer through J.N. Dole on a 1 to 2.01 basis, Schafer first.

3. Immediately after Walton, insert former FAL pilots A.B. Kendell through J.W. Albritton.

4. Immediately after Albritton, the Continental list continues with N.G. Correa through J.F. Banas.

5. Immediately after Banas, former PEX pilots D.M. Miller through A.R. Parkhurst shall be ratioed with Continental pilots F.J.   Buckley through A. Rusinowitz on a 1 to 2.346938 basis, Buckley first.

6. Immediately after Parkhurst, insert former PEX pilots D.L. Hill through J.A. Berry with former FAL pilots G.L. Sims through A.E. Jones on a date of hire basis.

7. Immediately after Jones, the list continues with former PEX pilots A.M. Samad through B.M. Morris.

8. Immediately after Morris, the Continental list continues with T.J. Kratt until it end.

### Conditions and Restrictions

1. No Displacements. The implementation of the integrated list shall not result in the displacement of any pilot from a status currently held, or any pilot to whom a bid has been awarded or for whom training has commenced, all as of the date the integrated list is implemented (i.e., no partial or total system flush). This provision applies only to the one time implementation of the integrated list and not to subsequent events, which shall be governed by normal operation of seniority as reflected on the integrated list.

2. No Changes in PEP. The integrated list shall not alter or vary Continental's employment policy.

3. No Change in Relative Seniority Within Pre-merger Groups. The integrated list shall not result in a change in the relative order of: (i) any PEX pilot vis-à-vis another PEX pilot; or (ii) any CAL or FAL pilot vis-à-vis another CAL or FAL pilot as integrated by Arbitrator Nicolau on June 15, 1987.

4. Implementation. The integrated list shall be implemented as soon as possible but not later than 60 days after the District Court's approval of this Award.

Resolution of Disputes

Any dispute regarding the interpretation, implemen-tation, or application of this Award shall first be referred to a Dispute Resolution Committee consisting of two Company representative and two Continental, two former People Express and two former Frontier pilots. In the event the Committee cannot agree, by majority vote in which the Company and at least one representative of each of the three pilot groups concurs, on a recommended resolution of the dispute, the Company or either the Continental pilot, People Express pilot, or Frontier pilot representatives may submit the dispute to arbitration before arbitrator Jerome Ross for final and binding resolution. For the limited purpose of resolving any such disputes, the undersigned retains jurisdiction unless the period of his unavailability exceeds six months from the date the dispute is filed with the Company.


                Jerome H. Ross
                Arbitrator

Dated: August 13, 1991
McLean, Virginia

EXHIBIT 4

**CONTINENTAL AIRLINES**
**INTEROFFICE MEMORANDUM**

**MAY 7, 1993**


TO:      All Continental Pilots

FROM:    Don Osmundson

SUBJECT: The Kasher Arbitration

ALPA has two ways it can give your jobs to the former Eastern
pilots. One is through collective bargaining, the other is through
legal proceedings.  I'll be sending you more information later
regarding how they can do this with collective bargaining.  Below
are the facts regarding the status of their efforts to this point
to force the Eastern pilots on to your seniority list using the
Courts and arbitration.

In 1989, ALPA filed a grievance with Eastern Air Lines that has
come to be known as the "Kasher Arbitration." Although a grievance
filed by a union at another carrier wouldn't normally affect
Continental pilots, in this instance it could.  Why? Because what
ALPA wants in the Kasher Arbitration is to force Continental to
hire Eastern pilots, with their seniority intact, and, in turn, to
displace Continental pilots.

ALPA bases its claim for Continental jobs on provisions in <u>the</u>
<u>Eastern/ALPA collective bargaining agreement</u>, which included
certain Labor Protective Provisions (referred to as "LPPs").  These
LPPs provided that if Eastern and any other carrier "unify,
consolidate, merge or pool in whole or in part their separate
airline facilities or any of the operations or services previously
performed by them," then Eastern and the other carrier would
integrate pilot seniority lists in a "fair and equitable" manner.
While claiming that Eastern pilots are entitled to Continental
pilot jobs, ALPA ignores these LPPs and its own "Fragmentation
Policy" which would have required carriers which purchased Eastern
assets (like United, Delta, and USAir) also to hire Eastern pilots
with their seniority. (To the extent ALPA attempted to enforce its
Fragmentation Policy, the ALPA pilots at other carriers resisted
and refused to integrate Eastern pilots.)

ALPA contends that Continental's purchase of Eastern assets in
1987-88 constitutes a "merger" which triggers these LPPs.  (The
National Mediation Board, when faced with the same asset
transactions, dismissed ALPA's application to have Eastern and
Continental declared a single carrier.)  Under these LPPs, ALPA
asserts that a "date of hire" seniority integration between Eastern
and Continental pilots would be "fair and equitable."  In March
1993, ALPA's lead counsel wrote to Arbitrator Kasher about the
authority of a union to alter seniority rights.

<F>ederal courts and arbitrators routinely uphold union decisions to rearrange seniority rights even where the affected employees have not participated in the decisionmaking process. The seniority rights of employees are not 'vested' rights with special legal protection. Rather, they derive their scope and significance from union or individual employment contracts. Indeed, competitive seniority rights have no legal significance outside an employment agreement, and employers and unions are free to alter seniority rights through collective bargaining and arbitration.

Continental has consistently and adamantly protected its pilots and rejected ALPA's efforts to force Eastern pilots on to the Continental seniority list. From the outset, Continental has insisted that it is not bound by a contract between Eastern and ALPA. In 1991, Continental sued ALPA in the Delaware Bankruptcy Court for a ruling to that effect. That lawsuit remains pending.

In December 1992, ALPA and individual Eastern pilots filed over $1.5 billion in LPP claims, which threatened to wreck Continental's exit from bankruptcy. In response, Continental asked the Bankruptcy Court for a ruling that, even if LPPs were triggered by the transaction between Eastern and Continental, ALPA's LPP claims were not entitled to specific performance (i.e. Eastern pilots do not get jobs at Continental with or without seniority) and are only entitled to "general prepetition" status (i.e. they get treated like all other claims under the reorganization plan and do not get paid in real cash). On February 11, 1993, the Bankruptcy Court ruled in Continental's favor, but ALPA immediately appealed to the District Court. As a part of our now confirmed plan of reorganization, ALPA is enjoined from going forward with hearings before Arbitrator Kasher. ALPA has also appealed the Bankruptcy Court order confirming the plan of reorganization.

ALPA's appeal brief was filed on May 3, 1993. In that brief, ALPA clearly states its position that only Arbitrator Kasher, and not the Bankruptcy Court, has the power to determine the appropriate remedy for the Eastern pilots. According to ALPA the Eastern pilots are entitled to "an order requiring Eastern and Continental to prospectively integrate the Eastern and Continental pilot seniority lists. . . . money damages in the form of backpay from the effective date of the merger up to and including the date the arbitration award is issued <and> . . . front pay from the date the arbitration award is issued to the date that the Eastern pilots complete training and begin revenue flying for Continental."

If Continental is successful in the District Court, ALPA is expected to appeal to the Court of Appeals, and possibly to the Supreme Court, in its continuing efforts to force the Eastern pilots on to your seniority list and to take your jobs. Continental is committed to vig-- ously opposing ALPA's efforts.

# Continental 

## PILOT BULLETIN SIGNIFICANT EVENT
### May 11, 1993

TO:      All Continental Pilots

FROM:    Don Osmundson

SUBJECT: UPCOMING UNION ELECTION


On May 10, 1993, a number of former ALPA pilots from Eastern filed
with the National Mediation Board claiming the right to vote in our
upcoming pilot union election. These individuals base their claim
on the Eastern LPPs (the Kasher Arbitration) which they assert
entitle them to employment at Continental.  They have further
requested that the election be postponed until such time as the
arbitration before Mr. Kasher is completed.

While the Company will vigorously oppose these efforts, we cannot
be certain of the final outcome.  Their attempt to participate in
your election is another threat, in addition to ALPA's continuing
efforts, to force the Eastern pilots onto our seniority list.
There can be no doubt that if the approximately 3,000 former
Eastern pilots are allowed to participate in your election, where
their votes will go and what ALPA's intended mission will be here
at Continental--regardless of the outcome before Arbitrator Kasher.

I will try to keep you informed as best as I can regarding this
turn of events.


DJO:cje

**CONTINENTAL AIRLINES**
**INTEROFFICE MEMORANDUM**
**May 17, 1993**


**TO:**        All Continental and Continental Express Pilots

**FROM:**    Don Osmundson and Bryan Green

**SUBJECT:**  Union Constitution and By-Laws

As you begin to consider your options in the upcoming representation election, you should understand how unions function. This memo will highlight some of the important features of union rules. It is not intended to take the place of a careful reading of the full Constitutions, By-Laws and related documents of any potential representative. Indeed, you are encouraged to ask the unions for copies of them and to review them thoroughly. Federal law requires unions to adopt Constitutions and By-Laws, and file them with the Department of Labor ("DOL"). The latest ALPA constitution filed with DOL, dated November 1, 1990 was used in preparing this letter. The IACP has only an "interim" Constitution and By-Laws, not yet available through DOL. However, we understand the IACP will provide copies upon request.

<u>Dues and Assessments</u>

Union members are generally required to pay an initiation fee to join, monthly dues, and special assessments. ALPA charges $50 for captains and $25 for first and second officers to join in the first 90 days after eligibility. If you join after 90 days the initiation fee is $200 for captains and $50 for first and second officers. This amount may be vastly increased, however, for many Continental pilots because the ALPA Constitution, Article II(E)(5) requires that former ALPA members who worked during the 1983-85 strike, pay the fines ALPA previously imposed on them, plus "back" dues from 1983 to present. Article II, Section 4.I. of ALPA's constitution also provides:

> Any pilot failing to apply for membership upon becoming eligible for such membership shall be deemed to have accepted the benefits of ALPA without assuming any of the obligations thereof, and as a prerequisite to his being accepted as an Active member, he shall be required to pay, in addition to the regular initiation fee, all of the annual dues, levies and assessments which would have accrued had he been an Active member of ALPA when he first became eligible for membership. A pilot shall be deemed eligible for membership as provided above, or upon the day ALPA is certified as a bargaining representative by the National Mediation Board, or is so recognized by the company.

Because ALPA has taken the position that they have always been, and remain the Continental pilots' bargaining representative, this provision allows ALPA to charge Continental pilots virtually any amount it desires before it will grant, or reinstate membership.

ALPA dues are presently 2.35% of income. IACP has said that its dues will be 1% of income. (We do not yet know if IACP will have initiation fees or assessments.)

An assessment is an additional bill sent by the union to its members to cover large expenses. ALPA levies assessments "to cover extraordinary expenses," the cost of a strike (even a strike at another carrier), for other "benefit purposes," or "any other lawful trade union purpose." Art. IX, Sec 7.

It is lawful for a union to insist upon a contract provision which requires that the employer fire any employee who does not pay the union's dues and assessments, regardless of whether the employee is a union member. This is known as a union security cause and most all ALPA contracts contain such a provision.

The ALPA Constitution allows it to impose fines for, among other reasons, performing work for or "assisting" an airline during a period when ALPA is on strike against the airline, or disobeying the Board of Directors, the Executive Board, the Executive Committee, the Master Executive Council or the Local Council, or "doing any act contrary to the best interests of the Association or its members." Art. VIII, Sec. 1.A.

ALPA routinely fines its members. For example, ALPA fined a Northeast pilot who had the temerity to protest the method of the Northeast/Delta seniority integration. ALPA also recently levied fines of $10,000 each against members who crossed picket lines at Eastern, and ALPA has sued these individuals in Florida to collect those fines. ALPA is able to sue to collect fines because its Constitution is considered to be a contract with its members, enforceable under state law.

## Membership

The IACP interim Constitution and By-Laws provides that all Continental and Continental Express members are free without restriction to join the IACP.

ALPA's Constitution and By-Laws are more restrictive, providing that each applicant for membership "...shall be thoroughly investigated..." (including of course, former members). Moreover, membership will be denied (or subject to restrictive conditions or fines set by the MEC & LEC) if the required investigation determines the individual has done any of the same things for which a fine would be assessed:

* Performed work or assisted an airline during a period when ALPA was on strike against that airline;
* Disobeyed ALPA's Board of Directors, Executive Board, Executive Committee, MEC or LEC; or
* Committed any act contrary to the best interest of the Association of its members.

## Voting and Structure

Regardless of the importance of a matter, neither the IACP nor ALPA all permit non-members to vote. ALPA members are not necessarily guaranteed the right to vote on all issues of significance. For example the national ALPA Board of Directors can impose an assessment on all pilots without

a vote for the first 90 days of any strike. Contract ratification is permitted at the option of the MEC, but is not required. Members of ALPA vote only for the Local Council officers and representatives. Other ALPA governing bodies and officers are not voted upon by the membership. The IACP has stated that it will allow members to vote on new contracts and strikes, and that it will conduct a direct vote of members for its President and other officers.

ALPA is a complex hierarchical structure with many levels. At the bottom are the Local Councils (usually one at each domicile), whose officers comprise the Local Executive Council ("LEC"). The Local Council representatives collectively form the Master Executive Council ("MEC"). At the national level, there is the ALPA Executive Board (composed of the Chairman of each ALPA MEC), and the Board of Directors (comprised of the captain, first officer and second officer representatives from each ALPA Local Council). Finally, the President and other officers, elected by the Board of Directors, are at the top of the structure and collectively form the Executive Committee.

The President of ALPA, with the approval of the Executive Board, can, and has, taken "corrective action," against MECs or LECs which he determines have failed to comply with ALPA policies. Such "corrective action" may include appointing a Trustee to take charge of that unit's affairs. A recent instance of ALPA receivership occurred at Eastern. Allegedly to silence the Eastern MEC, which was extremely critical of ALPA's marked lack of effort in helping Eastern strikers get jobs and seniority rights at other airlines, ALPA installed a custodian sympathetic to the aims of ALPA national. The ALPA custodian entered into a settlement with Eastern to dispose of all litigation and grievances of striking pilots against Eastern. Although there were approximately 3,000 Eastern strikers, the settlement proceeds were allotted only to some 280 of the most senior Eastern pilots.

The IACP has offered to provide copies of its Constitution and By-Laws to interested pilots. You should get a copy, and a copy of ALPA's Constitution and related documents - like its Merger and Fragmentation Policies. Choosing a union to represent you is much the same as entering into a contract with that union. It is crucial that you understand all the terms of the contract.